# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JEREMY PINSON                               :
                                            :
    Plaintiff,                          :
                                            :      Civil Action No.:      12-1872 (RC)
    v.                                  :
                                            :      Re Document No.:      147
U.S. DEPARTMENT OF JUSTICE, *et al.*,       :
                                            :
    Defendants.                         :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.  INTRODUCTION

*Pro se* Plaintiff Jeremy Pinson is currently an inmate at ADX Florence, a federal prison

located in Colorado.  While in prison, Mr. Pinson has filed multiple Freedom of Information Act

("FOIA"), 5 U.S.C. § 552, requests with different components of the U.S. Department of Justice

("DOJ").  On several occasions, the DOJ has asked Mr. Pinson to clarify his records requests,

told him that it could not find records that are responsive to his requests, or informed him that the

records he sought were exempt from disclosure by law.  Mr. Pinson took issue with some of

these determinations, so he filed a complaint claiming that the DOJ improperly withheld

numerous records from him in violation of FOIA.  In response, the DOJ filed several pre-answer

motions, each asking the Court to dismiss or grant summary judgment in its favor on different

portions of Mr. Pinson's complaint.

    Now before the Court is the DOJ's motion for summary judgment as to Mr. Pinson's

numerous FOIA requests submitted to the Federal Bureau of Prisons ("BOP") and several claims

brought against BOP employees pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Defs.' Mot. Summ. J., ECF No. 147. As to his FOIA requests, Mr. Pinson alleges that the BOP responded improperly to 51[1] of his requests, either by failing to locate relevant records or by wrongfully withholding responsive documents. *See* Corr. 2d Am. Compl. at 2–5, ECF No. 32. He further claims that the BOP failed to respond altogether to 19 additional, unnumbered requests. *Id.* at 5–6. Mr. Pinson also asserts that his constitutional rights were violated on four separate occasions under *Bivens* when: (1) John Dignam, Chief of BOP's Office of Internal Affairs ("OIA"), allegedly refused to investigate complaints regarding Mr. Pinson's safety unless Mr. Pinson agreed to cease news media contact and litigation; (2) BOP Director Charles Samuels allegedly instructed FCI Talladega staff to interrogate Mr. Pinson and, when Mr. Pinson did not cooperate, had Mr. Pinson transferred to ADX Florence based on allegedly false information; (3) Director Samuels allegedly ordered Mr. Pinson to be separated from another ADX Florence inmate and directed staff to harass Mr. Pinson; and (4) Director Samuels and Chief Dignam allegedly had Mr. Pinson placed on mail restrictions. *See* Corr. 2d Am. Compl. at 14–16.

For the reasons set forth below, the Court will grant in part and deny in part the DOJ's motion for partial summary judgment.

---

[1] While Mr. Pinson's Second Amended Complaint separately lists 51 requests, many of those requests were made concurrently and were assigned the same request number. Only 28 separately numbered requests are at issue in the BOP's motion. *See* Corr. 2d Am. Compl. at 2–5.

## II.  FACTUAL BACKGROUND

### A.  FOIA Claims

#### 1.  Requests that Were Not Processed Due to Unpaid Fees

In several instances, the BOP refused to process Mr. Pinson's FOIA requests altogether in light of unpaid, outstanding fees Mr. Pinson had incurred for prior FOIA requests, or in light of Mr. Pinson's failure to pay the anticipated fees for a particular request.

##### a.  Request No. 2010-12533

In August 2010, Mr. Pinson submitted a request to the BOP for the production of documents relating to: (1) the use of force against Mr. Pinson during November 2007 while he was held in a special housing unit at USP Florence; (2) inmate handbooks from ADX Florence; and (3) any related Administrative Remedy Requests.  *See* Corr. 2d Am. Compl. at 2; Christenson Decl. ¶ 13 & Ex. 2, ECF No. 147-6.  The BOP responded by letter dated February 28, 2011 that it would not process Mr. Pinson's request in light of an outstanding $24.80 fee for a different FOIA request, Request No. 2011-1886, that Mr. Pinson had not yet paid.  *See* Christenson Decl. ¶ 15 & Ex. 3.  Mr. Pinson now claims that, while he received a letter from the BOP on December 9, 2010 acknowledging Request No. 2010-12533, he never received a "final response from the BOP" with respect to this request.  2d Pinson Decl. ¶¶ 4–5, ECF No. 180 Ex. 1.  His Second Amended complaint states, however, that after the BOP assigned the request a number it "refused to produce the information."  Corr. 2d Am. Compl. at 2.  In any event, the Department of Justice's Office of Information Policy ("OIP") claims to have never received an appeal from Mr. Pinson with respect to this request.  *See* Christenson Decl. ¶ 16.  BOP did receive a $24.80 payment from Mr. Pinson on March 25, 2011 for the underlying, outstanding

fee for Request No. 2011-1886.[2]  *See* Greene Decl. ¶ 10, ECF No. 147-5.  As far as the record indicates, however, the BOP did not reopen and process Request No. 2010-12533 in light of this payment.

### b. Request Nos. 2011-7156, 2011-7619, 2012-39, 2012-40, 2012-975, 2013-1684, and 2013-2721

The BOP similarly refused to process a bevy of requests Mr. Pinson submitted in 2011 in light of an outstanding fee.  Between April 2011 and December 2012, Mr. Pinson submitted a series of requests to the BOP for the production of records relating to Mr. Pinson's inmate records, his ADX Florence placement, an array of incident reports, policies, and budgets for several prison facilities, and certain emails sent by a warden during 2011.  *See* Christenson Decl. ¶¶ 24, 63, 115, 119, 123, 132, 136 & Exs. 6, 14, 22, 24, 26, 30, 33.  In each instance, the BOP determined that Mr. Pinson had failed to pay a $72.90 fee with respect to a prior request, Request No. 2012-5839, that remained outstanding.  The BOP issued several letters in December 2012 and January 2013 informing Mr. Pinson that it would not process the requests because of the outstanding fee due for Request No. 2012-5839.[3]  *See id.* Exs. 7, 15, 23, 25, 27, 31, 34.  Mr.

---

[2] Despite Defendants' statement in its memorandum that OIP's records "reflect no payment of the fee" for Request No. 2011-1886, Defs.' Mem. Supp. Mot. Summ. J. at 8, ECF No. 147-1, the record plainly contradicts this assertion.  The paragraph of the Christenson Declaration to which the memorandum cites contains no allegation that the fee went unpaid, *see* Christenson Decl. ¶ 16, and the Greene Declaration clearly states that the fee was, in fact, paid in March 2011, and includes a copy of the check sent to cover the fee as an exhibit, *see* Greene Decl. ¶ 10 & Ex. 12.

[3] The BOP admits that some of the letters incorrectly identified the prior request as Request No. 2012-08542 or Request No. 2012-08935, although each accurately listed the outstanding fee as $72.90.  *See* Christenson Decl. ¶¶ 26, 133; Defs.' Stmt. of Mat. Facts ¶¶ 27, 64, ECF No. 147-3; *compare* Christenson Decl. Exs. 7, 32 (identifying incorrect request).  Despite these discrepancies, Mr. Pinson's responses and declarations indicate no confusion as to which request the outstanding $72.90 fee pertained.  *See* 2d Pinson Decl. ¶ 14.

Pinson did eventually remit payment for that fee on October 10, 2013.[4]  The DOJ had administratively closed the new requests in the interim, however, and it states that it did not process the new requests because Mr. Pinson "failed to ask the BOP to reopen the requests" after the fee was paid.  *See id.* ¶¶ 28, 65, 117, 121, 125, 134.

### c.  Request Nos. 2012-12518 and 2012-8542

In August 2012, Mr. Pinson submitted a request to the BOP for the "production of all Report[s] of Incident (Form[s] 583) on Calculated Uses of Force at FCI Talladega's Special Management Unit from March 2009 until March 2010," which Mr. Pinson lists as Request No. 2012-12518.[5]  Greene Decl. Ex. 21.  By letter dated October 16, 2012, the BOP advised Mr. Pinson that it estimated that Request No. 2012-12518 would incur a cost of $290.00 and,

---

[4] The BOP had notified Mr. Pinson on August 23, 2012 that Request 2012-5839 had incurred a fee of approximately $60.  *See, e.g.*, Christenson Decl. Ex. 15.  Mr. Pinson concedes that he "expressly agreed" to pay the fee, *see* 2d Pinson Decl. ¶ 14, and the BOP informed Mr. Pinson of the final fee amount on November 6, 2012, explaining that Request No. 2012-5839 had "result[ed] in a fee of $72.90 and that payment of the fee was now due," Christenson Decl. Ex. 7.  On November 26, 2012, the BOP claims to have "received a correspondence from [Mr. Pinson] indicating that while [he] agree[d] to pay the $72.90, [he] required additional time to obtain the funds to cover these costs."  *Id.*  Mr. Pinson claims that he did not receive the BOP's "final fee letter" until September 2013, however, because that letter "ha[d] 'been sitting in the case manager['s] office for months.'"  2d Pinson Decl. ¶ 14 (quoting SIS Technician M. McCalister).  He then declares that, "as soon as [he] became aware [of this] fee obligation," he sent payment on October 10, 2013.  *Id.*  Ultimately, this history is not particularly relevant, however.  As explained below, the pertinent point is that, although Mr. Pinson paid the fee, the BOP did not reopen the new requests.  *See infra* Part IV.B.2.b.

[5] The DOJ believes that what Mr. Pinson has listed as Request 2012-12518 is labeled in the BOP's system as Request No. 2012-12129 because the subject matters match.  The DOJ has reproduced a copy of Mr. Pinson's request letter seeking all incident reports on uses of force at FCI Talladega "from March 2009 until March 2010" and dated August 26, 2012 (three days later than the date listed in Mr. Pinson's Second Amended Complaint).  *See* Greene Decl. ¶ 14 & Ex. 21; *compare* Corr. 2d Am. Compl. at 4 (listing Request No. 12-12518, dated "8-23-12" and seeking "2009-10 Talladega Use of Force Documents").  Mr. Pinson has not disputed the DOJ's clarification.  To avoid confusion, and to match the Second Amended Complaint, the Court will nevertheless refer to the request as Request No. 2012-12518.

therefore, that Mr. Pinson must agree to pay the anticipated fees or modify his request before the BOP would process it.  *See id.* ¶ 14 & Ex. 22.

In a similar vein, on or about May 21, 2012, Mr. Pinson submitted a request, numbered 2012-8542, seeking the "production of all information . . . generated by [the BOP] in connection with inmate deaths at USP Florence occurring on April 20, 2008; August 10, 2008[;] and May 25, 2009."  Todd Decl. Attach. 1, ECF No. 147-9.  On November 27, 2012, the BOP issued a letter advising Mr. Pinson that, with respect to the latter two incidents, his request was duplicative of FOIA Request No. 2011-08171, in which he was "provided with a response on or about March 28, 2012."  *See id.* ¶ 3 & Attach. 2.  The letter also informed Mr. Pinson that it would suspend processing records related to the April 20, 2008 incident unless the estimated anticipated fee of $290.00 was paid within 30 days, or until he modified his request.  *See id.* ¶ 3 & Attach. 2.

In both instances, the BOP states that its records reflect no response to the BOP's request that Mr. Pinson agree to pay the $290.00 in fees or modify his request. *See* Greene Decl. ¶ 14; Todd Decl. ¶ 3.

### 2.  Purportedly Unexhausted Requests

#### a.  Request Nos. 2011-2666, 2011-4954, 2011-9164, 2011-9398, 2012-3706, 2013-2100, and 2013-4747

With respect to several requests that BOP did process and respond to, the DOJ claims that Mr. Pinson failed to file an appeal and, therefore, failed to exhaust his administrative remedies.

In December 2010, Mr. Pinson submitted a request to the BOP for the production of his Office of Internal Affairs records, to which BOP assigned number 2011-2666.  *See* Corr. 2d Am. Compl. at 3; Moorer Decl. ¶ 4 & Attach. 1, ECF No. 147-8.  By letter dated November 4, 2011, the BOP responded to Mr. Pinson's request and released 39 pages in full and 70 pages with

redactions pursuant to FOIA Exemptions 6, 7(C), and 7(F).  *See* Moorer Decl. ¶ 5 & Attachs. 2–3.

In February 2011, Mr. Pinson submitted a request to the BOP for the production of "[a]ny Discipline Hearing Officer Report, issued in the years 2010 or 2011, to an inmate assigned to any phase of the ADX Step-Down Program, wherein a Prohibited Act Code 100, 100A, 101, 101A was found to have been committed."  Christenson Decl. Ex. 4.  This request was assigned number 2011-4954 and, by letter dated October 20, 2011, the BOP advised Mr. Pinson that it had located no responsive records.  *See id.* ¶ 22 & Ex. 5.

In July 2011, Mr. Pinson submitted a request to the BOP for the production of: (1) "All information regarding debts or encumbrances to [his] inmate trust account includ[ing] the date, source and amount of each since 1-1-2008"; (2) "All contact data, incoming and outgoing messages in [his] TRULINCS account from 2-14-08 to 5/30/08"; and (3) photographs taken of him "following altercations on Aug. 31, 2007 and Sept. 9, 2007 at USP Beaumont, Oct. 15, 2007 and Dec. 12, 2007 at USP Florence, March 30, 2008 and April 9, 2008 at USP Victorville, Sept. 10, 2009 and June 25, 2010 at FCI Talladega."  Christenson Decl. Ex. 18.  In response to this request, which was assigned number 2011-9164, the BOP released 114 pages of responsive records with respect to the inmate trust account by letter dated July 26, 2012.  *See* Christenson Decl. ¶ 97 & Ex. 19.  The BOP, however, informed Mr. Pinson that no records could be found concerning the TRULINCS account because it had not existed at the facility he was housed in during the identified time period.  *See* Christenson Decl. Ex. 19.  Moreover, the BOP advised Mr. Pinson that it had only been able to locate photographic records for five of the eight altercations he had listed.  *See id.*

On or about July 7, 2011, Mr. Pinson submitted Request No. 2011-9398 to the BOP for the "production of all information maintained by [the BOP] on the Florencia X3 gang." Velilla-Arce Decl. Attach. 4, ECF No. 147-10. By letter dated August 25, 2011, the BOP informed Mr. Pinson that it had not located any responsive records because "the BOP does not maintain records on the Florencia X3 gang." Velilla-Arce Decl. ¶ 8 & Attach. 5.

In January 2012, Mr. Pinson submitted a request to the BOP for the production of certain "institution supplements from ADX Florence." *See* Christenson Decl. ¶¶ 127–28 & Ex. 28. Those supplements are documents that explain how national BOP policy will be implemented "at a local level." *See id.* ¶ 128. The request was designated number 2012-3706 and, by letter dated March 15, 2012, the BOP released 25 pages of responsive records in full and informed Mr. Pinson that the remaining institution supplements he sought either did not exist or could not be located. *See id.* ¶¶ 127, 130 & Ex. 29.

On or about November 14, 2012, Mr. Pinson submitted a request to the BOP for "copies of all public comments submitted in connection with the promulgation" of certain proposed BOP regulations. *See* Velilla-Arce Decl. ¶ 9 & Attach. 6. On December 4, 2012, the BOP issued a letter informing Mr. Pinson that his request—which had been assigned number 2013-2100— would not be processed since the records he sought were not held by the BOP. *See* Velilla-Arce Decl. ¶ 9 & Attach. 7.

Finally, Mr. Pinson submitted Request No. 2013-4747[6] to the BOP in December 2012, seeking the records of E.V., another inmate at ADX Florence. *See* Christenson Decl. ¶ 158 &

---

[6] At one point in its memorandum, the DOJ refers to Request No. "2013-3347." *See* Defs.' Mem. Supp. at 11. The paragraphs of the Christenson Declaration to which the DOJ cites, however, discuss Request No. 2013-4747, as do other parts of the DOJ's memorandum. *See* Christenson Decl. ¶¶ 158–59; Defs.' Mem. Supp. at 15 nn.6–7. Based on the discussion in the Declarations, the Court understands the DOJ to be seeking summary judgment for Request No.

Ex. 41.  Although Mr. Pinson included a signed release form from the inmate, the BOP advised

Mr. Pinson by letter dated February 27, 2013 that it would not provide responsive records to him

because "[i]nmates who are currently designated to the custody of the Bureau of Prisons are not

authorized to receive another currently designated inmate's records through the FOIA" and that,

furthermore, the records were exempt from disclosure under Exemptions 7(E) and 7(F).  *Id.* Ex.

42.

The DOJ states that it has no record of an appeal filed by Mr. Pinson for any of these

seven requests.  *See* Moorer Decl. ¶ 5; Christenson Decl. ¶¶ 23, 98, 131, 160; Velilla-Arce Decl.

¶¶ 8–9.  With respect to Request No. 2013-4747, Mr. Pinson now claims that he "never received

any correspondence from the Bureau of Prisons" at all.  *See* 2d Pinson Decl. ¶ 15.  For the

remaining requests, Mr. Pinson responds that, although he received an initial letter from BOP

acknowledging these requests, he never received the BOP's final response and therefore was

unable to file an appeal.  *See id.* ¶¶ 5, 6, 9, 11, 16.

### 3.  Fully Exhausted Requests

With respect to several other requests to which the BOP responded, Mr. Pinson either

fully appealed the BOP's response or, for reasons not stated in the record, the DOJ does not

claim the request remains unexhausted (despite no evidence of an appeal by Mr. Pinson).

#### a.  Request Nos. 2013-3342 and 2013-3343

In December 2012, Mr. Pinson submitted a series of requests to the BOP for the

production of records relating to third-party inmates who were housed at ADX Florence,

---

2013-4747.  In fact, although Pinson's opposition references a Request No. 2013-3347 (perhaps
in response to the DOJ's reference), *see* 2d Pinson Decl. ¶ 6, no such request is named in his
Second Amended Complaint.  Thus, even if a request with that number exists, it is not a part of
this action.  *See* Corr. 2d Am. Compl. at 2–5.

including Request Nos. 2013-3342 and 2013-3343 which sought records of inmates with the

initials A.M.B. and M.G.S., respectively. *See* Christenson Decl. ¶¶ 140, 152 & Exs. 35, 38. The

BOP responded with letters advising Mr. Pinson that no responsive records would be provided

because BOP policy forbids inmates "to receive another currently designated inmate's records

through the FOIA." Christenson Decl. ¶¶ 141, 153 & Exs. 36, 39. The letters also informed Mr.

Pinson that the inmates' records fell under Exemptions 7(E) and 7(F). *See id.* On dates that are

not apparent in this record, Mr. Pinson appealed the BOP's responses to the OIP, which affirmed

the BOP's withholding of records on April 22, 2014. *See id.* ¶¶ 142, 154 & Exs. 37, 40.

### b.  Request No. 2011-843

In October 2010, Mr. Pinson submitted a request to the BOP seeking the production of

"(1) Rated Capacity Computation Form (EMS-36), for FCI Talladega (most recent)" and "(2)

Site Safety and Control Plan (ICS Form 208), Incident Roster and Activity Log (ICS Form 214),

[and] Incident Action Plan Safety Analysis (ICS Form 215a), for FCI Talladega." Greene Decl.

¶ 7 & Ex. 1. Mr. Pinson limited his request to two hours of search time and 100 pages of

information. *See id.* Ex. 1. The request was assigned number 2011-843, and by letter dated

December 2, 2010, the BOP informed Mr. Pinson that no responsive documents had been

located. *See id.* ¶ 7 & Ex. 2. OIP closed Mr. Pinson's appeal of that determination due to this

pending litigation, *see id.* ¶ 7 & Ex. 4, but, in light of this litigation, the BOP later conducted

another search "in additional areas" for responsive documents and located four pages that were

released to Mr. Pinson in full, *see* Blanco Decl. ¶ 10 & Attach. 1, ECF No. 147-4.

### c.  Request No. 2011-2366

In December 2010, Mr. Pinson submitted a request to the BOP seeking all settlement

documents from inmates who have been awarded monetary settlements from 2006 to present in

litigation against officers or employees of prisons in three specific cities.  *See* Greene Decl. ¶ 13 & Ex. 18.  Mr. Pinson limited his request to two hours of search time and 100 pages of information.  *See id.*  The request was assigned number 2011-2366, and a search was conducted. *See id.* ¶ 13.  After an outstanding fee for a prior FOIA request was resolved, the BOP issued a letter to Mr. Pinson on December 10, 2013, informing him that no responsive documents were located.  *See id.* ¶ 13 & Ex. 20.

### d.  Request No. 2011-01351

In 2011, Mr. Pinson submitted a request to the BOP for the production of "[a]ll After-Action Review Reports, pertaining to any inmate on inmate assault and/or homicide" occurring at FCI Talladega during 2009-2010.  Greene Decl. Ex. 5.  The BOP initially responded that it would withhold these records in full under Exemptions 6 and 7(C) because the requested records concerned other inmates.  *See id.* ¶ 8 & Ex. 6.  After Mr. Pinson appealed this determination to the OIP, the BOP conducted a search for plaintiff's requested After Action Review Reports and located 97 total pages of responsive records.  *See id.* ¶ 8 & Ex. 7.  The BOP ultimately released 58 pages in full and 39 pages in part, withholding the names and register numbers of other inmates pursuant to Exemptions 6 and 7(C).  *See id.* ¶ 8; *id.* Ex. 8; *id.* Ex. 9, at 1–2.

### e.  Request No. 2011-01886

In 2010, Mr. Pinson submitted a request to the BOP for the production of documents associated with his placement referral to ADX Florence.  *See id.* ¶ 9 & Ex. 10.  The staff at FCI Talladega, where Mr. Pinson had been housed before he was transferred to ADX Florence, searched its facility for responsive documents.  *See id.*  After this request was twice remanded by OIP for reprocessing, the BOP identified 537 responsive pages, released 333 pages in full and 162 pages in part, but withheld 42 pages in full pursuant to Exemptions 6 and 7(C).  *See id.* ¶¶

11

10–12 & Ex. 17.  The redacted and withheld materials concerned staff names, injury

assessments, photos, the institution roster, the staff roster, and information regarding other

inmates.  *See* Defs.' Stmt. of Mat. Facts ¶ 15, ECF No. 147-3; Greene Decl. ¶¶ 15–21 & Ex. 9, at

3–10.

### f.  Request No. 2011-8167

In 2011, Mr. Pinson submitted a request to the BOP for the production of records

pertaining to the arrest of a BOP Director.  *See* Velilla-Arce Decl. ¶ 4 & Attach. 1.  The BOP's

Office of Internal Affairs searched its computer database and located 30 responsive pages.  *See*

*id.*  The BOP initially administratively closed this request after receiving no response from Mr.

Pinson to indicate that he remained interested in the records, *see id.* ¶ 5 & Attach. 2, but has

since opened a new request with number 2014-05138 after Mr. Pinson filed his complaint

(because the complaint demonstrated that Mr. Pinson remained interested in the records), *see id.*

¶ 6.  The BOP ultimately released 3 pages in full and 10 pages in part, invoking Exemptions 6

and 7(C) to redact names and other personal information of staff members.  *See id.* ¶ 6 & Attach.

3.

### g.  Request No. 2011-07400

In April 2011, Mr. Pinson submitted a request to the BOP for the production of

documents relating to psychology treatment programs, the "[n]ames of North Central Regional

Office ["NCRO"] [s]taff and [j]ob [t]itles," and "[a]ll DHO Reports dated 2007-2008" relating to

him.  Christenson Decl. Ex. 8.  The ADX Florence legal staff conducted a search in Mr. Pinson's

Central File and located 245 pages of responsive records.  *See id.* ¶ 31.  Of these 245 pages, the

BOP released 190 pages in full and 14 pages in part, and withheld 41 pages in full.  *See id.* ¶ 33

& Ex. 9.  After Mr. Pinson appealed the BOP's response and the request was remanded, the BOP

and its offices conducted another search, located responsive records, and re-released 216 pages

in full and 22 pages in part, but withheld 7 pages in full. *See id.* ¶ 36–37.  One of the responsive

records released included a telephone directory that "list[ed] every staff member who works for

the [NCRO], their title, and their phone number." *Id.*  Pursuant to Exemptions 5, 6, 7(C), 7(E),

and 7(F), the BOP withheld identifying and medical information of third-party individuals and

inmates, email discussions among BOP staff members regarding the future management and

housing of Mr. Pinson, letters containing threats to third-party individuals, and statements made

by third-party inmates during BOP disciplinary proceedings. *See id.* Ex. 13, at 1–4.

### h.  Request No. 2011-08171

In May 2011, Mr. Pinson submitted a request to the BOP for the production of: (1) "[a]ll

Incident Reports (Form 583) on inmate on inmate deaths (Homicide), from 2005 to present,

occurring at USP Florence, Lewisburg, Victorville, Atwater, Hazleton, Coleman 1 & 2, and FCI

Talladega"; (2) "[a]ll information relating to Incident Report No. 1642331, 1619674, 1610661,

1655656, 2033414"; (3) "SIS File (VIP Case No. VIP-08061), (FLP-07413), (BMP07-364)," (4)

"[a]ll information on [his] 1-30-08 Escort Trip"; (5) "[a]ll incident reports (Form 583) for inmate

on inmate assaults in FCI Oakdale Special Mgmt. Unit between 2010-11"; (6) "USP Florence

Suicide Watch information of [himself] from 10-25-2006 to 11-5-2007"; and (7) "[a]ll incident

reports (Form 583) on inmate on inmate assaults, during 2010-2011, in the USP Florence Special

Mgmt. Unit."  Christenson Decl. Ex. 16.  USP Florence staff searched its records for inmate-on-

inmate homicide incident reports, and ADX Florence staff searched Mr. Pinson's Central File for

the incident numbers he listed and for his suicide watch information.[7]  *See id.* ¶¶ 68–70.  All told,

---

[7] On each page of Request No. 2011-8171 (which ran four pages in total, coupling
several requests together on a single page), Mr. Pinson requested that the BOP spend no more
than two hours of search time on his request. *See* Christenson Decl. Ex. 16.  Because the

the BOP located a total of 93 pages of responsive records.  *See id.* ¶ 72.  Of these 93 pages, the

BOP released 86 pages in full or in part, and withheld seven pages in full.  *See id.* ¶ 72.  The

BOP invoked exemptions 6, 7(C), 7(E), and 7(F) to withhold identifying and medical

information of third-party inmates and staff members, the BOP's monitoring information and

classification of prisoners, the names and addresses of deceased inmates' designees, a statement

made by a third-party inmate regarding another inmate, and information about security measures

implemented by staff in response to violent incidents. *See id.* Ex. 13, at 5–10.

### i. Request No. 2011-10556

On or about August 19, 2011, Mr. Pinson submitted a request to the BOP for the

production of: (1) "[a]ll records concerning an optometrist examination of [himself], and/or

eyeglass prescription for [himself] during 2007 at USP Beaumont"; (2) "[a]ll documents located

in Designation and Sentence Computation Center containing [his] name of making reference to

[him] 2007 to now"; and (3) a "Letter from DSCC Chief to Judge David Russell concerning

[Judge Russell's] sentencing recommendation for designation to FCC Butner."  Christenson

Decl. Ex. 20.  Mr. Pinson limited his request to two hours of search time and 100 pages, and the

BOP located over 500 pages of responsive records in two hours search time.  *See id.* ¶ 99–100.

The BOP's response provided Mr. Pinson with 104 pages in full or in part, withheld 55 pages of

responsive records in full, and noted that Mr. Pinson had limited his request to no more than two

hours of search time and no more than 100 pages of records.  *See id.* ¶ 102 & Ex. 21.  The BOP

invoked Exemptions 7(C), 7(E), and 7(F) to withhold information regarding the BOP's

---

searches for inmate-on-inmate homicides, the specifically numbered incidents, and Mr. Pinson's
suicide watch information each exceeded two hours of search time, the BOP did not conduct
searches on Mr. Pinson's remaining requests.  *See id.* ¶ 71.

monitoring and classification of inmates or identifying and medical information about third-party inmates, third-party individuals, and prison staff members. *See id.* Ex. 13, at 11–14.

### j.  Request No. 2011-9352

On or about July 10, 2011, Mr. Pinson submitted a request to the BOP for the "production of all information in the SIS files of FCI Three Rivers which mention the use or involvement of a phone number on [his] inmate phone list 830-333-0908 in connection with a 2007 riot/disturbance resulting in an inmate on inmate injury and/or death."  Mack Decl. Attach. 2, ECF No. 147-7.  On August 11, 2011, the BOP issued a letter advising Mr. Pinson that, if the records he had requested existed, they would be exempt from release pursuant to exemptions 7(C) and 7(F) because such records "could endanger the orderly and secure running of [BOP] facilities and endanger the life or physical safety of individuals."  *See id.* ¶ 7 & Attach. 3.  The BOP informed Mr. Pinson that it "will neither confirm nor deny the existence of records responsive" to the request.  *Id.*  The OIP affirmed the BOP's response, finding that the release of the requested records "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *See id.* ¶¶ 8–10 & Attach. 4.

### 4.  Unnumbered Requests

In his complaint, Mr. Pinson lists nineteen unnumbered requests to which, he claims, the BOP failed to respond.  *See* Corr. 2d Am. Compl. at 5–6.  The DOJ states that it has been unable to identify the FOIA request numbers associated with these requests after performing a search of the BOP's FOIA database using Mr. Pinson's inmate register number and examining all requests received from January 1, 2010 through December 9, 2013.  *See* Christenson Decl. ¶ 11.

## B. *Bivens* Claims

As of September 16, 2014, Mr. Pinson "has filed, or attempted to file, a total of 727 administrative remedies" within the BOP's Administrative Remedy Program.  *See* Mitchell Decl. ¶ 15, ECF No. 147-12 & Exs. 3, 3A.   The BOP's Administrative Remedy Program "applies to all inmates in institutions operated by the [BOP]" and establishes a four-step process for resolving an inmate's grievances.  *Id.* ¶¶ 3, 7 (citing 28 C.F.R. § 542.10 *et seq.*).  Pursuant to that program, an inmate must first "present an issue of concern informally to staff," and staff shall "attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy."  28 C.F.R. § 542.13(a).  These informal requests "are not assigned a Remedy ID number and are not tracked" by the BOP's system.  *See* Mitchell Decl. ¶ 4.  If the inmate's concern is not resolved informally, he "may proceed to the second step" by filing "a formal Request for Administrative Remedy (also known as a 'BP-9') at the institution in which the inmate is incarcerated."  *Id.* (citing 28 C.F.R. § 542.14).  If the inmate is dissatisfied with the response of that particular institution's Warden, he "may then appeal the complaint to the Regional Director, by filing a Regional Office Administrative Remedy Appeal (also known as a 'BP-10')."  *Id.* (citing 28 C.F.R. § 542.15(a)).  If the inmate feels the response to his BP-10 is not satisfactory, he may then "appeal to the Director, National Inmate Appeals, in the Office of the General Counsel in Washington D.C., by filing a Central Office Administrative Remedy Appeal (also known as a 'BP-11')."  *Id.*  "Appeal to the General Counsel is the final administrative appeal."  *Id.* ¶ 5 (citing 28 C.F.R. § 542.15(a)).  "A Warden has 20 calendar days, with a 20-day extension, if needed," to respond to a BP-9; "the regional office has 30 calendar days, with a 30 day extension, if needed" to respond to a BP-10; and the "Central Office has 40 calendar days, with a 20 day extension, if needed" to respond to a BP-11.  *Id.* ¶ 6 (citing 28 C.F.R. § 542.18).  If

the inmate does not receive a timely response at any step of the administrative remedy process,

"he may consider the absence of a response to be a denial at that level."  *Id.*  Each formal

complaint (*i.e.* the BP-9, BP-10, or BP-11) is logged into a system called SENTRY at the

location that received the complaint.  *Id.* ¶ 9.  Additionally, "[h]ard copies of the administrative

remed[ies] filed are ordinarily maintained for a minimum of three years."  *Id.* ¶ 11.

Mr. Pinson asserts that "the BOP never published or provided [these] internal exhaustion

procedures on ADX placement to the BOP's general population."  Pl.'s 1st Partial Resp. at 1–2,

ECF No. 164.  He also claims that the "BOP officials threatened [him] with plac[ement] near his

known enemies," and that the "BOP officials refused to respond to submitted grievances" or to

provide the forms he needed to file complaints at the appropriate BP levels.  Pl.'s 1st Partial

Resp. at 3.

### 1.  First *Bivens* Claim: Refusal to Investigate

Mr. Pinson's first *Bivens* claim alleges that Chief John Dignam refused to investigate his

complaints regarding his safety unless he agreed to cease news media contacts and litigation.

Corr. 2d Am. Compl. at 14.  The BOP claims that its review of Mr. Pinson's administrative

remedy filings reveal "no subject substantially similar to this allegation, *i.e.*, staff refus[ing] to

investigate."  Mitchell Decl. ¶ 28.  The BOP has, however, identified four grievances that were

somewhat similar, although none contain allegations encompassing the claim stated in Mr.

Pinson's Second Amended Complaint.  *See id.* ¶¶ 29–32.  First, in Administrative Remedy Series

612103, Mr. Pinson alleged that he was sexually harassed by an FCI Talladega staff member.

*See id.* ¶ 29 & Ex. 12.  Second, in Administrative Remedy Series 699884, Mr. Pinson alleged

that a staff member "seized documents sent to [him] by [his] attorney."  *Id.* ¶ 30 & Ex. 13.

Third, in Administrative Remedy Series 757955-F1, Mr. Pinson alleged that the BOP staff

impermissibly opened his "incoming legal and special mail." *Id.* ¶ 31 & Ex. 14.  Finally, in

Administrative Remedy Series 792435-F1, Mr. Pinson alleges that "staff introduced contraband

into ADX Florence and SIS deliberately sabotaged investigations into misconduct." *Id.* ¶ 32 &

Ex. 15.  In addition to these four requests, Mr. Pinson claims that he also filed "an informal

resolution request . . . on the head of internal affairs [John Dignam] about his obstructing

investigations," but did not file an appeal after he was verbally threatened by "high ranking staff

. . . for fear [his] safety would be jeopardized."  1st Pinson Decl. ¶ 4, ECF No. 164.

## 2.  Second *Bivens* Claim: Transfer to ADX Florence

Mr. Pinson alleges that Director Charles Samuels instructed an employee "to interrogate

plaintiff and order plaintiff to cease all contacts with the news media," and that, when plaintiff

failed to do so, "Samuels ordered plaintiff moved to ADX Florence using information he knew to

be false."  Corr. 2d Am. Compl. at 15.  On January 14, 2011, Director Samuels approved Mr.

Pinson's transfer to ADX Florence.  Mitchell Decl. ¶ 22 & Ex. 7.  Mr. Pinson was advised of his

placement six days later.  *Id.*

Prior to Director Samuels's final decision regarding Mr. Pinson's ADX Florence transfer,

Mr. Pinson had filed a series of grievances to challenge his placement.  *Id.* ¶ 24.  In

Administrative Remedy Series 600334, Mr. Pinson challenged an impending transfer to ADX

Florence, arguing that such a placement would be "detrimental to [his] health, mental and

emotional well-being" and was the result of retaliation for his "litigation against the Unit

Manager, Executive Staff, DSCC staff and Regional staff."  *Id.* ¶ 24 & Ex. 8.  Mr. Pinson also

submitted Administrative Remedy Series 615362 to oppose his impending transfer to ADX

Florence.  He argued that the Warden improperly "referred [him] to ADX without a medical or a

dental evaluation as required by [the BOP's] policy."  *Id.* ¶ 24 & Ex. 9.  Additionally, in

Administrative Remedy Series 615364, Mr. Pinson requested not to be placed in ADX because he had a "significant mental disorder." *Id.* ¶ 24 & Ex. 10. For each of these requests, Mr. Pinson filed an appeal, and sometimes multiple appeals, throughout the BOP's administrative process. *See id.* ¶ 24 & Exs. 8–10. Mr. Pinson also filed Administrative Remedy Series 622004-F1 and 622088-F1, requesting a decision on his ADX Florence referral. *See id.* ¶ 25 & Ex. 3, at 27, Ex. 3A, at 16. According to BOP records, Mr. Pinson never appealed "the Warden's response to these administrative remedies to the regional level." *See id.* ¶ 25.

Once Mr. Pinson *was notified* that his transfer to ADX Florence had been approved, he did file Administrative Remedy 641235-R1, which challenged that decision. *See id.* ¶ 26 & Ex. 3, at 29. Mr. Pinson argued that (1) his "ADX [r]eferral [w]as in [r]etaliation for a lawsuit against [the] Warden," (2) that "[n]o medical or dental evaluation was conducted in relation to the referral, as required by [the BOP's] policy," and (3) that his ADX placement endangers his medical and mental health issues. Mitchel Decl. ¶ 26 & Ex. 11. On June 8, 2011, this request was denied. *See id.* Ex. 11. Mr. Pinson then proceeded to appeal this denial to "the Central Office on two occasions, but both attempts were procedurally rejected." *Id.* ¶ 27. Mr. Pinson attests that prison officials never provided him with the correct form to file his appeal after he asked several times. *See* 1st Pinson Decl. ¶ 3.

### 3. Third *Bivens* Claim: Order to Separate Mr. Pinson from Another Inmate

Mr. Pinson alleges that Director Samuels "ordered plaintiff and [another inmate] to be separated" in March 2013, and ordered staff to harass Mr. Pinson until he "quit filing lawsuits and contacting the news media." Corr. 2d Am. Compl. at 15. The BOP has identified four grievances that most closely resemble this allegation, although it contends that none include the claim stated in Mr. Pinson's Second Amended Complaint. *See* Mitchell Decl. ¶¶ 34–36. First, in

Administrative Remedy Series 728709 and 732337, Mr. Pinson sought "permission to correspond with other inmates regarding legal matters," and "to correspond with his co-plaintiffs in ongoing litigation in the District of Colorado."  Mitchell Decl. ¶ 34 & Exs. 16, 17.  In Administrative Remedy Series 727633, Mr. Pinson alleged that prison staff "engaged in a campaign of retaliation," where they sexually harassed him, "with[eld his] meals and mail," and "kick[ed his] door while" he was sleeping.  *Id.* ¶ 35 & Ex. 18.  Finally, in Administrative Remedy Series 759524, Mr. Pinson alleged that "his unit manager separated him from another inmate in retaliation after that inmate provided a declaration" that Mr. Pinson used in a lawsuit against the unit manager.  *Id.* ¶ 36 & Ex. 19.  This last grievance was submitted in November 2013 "after he was moved from one range to another housing range in his housing unit," *id.*, after he had filed his Second Amended Complaint, *see* Corr. 2d Am. Compl. at 17 (docketed October 23, 2013), and well after the March 2013 separation order alleged in that complaint, *see id.* at 15.

### 4. Fourth *Bivens* Claim: Imposition of Mail Restrictions

Mr. Pinson alleges that defendants Samuels and Dignam inappropriately imposed "mail restrictions limiting [his] communications with attorneys and the news media."  Corr. 2d Am. Compl. at 16.  On October 3, 2013, Mr. Pinson was notified of the pertinent mail restrictions. Mitchell Decl. ¶ 37 & Ex. 20.  Two weeks later, Mr. Pinson challenged the mail restrictions when he submitted Administrative Remedy Series 754155-F1 to the Warden of ADX Florence. *Id.* ¶ 38 & Ex. 3, at 40.  He argued that the mail restrictions were improper because they were "not approved by the regional counsel," because he was "not given an opportunity to respond" to the restrictions, and because he never threatened anyone.  *Id.* ¶ 38 & Ex. 21.  Mr. Pinson included this claim in his Second Amended Complaint on October 23, 2013, *see* Corr. 2d Am. Compl. at 17 (docketed October 23, 2013), before the Warden had denied his grievance in

November 2013, *see* Mitchell Decl. Ex 21.  On December 12, 2013, Mr. Pinson appealed this

denial to the regional office, which denied the appeal eleven days later.  *See id.* ¶ 39 & Ex. 22,

Ex. 3 at 41.  Finally, on January 12, 2014, Mr. Pinson appealed the regional office's denial to the

Central Office.  *See id.* ¶ 40 & Ex. 3, at 42.  As of September 16, 2014, the Central Office had

not responded to this appeal.  *See id.* ¶ 40.  Because the Central Office has not timely responded,

this grievance is "deemed denied as of approximately March 23, 2014."  *Id.*

### III.  LEGAL STANDARD

"FOIA cases typically and appropriately are decided on motions for summary judgment."

*Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing

*Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  Summary

judgment is appropriate where "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

"material" fact is one capable of affecting the substantive outcome of the litigation.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is

enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v.*

*Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of

factually unsupported claims or defenses and determining whether there is a genuine need for trial.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden

of identifying portions of the record that demonstrate the absence of any genuine issue of material

fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  In response, the non-movant must

point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See Celotex*,

477 U.S. at 324.  In considering a motion for summary judgment, a court must "eschew making

credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255.   Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

When assessing a summary judgment motion in a FOIA case, a court makes a *de novo* assessment of whether the agency has properly withheld the requested documents.  *See* 5 U.S.C. § 552(a)(4)(B); *Judicial Watch v. U.S. Dep't of Homeland Sec.*, 598 F. Supp. 2d 93, 95 (D.D.C. 2009).  To prevail on a motion for summary judgment, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements."  *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980) (internal quotation marks omitted) (quoting *Nat'l Cable Television Ass'n v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)).  To meet its burden, a defendant may rely on declarations that are reasonably detailed and non-conclusory.  *See Citizens for Ethics & Responsibility in Wash. v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) ("[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981))).  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"  *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)).  Generally, a reviewing

court should "respect the expertise of an agency" and not "overstep the proper limits of the judicial role in FOIA review." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

## IV. ANALYSIS

### A. Requests without Responses

Mr. Pinson's complaint lists nineteen unnumbered FOIA requests that he submitted to the BOP but, for almost all of which, he claims to have never received a response.[8]  *See* Corr. 2d Am. Compl. at 5–6.  As to these requests, the DOJ contends that summary judgment is appropriate because the BOP has no record of having received the requests.  *See* Defs.' Mem. Supp. Mot. Summ. J. at 6 ("Defs.' Mem. Supp."), ECF No. 147-1; Christenson Decl. ¶ 11.

As "federal jurisdiction over a FOIA claim is dependent upon a showing that an agency improperly withheld agency records," if there is no "'showing that the agency received the request, the agency has no obligation to respond to it,'" *see Banks v. Lappin*, 539 F. Supp. 2d 228, 235 (D.D.C. 2008) (quoting *Hutchins v. Dep't of Justice*, No. 00-2349, 2005 WL 1334941, at *2 (D.D.C. June 6, 2005)); *see also Trupei v. Bureau of Customs & Border Prot.*, No. 07-0475, 2008 WL 249878, at *1 (D.D.C. Jan. 29, 2008) ("[A]n agency's FOIA obligations are not

---

[8] With respect to one of those requests—Pinson's request for the "ADX Warden Competency Assessment"—Pinson's complaint does allege that he received a response from the BOP on October 1, 2013.  *See* Corr. 2d Am. Compl. at 5.  But the complaint lists "N/A" for the request's number.  As the DOJ asserts, once a request is received, "an acknowledgement letter will be generated informing the requestor that the FOIA request has been received and [of] the number it has been assigned."  Christenson Decl. ¶ 7.  In light of this assertion, it would be unusual for Pinson to have received a response to his request but for the BOP not to have assigned a number to that request.  The DOJ further explains that, like the other unnumbered requests, it has been unable to identify a FOIA request number associated with the request and has no record of receiving it.  Defs.' Mem. Supp. at 5–7.  As with the other unnumbered requests, Pinson has not responded to these assertions.

triggered until a request has been received."). In order to create an issue of material fact, a plaintiff must offer evidence that the requests were received by the agency, rather than merely stating that the requests were placed in the mail. *See Banks*, 539 F. Supp. 2d at 235 ("The mailing of a FOIA request to a federal government agency does not constitute its receipt by the agency.").

Here, not only has Mr. Pinson failed to provide any evidence that these requests were received by BOP, but Mr. Pinson's opposition fails to mention these requests at all. "In this district, when a party responds to some but not all arguments raised on a Motion for Summary Judgment, a court may fairly view the unacknowledged arguments as conceded." *Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008). The Court therefore deems conceded the BOP's motion for summary judgment as to the nineteen unnumbered requests.

## B. Failure to Exhaust Administrative Remedies

The DOJ seeks summary judgment as to nineteen of the numbered FOIA requests at issue[9] claiming that Mr. Pinson failed to exhaust administrative appeal remedies before seeking judicial redress in this Court. *See* Defs.' Mem. Supp. at 4–11. Specifically, the DOJ contends that Mr. Pinson failed to exhaust his administrative remedies because he either did not file an appeal of the agency's decision with respect to the documents or failed to provide advance payment of the appropriate fees incurred as a result of the request or a prior request. *Id.* Mr. Pinson disputes the DOJ's exhaustion argument as it pertains to these requests on several grounds. *See* Pl.'s 2d Partial Resp. at 1–3; *see generally* 2d Pinson Decl.

---

[9] The nineteen requests at issue include Request Nos.: 2010-12533, 2011-2666, 2011-4954, 2011-7156, 2011-7619, 2011-9164, 2011-9398, 2012-39, 2012-40, 2012-975, 2012-3706, 2012-8542, 2012-12518, 2013-1684, 2013-2100, 2013-2721, 2013-3342, 2013-3343, and 2013-3347. *See* Defs. Mem. Supp. at 7–11.

In general, a FOIA requester must exhaust his administrative remedies before filing suit in federal court. *See Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004).  This means that the requester must appeal an adverse determination of his FOIA request to the head of the agency before suing that agency in federal court. *See Smith v. Fed. Bureau of Prisons*, 517 F. Supp. 2d 451, 453 (D.D.C. 2007).  If the requester fails to exhaust administrative remedies before filing suit, a court can dismiss the complaint or grant summary judgment for the agency. *See Wilbur*, 355 F.3d at 676–77.  Where an agency requires a requester to pay fees in advance, "[e]xhaustion [of administrative remedies] does not occur until the required fees are paid or an appeal is taken from the refusal to waive fees." *Trueblood v. U.S. Dep't of the Treasury*, 943 F. Supp. 64, 68 (D.D.C. 1996) (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 66 (D.C. Cir. 1990)); *see also* 5 U.S.C. § 552(a)(4)(A)(v) (providing that "[n]o agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250").

But FOIA's exhaustion requirement is a prudential consideration, rather than a jurisdictional prerequisite. *See Wilbur*, 355 F.3d at 677.  A court therefore may waive the exhaustion requirement under certain circumstances, such as if an agency failed to respond to the FOIA request within a certain number of days. *See Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 184 (D.C. Cir. 2013) (citing 5 U.S.C. § 552(a)(6)(C)(i)). Further, if there is a genuine dispute of material fact on the exhaustion issue, a court may refuse to grant summary judgment for the agency. *See Jones v. DOJ*, 576 F. Supp. 2d 64, 67 (D.D.C. 2008).  A court may, for example, deny summary judgment to an agency that claims to have notified a plaintiff of its response to a FOIA request if the plaintiff attests that he never received it and if the agency fails to offer evidence to the contrary. *See id.* at 67 ("If Jones did not receive

a response to his FOIA request, then the agency did not comply with its duty to make a determination within 20 days after receiving Jones' request and 'immediately notify the person making such request' of its determination." (quoting 5 U.S.C. § 552(a)(6)(A)(i))).

### 1. Failure to Appeal

The DOJ seeks summary judgment as to Request Nos. 2011-2666, 2011-4954, 2011-9164, 2011-9398, 2012-3706, 2013-2100, and 2013-4747, arguing that Mr. Pinson failed to appeal the BOP's denials of information and, therefore, did not exhaust his administrative remedies.[10]  Defs.' Mem. Supp. at 7–11; *see also supra* note 6 (noting that the Court will construe the DOJ's reference to Request No. 2013-3347 in its memorandum as a reference to Request No. 2013-4747).  For those seven requests, the DOJ has provided the Court with copies of the BOP's final response letters and with the declarations of several BOP employees who assert that the BOP sent Mr. Pinson the letters in question.  *See* Moorer Decl. ¶ 5 & Attach. 2; Christenson Decl. ¶¶ 22, 97, 130, 159 & Exs. 5, 19, 29, 42; Velilla-Arce Decl. ¶¶ 8–9 & Attach. 5, 7.  The mere existence of these final response letters, however, does not conclusively "establish that the letter was actually . . . received by" Mr. Pinson, which may leave open a genuine issue of material fact.  *See Jones*, 576 F. Supp. 2d at 67.   In fact, although Mr. Pinson concedes that he did not appeal any of the seven responses at issue, he now attests that he never received the final response letters.  *See* 2d Pinson Decl. ¶¶ 4-6, 9, 11, 15-16.  In his complaint,

---

[10] The DOJ also seeks summary judgment as to Request No. 2010-12533 on this ground. *See* Defs.' Mem. Supp. at 8.  Mr. Pinson's Second Amended Complaint seems to imply that he received a final response from the BOP since he alleges that after his request was assigned Request No. 2010-12533 the BOP "then refused to produce the information."  Corr. 2d Am. Compl. at 2.  Mr. Pinson's failure to appeal is ultimately immaterial, however, because the BOP did not process this request due to an outstanding, unpaid fee for one of Mr. Pinson's prior FOIA requests.  As explained below, the BOP failed to process his request despite the fact that Mr. Pinson ultimately paid the underlying fee and, therefore, the Court will not grant summary judgment to DOJ with respect to Request No. 2010-12533.  *See infra* Part IV.B.2.c.

Mr. Pinson does generically state that he received a "response" from the BOP regarding these eight requests and lists a specific date of response for each request. Corr. 2d Am. Compl. at 1, 3–5. Although the inclusion of those dates in Mr. Pinson's complaint appear to acknowledge that he did receive a response from the BOP with respect to each request, in the past this Court has "credited statements in Mr. Pinson's declarations asserting that he had not received response letters from various DOJ components—despite the existence of contrary assertions in his verified complaint—where Mr. Pinson explained that he had received acknowledgement letters rather than final response letters." *Pinson v. U.S. Dep't of Justice*, 61 F. Supp. 3d 164, 176 (D.D.C. 2015). The Court faces similar circumstances here: in the declaration Mr. Pinson has submitted in opposition to BOP's motion for partial summary judgment, he now claims that, for almost all of these requests, he only received a letter acknowledging BOP's receipt of the request and that he never received a subsequent, final response from the BOP. *See* 2d Pinson Decl. ¶¶ 4–6, 9, 11, 15–16.

With respect to five of these requests, Mr. Pinson's declaration seems to clarify the meaning of the date he previously listed in his complaint, and therefore suffices to raise a genuine issue of material fact about whether he ever received a final response from BOP. For example, with respect to Request No. 11-9164, although the BOP avers that it sent a final response to Mr. Pinson on July 26, 2012, *see* Christenson Decl. ¶ 97 & Ex. 19, and Mr. Pinson's complaint lists a response date of August 26, 2012, *see* Corr. 2d Am. Compl. at 4, Mr. Pinson's declaration claims that he only received an acknowledgement letter from BOP, *see* 2d Pinson Decl. ¶ 6. Similarly, Mr. Pinson claims that he only received an acknowledgement letter for Request No. 11-9398, *see id.*, despite the fact that his complaint lists a response date of September 9, 2011, *see* Corr. 2d Am. Compl. at 4, which is close in time to the BOP's final

response letter dated August 25, 2011, *see* Velilla-Arce Decl. ¶ 8 & Attach. 5.[11]  It is, of course,

possible that Mr. Pinson is somewhat confused about the BOP's responses.  Indeed, although his

declaration attaches what Mr. Pinson purports to describe as an example of an acknowledgement

letter, because that letter refers to pages of responsive documents that BOP elected to withhold

under FOIA the letter appears to be, in fact, a final response letter.[12]  *See* 2d Pinson Decl. Ex. A.

And in several cases the receipt date that Mr. Pinson alleges in his Second Amended Complaint

is "close[] in time" to the date on which the BOP's final response letter was mailed.  *Pinson v.*

*U.S. Dep't of Justice*, 69 F. Supp. 3d 125, 132 (D.D.C. 2014).  At the same time, however, it is

clear that, in at least one instance, the dates listed in Mr. Pinson's complaint must refer to an

acknowledgment letter or some other type of pre-determination correspondence.  With respect to

Request No. 2011-4954, although Mr. Pinson's complaint and declaration list two *different*

response dates (April 4, 2011, and May 10, 2011, respectively), *see* Corr. 2d Am. Compl. at  3;

2d Pinson Decl. ¶ 4, both dates far pre-date BOP's final response on October 20, 2011, *see*

Christenson Decl. Ex. 5.  Thus, despite some imprecision with respect to the exact dates, in at

---

[11] Mr. Pinson's claim that he only received an acknowledgement letter for two other requests follow similar lines.  For Request No. 12-3706, Mr. Pinson's Second Amended Complaint lists a response date of May 31, 2012, *see* Corr. 2d Am. Compl. at 4, while BOP claims that it sent a final response on March 15, 2012, *see* Christenson Decl. ¶ 130 & Ex. 29.  For Request No. 13-2100, Mr. Pinson's Second Amended Complaint lists a response date of December 6, 2014, *see* Corr. 2d Am. Compl. at 5, and BOP claims that it had sent Mr. Pinson a final response two days earlier on December 4, 2012, *see* Velilla-Arce Decl. ¶ 9 & Attach. 7.

[12] Request Nos. 13-3342 and 13-3343 are emblematic of the confusion emanating from both parties' filings here.  Mr. Pinson's declaration claims that he never received a final response to those requests.  *See* 2d Pinson Decl. ¶ 6.  Meanwhile, the DOJ's memorandum represents that "OIP records reflect no appeals with respect to these responses," *see* Defs.' Mem. Supp. at 11 (citing Christenson Decl. ¶¶ 142, 154).  Yet, both parties are wrong.  Contrary to the DOJ's assertion, the Christenson Declaration states that, with respect to each request, "Inmate Pinson appealed the Bureau's response to OIP."  Christenson Decl. ¶¶ 142, 154.  And the letters responding to Mr. Pinson's appeal are reproduced as exhibits.  *See id.* Exs. 37, 40.  Furthermore, because Mr. Pinson filed an appeal, it is clear that he had received the DOJ's final response to these requests.

least some circumstances the date listed in Mr. Pinson's Second Amended Complaint unquestionably refers to an acknowledgement letter or some other pre-determination correspondence.

Moreover, the limited information BOP has provided here complicates the Court's task. While BOP generally avers that, "[a]fter a request is entered into the database, an acknowledgement letter will be generated informing the requester that the FOIA request has been received and the number it has been assigned," Christenson Decl. ¶ 7, BOP has not included the acknowledgement letters for any of these requests as exhibits or otherwise listed in the declarations it has provided the dates on which it sent letters acknowledging those requests. Instead, BOP's Declarations and Statement of Material Facts simply note that a request was received, identify the response number the request was assigned, and then describe the final response that it sent to Mr. Pinson.  Because the Court is unable to determine whether any of the response dates listed in Mr. Pinson's complaint post-date BOP's acknowledgement letters, and because at summary judgment the Court must view facts in the light most favorable to the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)), and cannot make credibility determinations, *see Fed. Ins. Co. v. Olawuni*, 539 F. Supp. 2d 63, 66 (D.D.C. 2008) ("On a motion for summary judgment, the Court must 'eschew making credibility determinations or weighing the evidence.'" (quoting *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007))), the Court must accept as true Mr. Pinson's declaration that he only received an acknowledgement letter and never received the BOP's final response letters as to Request Nos. 2011-4954, 2011-9164, 2011-9398, 2012-3706, and 2013-2100.  And if it turns out that Mr. Pinson did not receive the BOP's final response letter, he cannot "be deemed to have exhausted his administrative remedies" because he was denied the opportunity to reformulate his request or

appeal the determination that the request was improper.  Given the factual disputes on this issue,

the Court cannot grant the DOJ's motion for summary judgment on exhaustion grounds with

respect to these five requests.

With respect to two other requests BOP claims Mr. Pinson never appealed, however, the

Court finds that Mr. Pinson has failed to raise a material issue of fact because his verified Second

Amended Complaint directly contradicts the assertions he makes in his more recent declaration.

Mr.  Pinson's complaint was signed under penalty of perjury on October 10, 2013.  *See* Corr. 2d

Am. Compl. at 17.[13]  "Courts have long held that a party may not create a material issue of fact

simply by contradicting its prior sworn testimony."  *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924

F.2d 1114, 1123 (D.C. Cir. 1991).  "Virtually every circuit has adopted a form of the so-called

'sham affidavit rule,' which precludes a party from creating an issue of material fact by

contradicting prior sworn testimony unless 'the shifting party can offer persuasive reasons for

believing the supposed correction' is more accurate than the prior testimony."  *Galvin v. Eli Lilly

& Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (quoting *Pyramid Sec. Ltd.*, 924 F.2d at 1123).

First, Mr. Pinson's declaration claims that he never received a final response to Request

No. 2011-2666, but that he did receive a letter acknowledging that request on March 16, 2011.

*See* 2d Pinson Decl. ¶ 9.  Yet, Mr. Pinson's complaint alleges that he received a response to this

complaint on November 4, 2011.  *See* Corr. 2d Am. Compl. at 3.  And that date is the same date

listed on the final response letter BOP sent Mr. Pinson for this request.  *See* Moorer Decl. ¶ 5 &

Attach. 2.   To be sure, it is unlikely, if not implausible, that the BOP's letter arrived at ADX

---

[13] The Court notes that Mr. Pinson's complaint is "verified" and thereby must be treated
as the equivalent of an affidavit since Mr. Pinson affixed his signature to the document under
penalty of perjury pursuant to 28 U.S.C. § 1746.  *See Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir.
1992).

Florence the same day it was mailed.  Yet, Mr. Pinson's declaration claims that he received an

acknowledgement letter for Request No. 2011-2666 far earlier—on March 16, 2011—and that he

never received a final response letter from the BOP.  *See* 2d Pinson Decl. ¶ 4.  Mr. Pinson's

declaration neither mentions nor attempts to explain this November response.  Having already

indicated that he received an acknowledgement letter, however, the only other plausible

inference from the November 4 date listed in Mr. Pinson's Second Amended Complaint is that

he reproduced the date listed on the BOP's final response letter.  *See* Moorer Decl. Attach. 2.

Accordingly, because the record indicates that Mr. Pinson received the BOP's final

determination but has not appealed that determination, Mr. Pinson has failed to exhaust his

administrative remedies, and the Court will grant the DOJ's motion for summary judgment as to

Request No. 2011-2666.

Second, Mr. Pinson's declaration claims that he "never received any correspondence

from the Bureau of Prisons" regarding "Request [No.] [20]13-4747."  2d Pinson Decl. ¶ 15.  But

his complaint states that Mr. Pinson received a response to that request on March 18, 2013, *see*

Corr. 2d Am. Compl. at 5, only a few weeks after the BOP sent him a response on February 27,

2013, *see* Christenson Decl. Ex. 42.  Because Mr. Pinson has not clarified the import of the date

listed in his complaint, he has failed to provide the Court with any reason whatsoever "for

believing the supposed correction is more accurate than the prior testimony."  *United States v.

Project on Gov't Oversight*, 839 F. Supp. 2d 330, 347 (D.D.C. 2012) (internal quotation mark

omitted) (quoting *Galvin*, 488 F.3d at 1030).  In light of the direct contradiction between Mr.

Pinson's sworn statements, and in the absence of any reason to believe that the blanket denial of

receipt in Mr. Pinson's declaration for Request No. 2013-4747 is more accurate than his prior

statement that he received a response to the request, the Court finds that Mr. Pinson's prior

sworn statement is controlling. *See Pyramid Sec. Ltd.*, 924 F.2d at 1123.  Accordingly, the Court

finds that he has not exhausted his administrative remedies and thus grants summary judgment in

favor of the DOJ as to Request No. 2013-4747.

## 2.  Failure to Pay Fees

The DOJ also seeks summary judgment as to several requests on the ground that Mr.

Pinson failed to pay the required fees for these requests. *See* Defs.' Mem. Supp. at 8–11.  FOIA

typically prohibits agencies from requiring "advance payment of any fee" incurred as a result of

a requester's FOIA request, although once a request has been processed an agency may require a

requester to pay any applicable fees before releasing the requested records.  *See Farrugia v.*

*Exec. Office for U.S. Attorneys*, 366 F. Supp. 2d 56, 57 (D.D.C. 2005); *see also* 28 C.F.R. §

16.11(i)(1) (1998) (defining "advance payments" as payments made "before work is begun or

continued on a request" as distinguished from "[p]ayment owed for work already completed (i.e.,

a prepayment before copies are sent to a requester)," which "is not an advance payment").[14]

Yet, there are two exceptions to this general rule.  First, an agency may require advance

payment of fees if "the agency has determined that the fee will exceed $250."  5 U.S.C. §

552(a)(4)(A)(v).  Second, the agency may also require advance payment if "the requester has

previously failed to pay fees in a timely fashion."  *Id.*  Under this second exception, the agency

"*may refuse to continue processing the pending request* and refuse to accept any new request

from that requester, until the requester makes advance payment of any fees owed plus interest."

*Pollack v. Dep't of Justice*, 49 F.3d 115, 120 (4th Cir. 1995) (emphasis in original).  DOJ's

governing regulation further provides that when a requester "has previously failed to pay a

---

[14] As explained below, *see infra* Part B.2.b, this regulation was amended on May 4, 2015, but the version cited here was in force when Pinson submitted and the BOP responded to the requests at issue.

properly charged FOIA fee to any component or agency within 30 days of the date of billing" of

that previous request, the component may require "the requester to pay the full amount due, plus

any applicable interest, and to make an advance payment of the full amount of any anticipated

fee, before the component begins to process a new request or continues to process a pending

request from that requester."  28 C.F.R. § 16.11(i)(3) (1998).  Moreover, if advanced fees are

required either because the agency anticipates that a fee will exceed $250 or because the

requester has an outstanding fee for an earlier request, the regulation provides that "the request

shall not be considered received and further work will not be done on it until the required

payment is received."  *Id.* § 16.11(i)(4).

### a.  Request Nos. 2012-8542 and 2012-12518

The DOJ argues that Mr. Pinson failed to exhaust his administrative remedies for Request

Nos. 2012-8542 and 2012-12518 because he failed to pay the $290.00 anticipated fees to process

these requests.  *See* Defs.' Mem. Supp. at 10–11.  The BOP determined that the anticipated fees

for these requests would exceed $250 and therefore properly required Mr. Pinson to advance

payment of the anticipated fees.  *See* Greene Decl. ¶ 14; Todd Decl. ¶ 3; *see also* 5 U.S.C.

§ 552(a)(4)(A)(v).  Mr. Pinson does not attest that he either paid the $290.00 fees or asked to

modify his requests.  Therefore, by not paying the anticipated fees, Mr. Pinson has failed to

exhaust his administrative remedies for these requests.  Accordingly, the Court grants the DOJ's

motion for summary judgment as to FOIA Request Nos. 2012-8542 and 2012-12518.

### b.  Request Nos. 2011-7156, 2011-7619, 2012-40, 2012-39, 2012-975, 2013-1684, and 2013-2721

The DOJ seeks summary judgment as to Request Nos. 2011-7156, 2011-7619, 2012-39,

2012-40, 2012-975, 2013-1684, and 2013-2721, contending that Mr. Pinson did not exhaust his

administrative remedies for these requests because he failed "to ask the BOP to reopen [these]

requests" after he "ultimately paid" the $72.90 fee for Request No. 2012-5839 that was

outstanding when these requests were first processed.  Defs.' Mem. Supp. at 8–9.  While both

parties agree that Mr. Pinson did eventually pay the underlying $72.90 fee, the DOJ claims that

the governing regulation did not require the BOP to automatically continue processing Mr.

Pinson's other requests upon receipt of the outstanding fee.  As it existed when Mr. Pinson

submitted the requests at issue, the regulation provided that the requester must "pay the full

amount due, plus any applicable interest . . . before the component begins to process a new

request or continues to process a pending request from that requester."  28 C.F.R. § 16.11(i)(3)

(1998).  DOJ argues in its Reply that the regulation "does not say that work must resume

automatically upon payment if the agency has provided contrary instructions" and that the "BOP

reasonably elected to handle such situations by closing new requests when fees were long

outstanding on others."  Defs.' Reply at 5–6.

    Yet, with one exception, no "contrary instructions" were provided to Mr. Pinson with

respect to each of these requests.  In each instance, the BOP's letters merely stated that "the

above referenced request . . . will not be processed *until* your payment for FOIA Request [No.

2012-05839] *is received*."  Christenson Exs. 7, 15, 23, 25, 27, 31 (emphasis added) (citing 28

C.F.R. § 16.11(i)(3) (1998)).  This open-ended language lends the impression that the BOP

would continue to process Mr. Pinson's requests automatically once his payment was received.

Nowhere with respect to most of these requests did the BOP advise Mr. Pinson that his requests

would be administratively closed or that he must request that the BOP reopen the requests or

submit a new request altogether.  Indeed, these letters can be distinguished from other

circumstances in which the the BOP *did* affirmatively put Mr. Pinson on notice of any imposed

deadline.  *See* Todd Decl. Attach. 2 (advising Mr. Pinson that he must pay "the estimated fee

payment . . . within (30) days from the date of this request"); *cf. Judicial Watch, Inc. v. FBI*, No. 00-745, 2001 WL 35612541, at *1, *13 (D.D.C. April 20, 2001) (finding that, where a plaintiff had been informed that it would have "thirty days from the date of the letter in which to remit [the due] amount or have its request file administratively closed," the plaintiff "was on notice that failure to pay the assessed fees within thirty days from the date of the FBI's fee waiver denial letter would result in the administrative closing of plaintiff's FOIA request"). Additionally, the governing regulation was amended in 2015—after the requests at issue were submitted—and now explicitly specifies that when a requester must pay an advance payment and "the requester does not pay the advance payment *within 30 calendar days* after the date of the component's fee determination, *the request will be closed*."  28 C.F.R. § 16.10(i)(4).  The fact that the former version, which was in effect when Mr. Pinson submitted his requests, contained no similar deadline lends further credence to the Court's conclusion that Mr. Pinson faced no 30-day deadline and was under no obligation to formally request that the BOP reopen his requests, at least in the absence of notice to the contrary.  Accordingly, the Court will deny the DOJ's motion for summary judgment as to Request Nos. 2011-7156, 2011-7619, 2012-39, 2012-40, 2012-975, and 2013-1684.

The one exception is Request No. 2013-2721.  The BOP's letter responding to Mr. Pinson's request in that instance did specify that his new request "has been closed" in light of the $72.90 fee outstanding.  *See* Christenson Decl. Ex. 34.  The letter went on to state that, "[i]n the event you pay your outstanding fee, you will need to submit a new request for information."  *Id.* Because Mr. Pinson did have notice that his request was closed, and was informed that he would need to file a renewed request after he paid the outstanding fee, the Court will grant the DOJ's

motion for summary judgment as to Request 2013-2721 because Mr. Pinson failed to exhaust his administrative remedies.[15]

c. Request No. 2010-12533

The Court will also deny the DOJ's motion for summary judgment as to Request No. 2010-12533. The BOP refused to process that request because of an outstanding fee due for a different prior request (Request No. 2011-1886). *See* Christenson Decl. Ex. 3. But, as with the six requests just discussed, the letter there similarly stated only that the request "will not be processed *until* you have paid your outstanding bill." *Id.* (emphasis added). The record makes clear that the BOP did receive the outstanding fee for Request No. 2011-1886 on March 25, 2011. *See* Greene Decl. ¶ 10 & Ex. 12; *see also supra* note 2. Accordingly, Mr. Pinson was under no obligation to request that the BOP reopen this request, and summary judgment is denied.

**3. Request Nos. 2013-3342 and 2013-3343**

The DOJ seeks summary judgment as to a final pair of purportedly "unexhausted" requests, Request Nos. 2013-3343 and 2013-3342, on the ground that "OIP records reflect no appeals with respect to these responses." Defs.' Mem. Supp. at 11. Yet, the Declarations that the DOJ provides and the exhibits they attach both plainly demonstrate that Mr. Pinson filed an appeal of the BOP's response to each of these requests and that the BOP rejected those appeals. *See* Christenson Decl. ¶¶ 142, 154 & Exs. 37, 40. While the BOP responded to both of Mr.

---

[15] Although the record does not clarify why the language differed in this one letter which, like the others containing more open-ended language, was sent by the BOP's North Central Regional Office, the Court notes that the letter responding to Request No. 2013-2721 was sent on December 19, 2012—one month prior to the other letters, which were all dated January 13, 2013—and was signed by a different Regional Counsel. *Compare, e.g.*, Christenson Decl. Ex. 7, *with id.* Ex. 34.

Pinson's appeals on April 22, 2014, neither the DOJ nor Mr. Pinson have supplied Mr. Pinson's original appeal, and the record does not otherwise indicate when Mr. Pinson filed those appeals. If he failed to appeal the BOP's determination before he included these requests in his Second Amended Complaint, he would have failed to have exhausted his administrative remedies. *See Wilbur*, 355 F.3d at 677. If, however, he filed his complaint after his appeals went unanswered for more than 20 days, he would have been deemed to have constructively exhausted his administrative remedies. *See* 5 U.S.C. § 552(a)(6)(C)(i) (providing that if an agency "fails to comply with the applicable time limit provisions," any person making a request "shall be deemed to have exhausted his administrative remedies with respect to such request"). Without this information, the Court cannot resolve whether Mr. Pinson has exhausted his administrative remedies and therefore cannot grant summary judgment as to Requests No. 2013-3342 and 2013-3343.[16]

## C.  Adequacy of the BOP's Search

The DOJ seeks summary judgment on the ground that its search for responsive records was adequate with respect to the nine requests that Mr. Pinson either fully appealed or (for reasons not stated in the record, and despite no evidence of an appeal by Mr. Pinson) which the DOJ does not claim remain unexhausted. Those requests are: Request Nos. 2011-843, 2011-1351, 2011-1886, 2011-2366, 2011-7400, 2011-8167, 2011-8171, 2011-9352, and 2011-10556. *See* Defs.' Mem. Supp. at 12–23.[17]

---

[16] In addition, the DOJ has not gone further and attempted to develop an argument that the searches it conducted pursuant to those requests were adequate. *See generally* Defs.' Mem. Supp. at 12–23.

[17] Although the DOJ also seeks summary judgment as to Request No. 2011-2666 on adequate search grounds, *see* Defs.' Mem. Supp. at 13, this Court has already granted summary judgment to the DOJ as to this request because Mr. Pinson failed to exhaust his administrative remedies. Similarly, the DOJ seeks summary judgment as to Request Nos. 2011-4954, 2011-

Under FOIA, an adequate search is one that is "reasonably calculated to uncover all relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal quotation mark omitted) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)).  The agency does not have to search "every record system" for the requested documents, but it "must conduct a good faith, reasonable search of those systems of records likely to possess the requested records." *Marino v. Dep't of Justice*, 993 F. Supp. 2d 1, 9 (D.D.C. 2013) (citing *Oglesby*, 920 F.2d at 68).  When an agency seeks summary judgment on the basis that it conducted an adequate search, it must provide a "reasonably detailed" affidavit describing the scope of that search. *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313–14 (D.C. Cir. 2003) (quoting *Oglesby*, 920 F.2d at 68).  It is not enough, however, for the affidavit to state in conclusory fashion that the agency "conducted a review of [the files] which would contain information that [the plaintiff] requested" and did not find anything responsive to the request. *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 370 (D.C. Cir. 1980).  On the other hand, once the agency has provided a "reasonably detailed" affidavit describing its search, the burden shifts to the FOIA requester to produce "countervailing evidence" suggesting that a genuine dispute of material fact exists as to the adequacy of the search. *Morley*, 508 F.3d at 1116.

Here, the DOJ has provided several declarations from the BOP showing an organized and thorough search for the requests at issue, and its memorandum canvasses each request in detail, explaining to whom the request was sent, the search terms used, and the specific databases searched. *See* Defs.' Mem. Supp. at 12–23.  Generally speaking, Mr. Pinson's FOIA requests were referred to one of four BOP offices: the Central Office, the North Central Regional Office,

---

9164, and 2011-9398, *see* Defs.' Mem. Supp. at 14, 16–17, 19–20, but this Court has already concluded that there is a genuine issue of material fact regarding whether Mr. Pinson received the BOP's final response letter for those requests.

the Southeast Regional Office, or the South Central Regional Office. *See id.* at 12; Christenson

Decl. ¶¶ 6–7; Blanco Decl. ¶ 6; Mack Decl. ¶ 1. These four offices would often refer these

requests to specialized sub-units, *see, e.g.*, Velilla-Arce Decl. ¶ 8 (sending request seeking

information maintained by the BOP on the Florencia X3 gang to the Correctional Program

Division), which would review both electronic databases and paper records, where appropriate,

*see, e.g.*, Moorer Decl. ¶¶ 4–5; Velilla-Arce Decl. ¶ 4; Christenson Decl. ¶¶ 19–21, 68, 70, 88–

89. For two of the nine FOIA requests,[18] the BOP did not withhold records pursuant to a FOIA

exemption and either released to Mr. Pinson all of the responsive records it had located in full or

informed Mr. Pinson that it had failed to locate any responsive records. *See* Blanco Decl. ¶ 10;

Greene Decl. ¶ 13. As for the other seven,[19] the BOP invoked certain FOIA exemptions and

withheld portions of the responsive records. *See infra* Part IV.D.

      For several of these requests, the declarations' descriptions suffice to provide a

"reasonably detailed" account of the scope of the BOP's search for each request. The

declarations describe to whom the request was forwarded, which specific databases were

searched, how those databases store information and how that information is searchable, and,

where appropriate, identify the specific search terms used to locate documents with respect to

each of Mr. Pinson's requests. *See, e.g.*, Christenson Decl. ¶ 19; Velilla-Arce Decl. ¶¶ 4, 8;

Moorer Decl. ¶ 4. Neither Mr. Pinson's responses nor declarations address the DOJ's "adequacy

of the search" argument. As this Court has explained, "when a party responds to some but not all

arguments raised on a Motion for Summary Judgment, a court may fairly view the

unacknowledged arguments conceded." *Sykes*, 573 F. Supp. 2d at 202. Accordingly, the Court

---

[18] These two requests are Request Nos. 2011-843, and 2011-2366.

[19] These seven requests are Request Nos. 2011-1351, 2011-1886, 2011-7400, 2011-8167, 2011-8171, 2011-9352, and 2011-10556.

deems conceded the DOJ's motion for summary judgment with respect to the adequacy of the

BOP's search for Request Nos. 2011-7400, 2011-8167, 2011-8171, 2011-9352, and 2011-10556.

Despite Mr. Pinson's failure to contest the searches' adequacy, however, the Court finds

that two of the affidavits the DOJ has proffered are plainly deficient.  Specifically, the

declarations of Fernando Blanco and Christine Greene do no more than indicate that a search

was conducted, and therefore fail to supply the level of specificity necessary to establish an

adequate search at summary judgment.

For example, with respect to Request No. 2011-843, Mr. Blanco's declaration only

vaguely states that he "contacted institution and Regional staff to search additional areas for the

Rated Capacity Forms" and that "[s]taff were able to locate four (4) pages of responsive

documents."  Blanco Decl. ¶ 10; *see Weisberg*, 627 F.2d at 370 (noting that it is insufficient for

an agency to state in conclusory fashion that it "conducted a review of [the files] which would

contain information that [the plaintiff] requested" but failed to find any responsive documents).

Similarly, with respect to Request No. 2011-1351, Ms. Greene's declaration merely states that

the request was received and that, after an appeal, the request was "remanded for [a] search of all

of inmate Pinson's After Action Review Reports only."  Greene Decl. ¶ 8.  Presumably, a search

was conducted because Ms. Greene's declaration goes on to explain that the "BOP released 59

pages in full and 39 pages in part."  *Id.*  But entirely absent from her declaration is *any* iteration

of the search methods used, or the search terms employed, to locate responsive documents.  *See*

*Ogelsby*, 920 F.2d at 68 (noting that a "reasonably detailed affidavit" should "set[] forth the

search terms and the type of search performed" in order "to afford a FOIA requester an

opportunity to challenge the adequacy of the search and to allow the district court to determine if

the search was adequate"); *see also* Greene Decl. ¶ 9 (stating only that Ms. Greene "requested

that staff at FCI Talladega search for the requested records" for Request No. 2011-1886 and that "348 pages had been located"); *id.* ¶ 13 (stating only that "no documents could be located" for Request No. 2011-2366); *compare, e.g.*, Christenson Decl. ¶¶ 19–21, 31 (describing in detail the physical files reviewed or electronic databases searched, and detailing the search terms or methods employed).

The DOJ's failure to provide a relatively detailed affidavit with respect to these requests raises "substantial doubts as to the reasonableness of the search." *Marino*, 993 F. Supp. 2d at 9. Accordingly, the Court denies the DOJ's motion for summary judgment without prejudice with respect to Request Nos. 2011-843, 2011-1351, 2011-1886, and 2011-2366 and at this juncture the Court will not consider whether information was properly withheld from the responsive documents thus far identified for those requests.

### D. FOIA Exemptions

The DOJ next argues that the BOP properly withheld responsive records from its releases for Request Nos. 2011-7400, 2011-8167, 2011-8171, 2011-9352, and 2011-10556 pursuant to FOIA Exemptions 5, 6, 7(C), 7(E), and 7(F). *See* Defs.' Mem. Supp. at 23–34. Although Mr. Pinson does not respond to much of the DOJ's argument, he does contend that the BOP improperly withheld "the names and titles of staff members" in numerous requests "under various FOIA exemptions." *See* Pl.'s 2d Partial Resp. at 2–3, ECF No. 180.

"[D]isclosure, not secrecy, is the dominant objective of [FOIA]." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976). "Consistent with this purpose, agencies may withhold only those documents or portions thereof that fall under one of nine delineated statutory exemptions." *Elliot v. USDA*, 596 F.3d 842, 845 (D.C. Cir. 2010) (citing 5 U.S.C. § 552(b)). "[T]he exemptions are 'explicitly exclusive.'" *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151

(1989) (quoting *FAA Adm'r v. Robertson*, 422 U.S. 255, 262 (1975)).  And it is the agency's

burden to show that withheld material falls within one of these exemptions.  *See* 5 U.S.C. §

552(a)(4)(B); *Elliott*, 596 F.3d at 845.

### 1.  Exemption 5

BOP invoked Exemption 5 to withhold from the agency's response to Request No. 2011-

7400 two email discussions among BOP staff members about the future management and

housing of Mr. Pinson.  *See* Christenson Decl. ¶ 40 & Ex. 13 (reproducing Vaughn index noting

withholdings from documents 6 and 7 listed in the index).  Exemption 5 permits the withholding

of "inter-agency or intra-agency memorandums or letters which would not be available by law to

a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This

exemption protects documents "normally privileged in the civil discovery context," *Judicial*

*Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004), such as materials shielded

by the attorney-client privilege, the attorney work-product privilege and "what is sometimes

called the 'deliberative process' privilege," *Dep't of the Interior v. Klamath Water Users*

*Protective Ass'n*, 532 U.S. 1, 8 (2001).  The deliberative process privilege "covers documents

reflecting advisory opinions, recommendations, and deliberations comprising part of a process

by which governmental decisions and policies are formulated."  *Id.* at 8 (quoting *NLRB v. Sears,*

*Roebuck & Co.*, 421 U.S. 132, 150 (1975)).

For the deliberative process privilege to apply, a court must first determine whether the

exempt document is both predecisional and deliberative.  *Access Reports v. Dep't of Justice*, 926

F.2d 1192, 1194 (D.C. Cir. 1991).  "A document is predecisional if it is generated 'before the

adoption of an agency policy.'"  *McKinley v. FDIC*, 744 F. Supp. 2d 128, 138 (D.D.C. 2010)

(quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  A

document is "deliberative" if it "reflects the give-and-take of the consultative process," *id.* (quoting *Coastal States Gas*, 617 F.2d at 866), "by which the decision itself is made," *Jowett, Inc. v. Dep't of the Navy*, 729 F. Supp. 871, 875 (D.D.C. 1989) (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975)).

The DOJ argues that the BOP's final response with respect to Request No. 2011-7400 properly invoked Exemption 5. *See* Defs.' Mem. Supp. at 23–26. Specifically, the DOJ argues that these email discussions about Mr. Pinson's housing were both predecisional and deliberative because "they reflect the give-and-take of discussing possible ways to manage and house plaintiff." *Id.* at 26 (citing Christenson Decl. ¶ 41). Because Mr. Pinson has not contested this argument in his oppositions, the Court deems the DOJ's argument conceded as to Request No. 2011-7400.

## 2. Exemption 6

The DOJ argues that the BOP properly invoked Exemption 6 in response to records requested in Request Nos. 2011-0400, 2011-8167, and 2011-8171. Under Exemption 6, an agency may withhold "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The Supreme Court has interpreted the term "similar files" broadly so as "to cover detailed Government records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982) (internal quotation mark omitted) (quoting H.R. Rep. No. 1497, at 11 (1966)). Therefore, not only does the exemption protect files, "but also bits of personal information, such as names and addresses, the release of which would 'create a palpable threat to privacy.'" *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (brackets and internal quotation mark omitted) (quoting

*Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006)).  "The information in the file

'need not be intimate' for the file to satisfy the standard, and the threshold for determining

whether information applies to a particular individual is minimal."  *Milton v. U.S. Dep't of*

*Justice*, 783 F. Supp. 2d 55, 58 (D.D.C. 2011) (quoting *N.Y. Times Co. v. Nat'l Aeronautics &*

*Space Admin.*, 920 F.2d 1002, 1006 (D.C. Cir. 1990)).

     Once this threshold determination is met, a court must next ask whether disclosure would

compromise a "substantial" privacy interest, since FOIA requires the release of information "[i]f

no significant privacy interest is implicated."  *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d

1224, 1229 (D.C. Cir. 2008) (alteration in original) (internal quotation marks omitted) (quoting

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)).  This

standard, however, "means less than it might seem," as a substantial privacy interest is "anything

greater than a *de minimis* privacy interest."  *Id.* at 1229–30.  If a substantial privacy interest

exists, a court next tests whether release of such information would constitute a "clearly

unwarranted invasion of personal privacy," *Wash. Post Co. v. U.S. Dep't of Health & Human*

*Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982) (internal quotation marks omitted) (quoting 5 U.S.C.

§ 552(b)(6)), by balancing "the privacy interest that would be compromised by disclosure against

any public interest in the requested information," *Multi Ag Media*, 515 F.3d at 1228.  "[T]he only

relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the

information sought would 'she[d] light on an agency's performance of its statutory duties' or

otherwise let citizens know 'what their government is up to.'"  *Lepelletier v. FDIC*, 164 F.3d 37,

46 (D.C. Cir. 1999) (internal quotation marks omitted) (alterations in original) (quoting *U.S.*

*Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 497 (1994)).  "Information that

'reveals little or nothing about an agency's own conduct' does not further the statutory purpose."

*Beck v. Dep't of Justice*, 997 F.2d 1489, 1493 (D.C. Cir. 1993) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)).

The DOJ argues that, with respect to these requests, the BOP properly withheld "identifying information and medical records relating to, and statements by, third-party inmates and staff members (Christenson Decl. ¶ 43-46 & Ex. 13; Green[e] Decl. Ex. 9; and Moorer Decl. Attach. 3), and the names and addresses of survivors of deceased inmates (*id.* at ¶ 75)" because there is no countervailing public interest that can overcome these individuals' strong privacy interest in personal records which "shed little light on what the government is up to."  Defs.' Mem. Supp. at 27–28.  In response, Mr. Pinson generically argues that the BOP improperly withheld staff names because "staff names alone are not exempt" from FOIA and that the BOP's "use of the exemption is barred by the doctrine of res judicata" since "this issue has already been litigated and conceded by the BOP" in *Pinson v. Lappin*, 806 F. Supp. 2d 230, 233 (D.D.C. 2011).  Pl.'s 2d Partial Resp. at 2–3.

As for Mr. Pinson's broader argument, as the Court reads *Lappin*, the BOP did not concede that the withholding of staff names is categorically improper.  Rather, the court explained in *Lappin* that the BOP had "clarified" that, with respect to the documents requested in that case, "the names and titles of BOP employees requested by plaintiff *could* be released in full," and, therefore, that the BOP had released that information to Mr. Pinson.  *Lappin,* 806 F. Supp. 2d at 233 (emphasis added) (internal quotation marks omitted).  Thus, because the BOP's decision was specific to the documents requested in that case, res judicata does not bar the BOP's use of the exemption to withhold staff names here.  Moreover, it is clear that, in some circumstances, staff names may be properly withheld, particularly if there is no genuine public interest in such information or if the information's release will endanger a staff member's safety.

*See Cuban v. SEC*, 744 F. Supp. 2d 60, 74 (D.D.C. 2010) ("[S]taff names and contact information *may* fall within [FOIA] Exemptions . . . and thus are shielded from disclosure" when "'the material relates to . . . matters of no genuine public interest.'" (emphasis added) (quoting *Schwaner v. Dep't of the Air Force*, 898 F.2d 793, 794 (D.C. Cir. 1990))); *cf. Jordan v. U.S. Dep't of Justice*, 668 F.3d 1188, 1198 (10th Cir. 2011) (finding that a complete list of staff names and titles for all staff at prison was exempt under FOIA).

With respect to the specific records at issue in this case, Mr. Pinson has failed to identify any particular release with which he takes issue. It is not this Court's role to comb through DOJ's filings and the accompanying Vaughn indices to determine which releases Mr. Pinson contests. *See Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978) (explaining that district courts are not expected to assume the role of advocate for pro se plaintiffs); *Sun v. District of Columbia Gov't*, No. 12-cv-1919, 2015 WL 5726471, at *9 n.6 (D.D.C. Sept. 30, 2015) ("[I]t is not the Court's job to canvass the record for documents supporting a pro se party's position."); *see also Davis v. Kelly*, 160 F.3d 917, 922 (2d Cir. 1998) ("[A] court need not act as an advocate for *pro se* litigants . . . ."). Moreover, it appears that the BOP *has* released the names of staff members and their titles in some circumstances when the information is responsive to a request. For example, when Mr. Pinson specifically sought the names and titles of North Central Regional Office staff in Request No. 2011-7400, the BOP provided "a telephone directory that list[ed] every staff member who works for the Region, their title, and their phone number." Christenson Decl. ¶¶ 36–37. Because Mr. Pinson has not demonstrated which particular releases improperly withheld names of staff members, the Court is unable to conduct the balancing of interests required by Exemption 6 and, thus, deems Mr. Pinson's general argument insufficient.

Therefore, the Court finds that the DOJ's arguments with respect to Exemption 6 withstand Mr. Pinson's conclusory challenge.

### 3. Exemption 7

#### a. Threshold Inquiry

The DOJ argues that it properly invoked Exemption 7 in response to documents requested in Request Nos. 2011-7400, 2011-8167, 2011-8171, 2011-9352, 2011-10556. Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes," but only to the extent that disclosure would cause an enumerated harm.  5 U.S.C. § 552(b)(7); *see FBI v. Abramson*, 456 U.S. 615, 622 (1982).  "In order to withhold documents under Exemption 7, the agency must, as a preliminary matter" make a "threshold" showing and "demonstrate that the records were compiled for a law enforcement purpose." *Kay v. FCC*, 976 F. Supp. 23, 37 (D.D.C. 1997).  "To show that . . . documents were 'compiled for law enforcement purposes,' the [agency] need only 'establish a rational nexus between [an] investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law.'" *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998)).

It is apparent that the protection of all persons charged with or convicted of offenses against the United States is a primary responsibility of the BOP.  The plain language of plaintiff's FOIA requests—all of which pertain to inmate and prison matters handled by the BOP—and the location of the responsive records in criminal-related databases, *see*, *e.g.*, Moorer Decl. ¶¶ 4–5; Velilla-Arce Decl. ¶¶ 4–5; Christenson Decl. ¶¶ 18–21, 31, evidence a law enforcement purpose: that is, the protection and management of all persons charged with or convicted of offenses

against the United States, *see generally* 18 U.S.C. § 4042.   One BOP declarant explains that

BOP's "law enforcement mission" is to "protect[ ] inmates, staff, and the community."

Christenson Decl. ¶¶ 48, 77.   Accordingly, the declarants adequately establish—and Mr. Pinson

has not disputed—that the responsive records at issue in this case were compiled for law

enforcement purposes within the scope of Exemption 7.   The Court therefore deems the DOJ's

threshold argument conceded.

### b.  Exemption 7(C)

The DOJ argues that it properly invoked Exemption 7(C) in response to Request Nos.

2011-7400, 2011-8171, and 2011-9352, 2011-10556.   Under Exemption 7(C), an agency is

exempt from producing "records or information compiled for law enforcement purposes . . . to

the extent that the production of such law enforcement records or information . . . could

reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. §

552(b)(7)(C).  In determining whether this exemption applies to particular information, a court

must balance the privacy interests of individuals mentioned in the records against the public

interest in disclosure.  *See ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011).  The

privacy interest at stake belongs to the individual, not the government agency, *see U.S. Dep't of

Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763–65 (1989), and

"individuals have a strong interest in not being associated unwarrantedly with alleged criminal

activity," *Stern v. FBI*, 737 F.2d 84, 91–92 (D.C. Cir. 1984).  When balancing an individual's

privacy interest against the public interest, "the only public interest relevant for purposes of

Exemption 7(C) is one that focuses on 'the citizens' right to be informed about what their

government is up to.'"  *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992)

(quoting *Reporters Comm.*, 489 U.S. at 773).  It is a FOIA requester's obligation to articulate a

public interest sufficient to outweigh an individual's privacy interest, and the public interest must be significant. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).

The DOJ argues that the BOP properly invoked Exemption 7(C) to withhold identifying and medical information relating to the BOP staff members and third-party inmates because releasing such information "would constitute an unwarranted invasion of privacy" and "would shed virtually no additional light on the BOP's operations."  Defs.' Mem. Supp. at 29–30.  Mr. Pinson responds that the withholding of staff names was improper. Pl.'s 2d Partial Resp. at 2–3. As explained above, however, because Mr. Pinson has not specifically identified any particular release, he has not sufficiently explained why the BOP's invocation of Exemption 7(C) to withhold staff names in any particular instance was improper and the Court is unable to conduct the balancing of interests required by Exemption 7(C).  The Court will not assume the role of advocate for Mr. Pinson and determine which particular releases he challenges.  *See Gordon*, 574 F.2d at 1151; *Sun*, 2015 WL 5726471, at *9 n.6.  Mr. Pinson has not otherwise contested any of the DOJ's arguments with respect to Exemption 7(C) and therefore those arguments are deemed conceded as to Request Nos. 2011-7400, 2011-9352, 2011-8171, and 2011-10556.

### c.  Exemption 7(E)

The DOJ also contends that the BOP properly invoked Exemption 7(E) in its responses to Request Nos. 2011-7400, 2011-8171, and 2011-10556.  Exemption 7(E) protects law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The exemption permits the withholding of information "not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk

of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009). "[A]n agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions, even when the materials have not been compiled in the course of a specific investigation." *Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002).

The DOJ argues that the BOP properly withheld identifying information of third-party inmates, letters obtained by monitoring plaintiff's email and correspondence, and information relating to its inmate monitoring system because such information concerns law enforcement techniques and procedures and revealing such information would "render those procedures vulnerable and weaken their effectiveness." Defs.' Mem. Supp. at 31–32 (internal quotation mark omitted) (quoting *Morley*, 508 F.3d at 1129). Mr. Pinson argues in response that the BOP improperly withheld staff names. *See* Pl.'s 2d Partial Resp. at 2–3. The Court has already noted that the Mr. Pinson's general argument was inadequate and will not repeat its reasoning here. As with the other exemptions, Mr. Pinson has not otherwise contested the DOJ's arguments with respect to Exemption 7(E). Consequently, the Court deems those arguments as conceded with respect to Request Nos. 2011-07400, 2011-08171, and 2011-10556.

### d.  Exemption 7(F)

Finally, the DOJ claims that it properly invoked Exemption 7(F) in its response to Request Nos. 2011-7400, 2011-10556, and 2011-9352. FOIA Exemption 7(F) protects from disclosure information contained in law enforcement records that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). "That

language is very broad," and the exemption "does not require that a particular kind of individual be at risk of harm; 'any individual' will do." *Public Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 205 (D.C. Cir. 2014).  Moreover, "[d]isclosure need not *definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices." *Id.* (emphasis in original).

The DOJ argues that the BOP properly withheld identifying information of third-party inmates, monitoring and classification information of inmates, tracking numbers relating to the entry and withdrawal of information from a facility, and information relating to the implementation of security measures because such information "could endanger the life or physical safety of third-party inmates and prison staff members."  Defs.' Mem. Supp. at 33–34. In response, Mr. Pinson contends that the BOP's withholding of staff names alone under the exemptions is improper.  The Court deems the DOJ's argument conceded as to Request Nos. 2011-7400, 2011-10556, and 2011-9352 because Mr. Pinson has not addressed those arguments and his general argument on staff names is insufficient.[20]

In light of this Court's conclusions regarding the exemptions BOP has invoked, the Court will grant summary judgment to the DOJ as to Request Nos. 2011-7400, 2011-8167, 2011-8171, 2011-9352, and 2011-10556.

---

[20] FOIA requires that when a document contains some information that is exempt from disclosure, any reasonably segregable information not exempt from disclosure be released after deleting the exempt portions, unless the non-exempt portions are inextricably intertwined with exempt portions.  *See* 5 U.S.C. § 552(b); *see also Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002).  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007), and the declarations the DOJ has supplied here attest that "[e]very effort was made to release all segregable information" without revealing properly withheld material, *see, e.g.*, Christensen Decl. ¶¶ 41, 43, 44, 57; Greene Decl. ¶¶ 21.  Because Mr. Pinson has not responded to the DOJ's argument, he has failed to provide any evidence either to overcome the presumption or to contest the DOJ's representations.

## E. *Bivens* Claims

Mr. Pinson also brings several constitutional claims against OIA Chief John Dignam and BOP Director Charles Samuels in their individual capacities pursuant to *Bivens*.

### 1. Exhaustion

The DOJ has moved to dismiss Mr. Pinson's *Bivens* claims on the ground that he failed to exhaust his administrative remedies. Defs.' Mem. Supp. at 36–44; Defs.' Reply at 11–15. Mr. Pinson generally responds that the BOP did not provide a process for challenging his placement in the ADX general population, that the BOP's alleged misconduct rendered his administrative remedies unavailable, and that he already exhausted certain administrative remedies. *See* Pl.'s 1st Partial Resp. at 1–4.[21]

Under *Bivens*, a plaintiff has "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (discussing *Bivens*, 403 U.S. 388 (1971)). To state a *Bivens* claim, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "[I]ndividual government officials 'cannot be held liable' in a *Bivens* suit 'unless they themselves acted [unconstitutionally].'" *Wood v. Moss*, 134 S. Ct. 2056, 2070 (2014) (quoting *Iqbal*, 556 U.S. at 683). Moreover, "[p]risoners' claims supporting *Bivens* actions . . . must first

---

[21] Mr. Pinson also argues that he "was not required to repeat exhaustion" with regard to "the issue of being housed around known enemies," and he claims that he has "been in litigation with [the] BOP for years . . . over this issue" and that other inmates have suffered the same fate. Pl.'s 1st Partial Resp. at 3–4; *see also* 1st Pinson Decl. ¶ 9 (discussing Administrative Remedy Series 472128). Yet, none of Mr. Pinson's *Bivens* claims as stated in his Second Amended Complaint appear to be founded on a claim that he has been "housed near his enemies." *See* Corr. 2d Am. Compl. at 13–16. Therefore, as it does not relate to any of the four *Bivens* claims Mr. Pinson has asserted, the Court will not address Administrative Remedy Series 472128.

be exhausted administratively." *Davis v. Mukasey*, 669 F. Supp. 2d 45, 49 (D.D.C. 2009); *see* 42 U.S.C. § 1997e(a) (providing that "[n]o action shall be brought . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted"); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002) (explaining that exhaustion is required for all actions brought with respect to prison conditions, including those brought under *Bivens*, and that the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong").  Mr. Pinson's *Bivens* claims brought in this action concern "prison life," and thus cannot be maintained unless such claims have been administratively exhausted.

Mr. Pinson makes two factual arguments that generally respond to the BOP's exhaustion arguments as a categorical matter.  First, Mr. Pinson asserts that "the BOP never published or provided its internal exhaustion procedures on ADX placement to the BOP's general population," and therefore his failure to comply with the administrative process should be excused.  Pl.'s 1st Partial Resp. at 1–2.  As the BOP points out, however, Mr. Pinson was made aware of the BOP's administrative review process, as evidenced by his signature on the "ADX General Population Placement Decision" that explains the process for administratively appealing his placement.  *See* Defs.' Reply at 11–12; Mitchell Decl. Ex. 7.  Mr. Pinson has not presented any countervailing evidence.  Therefore, the Court finds no genuine issue of material fact with regard to the publication and provision of the BOP's administrative review process.

Second, Mr. Pinson argues that the BOP's misconduct rendered his administrative remedies unavailable as a general matter.  *See* Pl.'s 1st Partial Resp. at 3.  Specifically, he claims that "BOP officials threatened [him] with plac[ement] near his known enemies," and that "BOP officials refused to respond to submitted grievances or to provide forms to proceed to the next

level." Pl.'s 1st Partial Resp. at 3.  To be sure, "[a]n administrative remedy is actually available

to an inmate only if it is present or ready for immediate use, accessible, or obtainable." *DeBrew*

*v. Atwood*, 792 F.3d 118, 128 (D.C. Cir. 2015) (internal quotation marks and citation omitted).

But the BOP has demonstrated that Mr. Pinson continued to file numerous grievances during the

period at issue, as evidenced by the approximately 727 administrative remedies he has filed as of

September 16, 2014.  *See* Mitchell Decl. ¶ 15 & Exs. 3, 3A.  Nevertheless, Mr. Pinson attests

that he will proffer inmate witnesses that will corroborate that, "[f]rom Nov. 14, 2012 until Dec.

11, 2012," Counselor Richard Madison interfered with his ability to pursue grievances.  *See* Pl.'s

3d Partial Resp. at 1–2 & Attach. A, ECF No. 224.  Such promised statements relating to a one-

month period, however, would be insufficient to demonstrate that the administrative remedy

process was entirely unavailable, particularly when the record shows that Mr. Pinson did

continue to file grievances during that very same one-month period.  *See* Mitchell Decl. Ex. 3A,

at 21–22 (listing grievances filed on November 19, 2012, November 26, 2012, and November

30, 2012).  While—as discussed below—particular instances of staff misconduct might be

relevant to certain of Mr. Pinson's *Bivens* claims, on this record the Court is unable to conclude

that the administrative remedy process was rendered wholly unavailable to Mr. Pinson.

Consequently, the Court will proceed to consider the DOJ's exhaustion arguments specific to the

Mr. Pinson's four *Bivens* claims.

### a.  First *Bivens* Claim: Refusal to Investigate

The Court declines to dismiss Mr. Pinson's first *Bivens* claim.  Mr. Pinson alleges that

defendant Dignam refused to investigate his complaints regarding his safety unless he agreed to

cease news media contacts and litigation.  *See* Corr. 2d Am. Compl. at 14–15.  The BOP argues

that none of Mr. Pinson's administrative remedy filings match his allegation that the BOP staff

refused to investigate his claims and, as a result, that he has "failed to pursue, much less exhaust, his administrative remedies with respect to his first *Bivens* claim." Defs.' Mem. Supp. at 39–40. The BOP has identified four Administrative Remedy Series (hereinafter "grievances") that most closely match Mr. Pinson's *Bivens* claim, in that they all discuss alleged prison staff misconduct. The first, grievance 612103, involved an allegation of sexual harassment by prison staff.  *See* Mitchell Decl. ¶ 29 & Ex. 12.  The other three grievances, numbered 699884, 757955-F1, and 792435-F1, alleged that the prison staff had improperly seized legal documents, *see id.* ¶ 30 & Ex. 13, opened special mail outside of Mr. Pinson's presence, *see id.* ¶ 31 & Ex. 14, or introduced contraband into ADX Florence and deliberately sabotaged investigations into misconduct, *see id.* ¶ 32; *id.* Ex. 15.  As the BOP notes, although these grievances generally allege malfeasance by prison staff, none involve complaints directed at Mr. Dignam or allegations of refusals to investigate Mr. Pinson's claims unless he agreed to cease contacting members of the media or pursuing litigation.  Therefore, because such remedies have no relation to Mr. Pinson's first *Bivens* claim, the Court concludes that Mr. Pinson has not availed himself of the administrative remedy process. Defs.' Mem. Supp. at 39–40.  In his oppositions and declarations, Mr. Pinson does not address the four identified administrative remedies.  The Court therefore deems the BOP's arguments on this score as conceded.

Yet, Mr. Pinson does attest that he filed "an informal resolution request" in June 2011 related to Mr. Dignam's alleged obstruction of investigations.[22]  1st Pinson Decl. ¶ 4.  Mr.

---

[22] The Court treats this allegation as a claim of intimidation specific to Mr. Pinson's first *Bivens* claim.  Mr. Pinson makes no effort to tie this allegation to his categorical argument that administrative remedies were generally unavailable or his claim that Counselor Richard Madison obstructed his ability to file administrative grievances.  Nor could he, as this alleged intimidation purportedly took place in June 2011—over a year before the November 14, 2012 through December 11, 2012 time period during which Mr. Pinson claims that Mr. Madison obstructed his ability to file grievances.

Pinson concedes that he never filed a formal BP-9 grievance. But he claims that he was removed from his cell and interviewed by two prison officials who informed him that he "could not file [a grievance against] the head of internal affairs about his obstructing interrogations" because there existed "no BOP official responsible for investigating Mr. Dignam since he was the chief investigator of the BOP," that Mr. Pinson should understand that prison officials "would not be pleased" if he "pursued the issue further to a BP-9" grievance, and that he should therefore refrain from filing "if [he] wanted them to keep other inmates from hurting him." *Id.* Mr. Pinson interpreted this conversation as a threat from two "high ranking staff" members that he "needed to stop filing [grievances against] the people responsible for [his] safety," and asserts that he "fear[ed] [that his] safety would be jeopardized" if he pursued a formal grievance. *Id.* In its reply, the DOJ fails to respond to these specific allegations. In any event, while it appears that the D.C. Circuit has not yet considered the question, at least five circuits have held that "when a prisoner reasonably fears retaliation for filing a grievance, the administrative remedy is effectively rendered unavailable and the prisoner's failure to exhaust [is] excused." *McBride v. Lopez*, No. 12-17682, 2015 WL 7434623, at *3 (9th Cir. June 30, 2015); *accord Tuckel v. Grover*, 660 F.3d 1249, 1252–53 (10th Cir. 2011); *Turner v. Burnside*, 541 F.3d 1077, 1084–85 (11th Cir. 2008); *Kaba v. Stepp*, 458 F.3d 678, 686 (7th Cir. 2006); *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004). These circuits have held that an exception to the exhaustion requirement is readily compatible with the plain language of the Prison Litigation Reform Act, which requires only that a prisoner make use of "such administrative remedies *as are available*." 42 U.S.C. § 1997e(a) (emphasis added); *see Tuckel*, 660 F.3d at 1252–53. The Court is aware of no circuit to have reached the question and held to the contrary.

Given Mr. Pinson's specific allegations that he was foreclosed from pursuing an administrative remedy for his first *Bivens* claim, there currently exists a genuine issue of material fact.  Accordingly, the Court will deny the DOJ's motion to dismiss this claim at this time. *Accord Lineberry v. Fed. Bureau of Prisons*, 923 F. Supp. 2d 284, 293 (D.D.C. 2013) (noting that exhaustion may be excused where an inmate is threatened with retaliation for filing a grievance and accepting as true, for purposes of motion to dismiss, the plaintiff's allegations that he was so threatened).

### b. Second *Bivens* Claim: Transfer to ADX Florence

The Court similarly declines to grant the DOJ's motion to dismiss Mr. Pinson's second *Bivens* claim, which alleges that defendant Samuels directed an employee "to interrogate plaintiff and order plaintiff to cease all contacts with the news media," and that, when plaintiff failed to do so, "Samuels ordered plaintiff moved to ADX Florence using information he knew to be false." Corr. 2d Am. Compl. at 15.  Several grievances appear to encompass aspects of this claim, and as to each one the BOP contends that Mr. Pinson has failed to perfect an appeal regarding the final decision to transfer him to ADX and, therefore, that he has not completed the BOP's administrative remedy process as to his second *Bivens* claim.  Defs.' Mem. Supp. at 40–42.

The record does support BOP's claim that Mr. Pinson either failed to perfect an appeal from the BOP's initial response to his grievances or that the relevant grievances were filed prematurely.  First, Mr. Pinson did not appeal the BOP's responses to grievances 622004-F1 and 622088-FI to the regional level, *see* Mitchell Decl. ¶ 25 & Ex. 3, Ex. 3A, and does not attest to doing so in his declaration, *see generally* 1st Pinson Decl.  Second, the BOP correctly points out that grievances 600334, 615362, and 615364 pre-dated the BOP's final decision to place Mr.

Pinson at ADX Florence on January 14, 2011, and therefore those grievances challenged only the BOP's *consideration* of whether to transfer Mr. Pinson to ADX, not his actual placement at ADX.[23]   *See* Defs.' Mem. Supp. at 41; Mitchell Decl. ¶ 24.   Mr. Pinson argues that these grievances were not premature, as the BOP claims, because the governing regulations do not specify "when an inmate must wait to begin the process" and that he validly began challenging the process as soon as his transfer was under consideration in "mid-2010."   Pl.'s 1st Partial Resp. at 4.   But the pertinent regulation states in relevant part that "[t]he deadline for completion of informal resolution and submission of a formal written [grievance] . . . is 20 calendar days following the date on which *the basis for the [grievance] occurred*," 28 C.F.R. § 542.14(a) (emphasis added), and the DOJ argues that "the basis for the request was the BOP's decision to transfer plaintiff to ADX Florence"—which was not made until January 11, 2014—and not the agency's consideration of transferring Mr. Pinson.   Defs.' Reply at 15.   The Court agrees with the BOP's interpretation of Mr. Pinson's grievances and concludes that to challenge his transfer to ADX Florence, Mr. Pinson needed to file a grievance within 20 days following the action that formed the "basis" of his grievance: namely the BOP's formal decision to transfer him.   As the DOJ validly points out, "[a]ny other conclusion would risk a deluge of grievances in instances where an inmate merely believes that officials may be contemplating a disfavored action, or in which the BOP is considering actions that are not ultimately taken."   Defs.' Reply at 15. Consequently, the Court finds that grievances 600334, 615362, and 615364 were premature

---

[23] Moreover, Mr. Pinson did not properly pursue the second *Bivens* claim in grievances 600334 and 615363 as those grievances named the Deputy Regional Director, not Dignam and Samuels, and thus failed to provide notice to the BOP that Mr. Pinson was complaining about defendant Dignam's or Samuels's actions. *See* Mitchell Decl. ¶ 24.

since the basis of their complaints—the BOP's final decision to transfer Mr. Pinson to ADX

Florence—had not yet occurred when those grievances were filed.

      Nevertheless, a genuine issue of fact does exist as to the only grievance post-dating the

BOP's final decision, which the DOJ admits "did allege that [Mr. Pinson's] ADX referral was in

retaliation for a lawsuit he filed": grievance 641235-R1.  Defs.' Reply at 14.  The appeal for

grievance 641235-R1 was denied by the Central Office on procedural grounds because Mr.

Pinson's filing was not on the correct administrative form.  *See* Mitchell Decl. ¶ 27 & Ex. 3, at

29, 31.  In light of this, the BOP argues that Mr. Pinson has not perfected an appeal regarding

this grievance.  Defs.' Mem. Supp. at 41–42.  But Mr. Pinson attests that prison officials never

gave him the correct administrative form, despite several requests he made to prison staff for it.

*See* 1st Pinson Decl. ¶ 3.  While "[n]either [a] lack of awareness of a grievance procedure nor an

inmate's assessment of the viability of the process can excuse the exhaustion requirement," if

"'prison officials refuse to provide the required grievance forms upon request or ignore such a

request,' or if the inmate receives 'threats of retaliation for filing a grievance,' exhaustion may

be excused."  *Lineberry*, 923 F. Supp. 2d at 293 (citations omitted) (quoting *Albino v. Baca*, 697

F.3d 1023, 1034 n.7 (9th Cir. 2012)).  Therefore, in light of Mr. Pinson's sworn declaration,

there is a genuine issue of material fact regarding whether he exhausted his administrative

remedies with respect to this *Bivens* claim.  And if it turns out that Mr. Pinson did not receive the

correct form from the BOP, he cannot be deemed to have exhausted his administrative remedies

because he was denied the opportunity to properly appeal the determination for grievance

641235-R1.  Given the factual disputes on this issue at this stage, the Court will not dismiss Mr.

Pinson's second *Bivens* claim at this time.

c.  Third *Bivens* Claim: Order to Separate Mr. Pinson from Another Inmate

Mr. Pinson has not exhausted administrative remedies for his third *Bivens* claim.  In his

amended complaint, Mr. Pinson alleges that "defendant Samuels ordered plaintiff and [another

inmate] to be separated," and instructed prison staff to harass Mr. Pinson until he "quit filing

lawsuits and contacting the news media."  Corr. 2d Am. Compl. at 15.  But none of the relevant

grievances the BOP has identified as most analogous to this allegation in fact relate to this claim.

For example, grievances 728709 and 732337 do not address allegations of being separated from

another ADX inmate or staff harassment, but instead concern correspondence privileges with

other inmates.  *See* Mitchell Decl. ¶ 34 & Exs. 3, 3A, 16, 17.  Moreover, although grievance

727633 alleges harassment by correctional officers, it does not allege that defendant Samuels

ordered the harassment or ordered Mr. Pinson to be separated from another inmate.  *See* Mitchell

Decl. ¶ 35 & Ex. 18.  Furthermore, grievance 759524's allegation—that Mr. Pinson was

separated from another inmate in retaliation for that inmate providing a declaration for Mr.

Pinson—concerns activity that took place eight months after the conduct alleged in the

complaint.  *See* Corr. 2d Am. Compl. at 15; Mitchell Decl. ¶ 36 & Ex. 19.  And furthermore,

even if the grievance does relate to Mr. Pinson's third *Bivens* claim, the grievance was filed in

November 2013—after the claim had already been included his Second Amended Complaint—

demonstrating that Mr. Pinson failed to adequately exhaust his administrative remedies before

including the claim in this action.  Mr. Pinson neither responds to these arguments nor identifies

any other grievances that might relate to this claim or name Defendant Samuels, specifically.

Accordingly, because the record demonstrates that Mr. Pinson has not exhausted his

administrative remedies with respect to his third *Bivens* claim, the Court will dismiss this claim

without prejudice.

### d. Fourth *Bivens* Claim: Imposition of Mail Restrictions

Finally, the Court will dismiss Mr. Pinson's fourth *Bivens* claim on exhaustion grounds.

Mr. Pinson alleges that defendants Samuels and Dignam authorized the imposition of "mail

restrictions limiting plaintiff's communications with attorneys and the news media." Corr. 2d

Am. Compl. at 16. The record reveals that grievance 754155-A1 is the only grievance relating to

Mr. Pinson's mail restriction claim. *See* Mitchell Decl. ¶¶ 38, 40; *id.* Ex. 3.[24] Although Mr.

Pinson did exhaust the administrative process with respect to grievance 754155, he did not do so

before filing his Second Amended Complaint. While Mr. Pinson included his mail restriction

claim in his Second Amended Complaint filed on October 23, 2013, *see* Corr. 2d Am. Compl. at

16, Mr. Pinson did not file an appeal of grievance 754155 until January 22, 2014, *see* Mitchell

Decl. ¶ 40 & Ex. 3, at 41. In fact, Mr. Pinson acknowledges that the grievance only "became

final on March 23, 2014," after the BOP failed to respond to his appeal within sixty calendar

days. 1st Pinson Decl. ¶ 6; *see also* 28 C.F.R. § 542.18 (setting forth period in which the BOP

must respond); Mitchell Decl. ¶ 40 (acknowledging that because "the time for response,

including extensions, has passed," grievance 754155 "may be deemed denied as of

approximately March 23, 2014").[25] Mr. Pinson, therefore, did not exhaust his administrative

---

[24] In his declaration, Mr. Pinson references grievance 784491, which relates to his challenge to "classifications." *See* 1st Pinson Decl. ¶ 6. Whatever relevance this grievance has to the four asserted *Bivens* claims, however, Mr. Pinson concedes that this grievance "remains pending." *Id.* Because Mr. Pinson has provided no indication that the appeal has been pending for longer than the period afforded to the BOP by regulation to respond, *see* 28 C.F.R. § 542.18—and thus has been constructively exhausted—the Court assumes that it has not yet been administratively exhausted.

[25] Although Mr. Pinson attests that grievances 754155 and 784491, *see supra* note 24, "were not [his] first attempt to challenge" the mail restrictions, and that he had previously filed grievances for which he either received no response or was not provided the correct administrative form to file an appeal, Mr. Pinson provides no evidence to support his bald assertion that other relevant grievances were filed. 1st Pinson Decl. ¶ 7.

remedies with regard to his final *Bivens* claim before he filed his Second Amended Complaint on

October 23, 2013.  *See Davis,* 669 F. Supp. 2d at 49–50 (noting that the exhaustion of

administrative remedies is required before filing a *Bivens* action in federal court); *see also*

*Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010) ("[The] exhaustion requirement does

not allow a prisoner to file a complaint addressing non-exhausted claims, even if the prisoner

exhausts his administrative remedies while his case is pending.").  Accordingly, this Court

dismisses his fourth *Bivens* claim without prejudice.

### 2. Sufficiency of the *Bivens* Allegations

In its reply brief, the DOJ argues for the first time that Mr. Pinson's *Bivens* claims

warrant dismissal because they are "speculative, conclusory, and entirely unsupported."  Defs.'

Reply at 7–11.  This argument as to the merits was not raised in the DOJ's initial memorandum,

however, *see* Defs.' Mem. Supp. at 36–44, and "it is a well-settled prudential doctrine that courts

generally will not entertain new arguments first raised in a reply brief," *Lewis v. District of*

*Columbia*, 791 F. Supp. 2d 136, 139–40 n.4 (D.D.C. 2011) (quoting *Aleutian Pribilof Islands*

*Ass'n v. Kempthorne*, 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008)).  Therefore, the Court declines to

consider the DOJ's insufficient-pleading argument in this memorandum opinion.

The Court nevertheless acknowledges that Mr. Pinson's *Bivens* claims, as currently

crafted, are vague at best.  Rather than dismissing Mr. Pinson's claims outright or forcing the

DOJ to expend its resources to respond to the complaint in its current form, the Court will

instead *sua sponte* treat the DOJ's arguments as a motion for a more definite statement.  *See* Fed.

R. Civ. P. 12(e) ("A party may move for a more definite statement of a pleading to which a

responsive pleading is allowed but which is so vague or ambiguous that the party cannot

reasonably prepare a response."); *see also Fikes v. City of Daphne*, 79 F.3d 1079, 1083 n.6 (11th

Cir. 1996) (noting that a district court has "inherent authority to require the appellant to file a more definite statement," either under Rule 12(e) or "within the district court's authority to narrow the issues in the case in order to speed its orderly, efficient, and economic disposition"); *Commc'ns Assocs., Inc. v. Notatel Commc'ns, Inc.*, No. 84 C 6076, 1985 WL 2542, at *7 n.2 (N.D. Ill. Sept. 15, 1985) ("Where the court deems it appropriate, it may treat a motion to dismiss as a motion for a more definite statement and grant such a motion *sua sponte*."); *cf.* *Crawford-El v. Britton*, 523 U.S. 574, 597–98 (1998) (noting that, while no heightened burden of proof is required to defeat a summary judgment motion raising qualified immunity, where a plaintiff "files a complaint against a public official alleging a claim that requires proof of wrongful motive," a court may "grant the defendant's motion for a more definite statement under Rule 12(e)," thereby "insist[ing] that the plaintiff 'put forward specific, nonconclusory factual allegations' . . . in order to survive a prediscovery motion for dismissal or summary judgment" (quoting *Siegert v. Gilley*, 500 U.S. 226, 236 (1991) (Kennedy, J., concurring in the judgment)).

The Court will therefore order Mr. Pinson to file an amended complaint with the Court on or before February 3, 2016, that "[a]t a minimum" contains specific, non-conclusory "factual allegations that set forth the 'who, what, where, when and why'" of his two remaining *Bivens* claims. *Umude v. Am. Sec. Programs, Inc.*, No. 14-1587, 2014 WL 6967815, at *1 (D.D.C. Dec. 10, 2014) (*sua sponte* treating defendant's motion as one for a more definite statement). As set forth more fully in the order separately and contemporaneously issued with this Memorandum Opinion, Mr. Pinson must provide specific allegations, among other things, to tie Defendants Dignam and Samuels to the alleged acts.

**V.  CONCLUSION**

For the foregoing reasons, the DOJ's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 4, 2016                                    RUDOLPH CONTRERAS
                                                           United States District Judge