# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JEREMY PINSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-1872 (RC) |
| | : | | |
| v. | : | Re Document No.: | 239 |
| | : | | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

*Pro se* Plaintiff Jeremy Pinson is currently incarcerated in federal prison. While in prison,

Mr. Pinson has filed multiple Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, requests

with different components of the U.S. Department of Justice ("DOJ"). On several occasions,

DOJ has asked Mr. Pinson to clarify his records requests, told him that it could not find records

responsive to his requests, or informed him that the records he sought were exempt from

disclosure by law. Mr. Pinson filed a complaint claiming that DOJ improperly withheld

numerous records from him in violation of FOIA. In response, DOJ filed several pre-answer

motions, each asking the Court to dismiss or grant summary judgment in its favor on different

portions of Mr. Pinson's complaint.

One of those motions was a motion for partial summary judgment as to Mr. Pinson's

FOIA claims against DOJ's Office of Information Policy ("OIP"). *See generally* Defs.' Mot.

Partial Summ. J. [hereinafter OIP Mot. Summ. J.], ECF No. 131. Some of the withholdings at

issue in that motion were made at the request of the Bureau of Prisons ("BOP"), however, and

the Court ordered DOJ to justify those withholdings after they were not discussed in the OIP

motion. *See* Order of August 27, 2015, ECF No. 235. DOJ later filed a separate justification for

these redactions, which the Court indicated it would treat as a separate dispositive motion for

partial summary judgment. *See* BOP's Justifications Withholdings Noted OIP's Dispositive Mot.

[hereinafter Defs.' Mot. Summ. J.], ECF No. 239; Order of Oct. 2, 2015, ECF No. 240.

That motion is now ripe, and for the reasons explained below, the Court will grant in part

and deny in part the motion.

## II.  FACTUAL BACKGROUND

In its prior memorandum opinion, the Court already explained in detail the factual

background regarding these requests. *See Pinson v. U.S. Dep't of Justice*, No. 12-01872, 2016

WL 614364, at *1–4 (D.D.C. Feb. 16, 2016). The Court assumes familiarity with its prior

opinion and confines its discussion here to the facts most relevant to the present motion.

### A.  FOIA/PA Request No. AG/10-R1351

By letter dated September 5, 2010, Mr. Pinson submitted a FOIA request to OIP for "any

correspondence or electronic messages generated after January 21, 2009 by the Attorney

General, or staff within the Attorney General's office, addressed to or intended for the Director

of the Federal Bureau of Prisons." Decl. Vanessa R. Brinkmann ¶ 4 & Ex. A [hereinafter

Brinkmann Decl.], ECF No. 131-3. Mr. Pinson requested that no more than two hours of search

time be expended and that no more than one hundred pages of responsive documents be

produced. *See id.* OIP received Mr. Pinson's request on September 16, 2010, and assigned it

FOIA tracking number AG-10/R1351. *See id.* ¶ 5 & Ex. B. On November 9, 2012, OIP

responded to Mr. Pinson's FOIA request, identifying seventy-two pages of responsive material.

*See id.* ¶ 11. OIP made several redactions on its own behalf, which this Court previously

addressed. *See generally Pinson*, 2016 WL 614364. OIP also forwarded the records to BOP for consultation, and BOP requested that certain additional material be withheld pursuant to FOIA Exemptions 5, 6, and 7. *See* 5 U.S.C. § 552(b)(5), (6), (7); Brinkmann Decl. ¶ 12; Defs.' Mot. Summ. J. at 10–14.

Specifically, BOP redacted the name of an individual (other than Mr. Pinson) then in BOP custody and the details regarding an inquiry about that individual from an email message a member of the Office of the Attorney General ("OAG") sent to the former Director of BOP. *See* Defs.' Mot. Summ. J. at 9; Notice Re BOP's Justification OIP's Withholdings at 1, ECF No. 247. In addition, BOP requested that thirty-two pages be withheld in full. Those pages consisted of two memoranda detailing Special Administrative Measures ("SAMs") imposed on two different individuals in BOP custody ("SAMs memoranda"). *See* Defs.' Mot. Summ. J. at 9–10. SAMs are special measures that the Attorney General can implement for certain inmates in order to create individualized conditions of confinement that are deemed "reasonably necessary to protect persons against the risk of death or serious bodily injury." 28 C.F.R. § 501.3(a). These measures may include limitations on individuals' access to the mail, media, telephone, and visitors. *See* Defs.' Mot. Summ. J. at 11–12 (citing Decl. Ronald L. Rodgers ¶ 12(a) [hereinafter Rodgers Decl.], ECF No. 239-1). SAMs may be imposed for up to one year and may be extended in increments not to exceed one year, at the direction of the Attorney General. *See* 28 C.F.R. § 501.3(c).

Upon BOP's recommendation, DOJ withheld in full the two SAMs memoranda, of fourteen pages and eighteen pages in length, respectively. *See* Defs.' Mot. Summ. J. at 11. The SAMs memoranda memorialize the Attorney General's SAMs decisions with respect to two inmates and recount in detail the criminal conduct of the individuals subject to the orders, those

individuals' continued threat to public safety, and the terms of the SAMs themselves. *See id.* at 11–12. Although DOJ has indicated that one of the memoranda dealt with a convicted prisoner and the other dealt with a pretrial detainee, it has not specified which memorandum relates to which individual. *See id.* at 11.

Mr. Pinson administratively appealed OIP's decision on November 19, 2012. In his appeal letter, Mr. Pinson did not challenge any of the excisions made on the released documents. Instead, as relevant here, he challenged the withholding of the SAMs memoranda in full. *See* Brinkmann Decl. ¶ 13 & Ex. D. On February 19, 2013, OIP responded to Mr. Pinson's appeal, informing him that because he had filed a lawsuit related to the denial of this request, his appeal had been closed. *See id.* ¶ 14 & Ex. E.

### B. FOIA/PA Request No. AG/12-0668, DAG/12-0669, and ASG/12-0670

On March 7, 2012, Mr. Pinson submitted a FOIA request to the Attorney General for "all information related to the selection of Bureau of Prisons Director Charles Samuels and Regional Director Paul Laird for those positions" and "any reports of deaths of inmates in federal custody during 2008–2011." *Id.* ¶ 27. Again, Mr. Pinson specified that no more than two hours be spent searching for responsive records and that he sought no more than one hundred pages of responsive documents. OIP initiated processing on behalf of OAG, the Office of the Deputy Attorney General (ODAG), and the Office of the Associate Attorney General (OASG), assigning the request FOIA tracking numbers AG/12-0668, DAG/12-0669, and ASG/12-0670. *Id.* ¶¶ 27, 28 & Exs. N, O.

OIP identified 139 pages responsive to Mr. Pinson's request among the records of OAG, ODAG, and OASG. OIP released seventy-two of those pages in full, sixty pages with redactions, and withheld the remaining seven pages in full. *See* ¶ 33. Some of the redactions were made, and

all seven pages were withheld, at the request of BOP. The redactions and withholdings on behalf of BOP consist of: (1) identifying information of third-parties referenced in the "information memoranda" from the BOP Director to the Deputy Attorney General reporting on inmate deaths, (2) the identity, recommendation, and curriculum vitae of a candidate for the position of Director of BOP who was not ultimately selected for that position, and (3) the home address of the current Director of BOP. *Id.* ¶¶ 32–34 & Ex. Q.

### III.  LEGAL STANDARD

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol,* 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency for Int'l Dev.,* 484 F. Supp. 2d 68, 73 (D.D.C. 2007)). Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

In the FOIA context, a district court reviewing a motion for summary judgment conducts a *de novo* review of the record, and the responding federal agency bears the burden of proving that it complied with its obligations under FOIA. 5 U.S.C. § 552(a)(4)(B). The court must analyze all underlying facts and inferences in the light most favorable to the FOIA requester. *See Wills v. U.S. Dep't of Justice*, 581 F. Supp. 2d 57, 65 (D.D.C. 2008). To prevail on a motion for summary judgment, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable[,] or is wholly exempt from the Act's inspection requirements." *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980) (quoting *Nat'l Cable Television Ass'n v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)). To meet its

burden, a defendant may rely on declarations that are reasonably detailed and non-conclusory. *See Citizens for Ethics & Responsibility in Wash. v. U.S. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) ("[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations [that] describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981))). Such declarations "are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). Generally, a reviewing court should "respect the expertise of an agency" and not "overstep the proper limits of the judicial role in FOIA review." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

## IV. ANALYSIS

### A. FOIA/PA Request No. AG/10-R1351

DOJ argues that it is entitled to summary judgment as to Request No. AG/10-R1351, claiming that it properly withheld documents pursuant to FOIA Exemptions 6, 7(C), 7(D), 7(E) and 7(F). *See generally* Defs.' Mot. Summ. J. Two withholdings made at the request of BOP are at issue: (1) the redaction of the name of a third-party inmate and an inquiry about him or her contained in an email to the former BOP Director; and (2) the withholding in full of the two

SAMs memoranda. *See id.* at 9, 11–12. The Court will grant summary judgment with respect to the email redaction, but will deny summary judgment, without prejudice, with respect to the SAMs memoranda.

### 1. Email (released with redactions)

Mr. Pinson does not directly address the email redaction in his opposition to DOJ's motion, although he does vaguely refer to "other info" that has been withheld and contests the withholding of "the identities of . . . violent criminals engaged in a violation or continuing violation of the law," Pl.'s Resp. OIP's/BOP's Witholdings Noted OIP's Dispositive Mot. at 1, 5 [hereinafter Pl.'s Resp.], ECF No. 261. Even if this vague reference encompasses the email redaction, Mr. Pinson failed to contest this redaction in his administrative appeal. *See* Brinkmann Decl. ¶ 13 & Ex. D; *see also Pinson*, 2016 WL 614364, at *3 (noting that "[i]n his appeal letter, Mr. Pinson did not challenge any of the excisions made on the released documents").

In the FOIA context, "[e]xhaustion of administrative remedies is generally required before filing suit in federal court so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision." *Hidalgo v. FBI*, 344 F.3d 1256, 1258 (D.C. Cir. 2003) (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 61 (D.C. Cir. 1990)). Thus, if a plaintiff has not exhausted his administrative remedies, the suit must be dismissed for failure to state a claim. *See id.* at 1257, 1260. Additionally, "[a] requester 'may have exhausted administrative remedies with respect to one aspect of a FOIA request—and thus properly seek judicial review regarding that request—and yet not have exhausted [his] remedies with respect to another aspect of a FOIA request." *Lair v. Dep't of Treasury*, No. 03-827, 2005 WL 645228, at *3 (D.D.C. Mar. 21, 2005) (quoting *Dettmann v. Dep't of Justice*, 802 F.2d 1472, 1477 (D.C. Cir. 1986)).

Although Mr. Pinson challenged other aspects of the withholding in his administrative appeal (including the withholding of the SAMs memoranda, discussed below, *see infra* Section IV.A.2), he did not challenge the redactions of information regarding the third-party inmate in the email to the former BOP Director. Because Mr. Pinson did not raise this issue in his administrative appeal, and thus did not exhaust his administrative remedies, he may not make arguments for the first time here. Accordingly, the Court will grant summary judgment to DOJ with respect to this redaction.

### 2.  SAMs Memoranda

DOJ invokes Exemptions 6 and 7(C) to justify the withholding in full of the two SAMs memoranda. *See* Defs.' Mot. Summ. J. at 12. DOJ also invokes Exemptions 7(D) and 7(E) to justify the withholding of the 14-page memorandum and Exemption 7(F) to justify the withholding of the 18-page memorandum. *See id.* at 13–14. As explained below, the Court agrees with DOJ that at least some of the information in the SAMs memoranda may properly be withheld. At the same time, however, DOJ has asserted vague justifications for withholding certain information, and has not met its burden to show that no segregable material exists in the documents. As a result, the Court will deny, without prejudice, DOJ's motion with respect to the SAMs memoranda.

### a.  Exemption 6

Exemption 6 permits the government to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Application of Exemption 6 requires a two-step inquiry: first, the Court must ask whether the information is contained in a personnel, medical, or "similar" file. *See Multi Ag Media v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008). Second, the Court

considers whether disclosure "would constitute a clearly unwarranted invasion of personal privacy." *Id.* (quoting 5 U.S.C. § 552(b)(6)).

The first step has been construed broadly to cover essentially all information sought from Government records that "appl[y] to a particular individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982) (explaining that Exemption 6 was "intended to cover detailed Government records on an individual which can be identified as applying to that individual" (quoting H.R. Rep. No. 89-1497, at 11 (1966))). This broad construction accords with Congress's purpose in enacting Exemption 6, namely, "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Id.* at 599. Because the SAMs memoranda are Government records that contain information that "applies to a particular individual" and could result in "injury and embarrassment" if disclosed, *id.* at 602, 599, the SAMs memoranda satisfy the first step of the inquiry.

At the second step, the Court must balance "the privacy interest that would be compromised by disclosure against any public interest in the requested information." *Multi Ag Media*, 515 F.3d at 1228. The Court must first examine whether disclosure of the information would compromise a substantial privacy interest, although the word substantial "means less than it might seem" and encompasses "anything greater than a *de minimis* privacy interest." *Id.* at 1229–30. Information such as an individual's name, address, criminal history, and employment history have been found to constitute a substantial privacy interest. *See, e.g.*, *Associated Press v. U.S. Dep't of Justice*, 549 F.3d 62, 65 (2d Cir. 2008) ("[A] citizen's name, address, and criminal history . . . implicate a privacy interest cognizable under the FOIA exemptions."); *Core v. U.S. Postal Serv.*, 730 F.2d 946, 948 (4th Cir. 1984) (concluding that a narrative summary including "names of present and former employers, awards, commendations, and membership in

professional organizations" implicated a substantial privacy interest). Additionally, "[t]he exemption is generally thought to protect intimate personal details the disclosure of which would be likely to cause embarrassment." *Ripskis v. Dep't of Hous. & Urban Dev.*, 746 F.2d 1, 3 (D.C. Cir. 1984).

Mr. Pinson argues that the individuals discussed in the SAMs memoranda have only an "attenuated privacy interest in their underlying criminal conduct"—conduct that is a matter "of public record as a result of [the individuals'] public prosecutions." Pl.'s Resp. at 2. The Court disagrees. The privacy interests of these individuals remain substantial, and these individuals are not precluded from retaining a privacy interest merely on the basis of their public prosecutions. Indeed, at least at the time the SAMs memoranda were written, one of the inmates had not yet been convicted. *See* DOJ's Reply at 2, ECF No. 262. As for the other inmate, while the "interests in privacy fade when the information involved already appears on the public record," *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494–95 (1975), and "the disclosure of convictions and public pleas is at the lower end of the privacy spectrum," even convicted defendants retain a privacy interest in the facts of their conviction, which can be embarrassing and stigmatizing, *see ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 7 (D.C. Cir. 2011). Disclosure of the individuals' names, criminal history, and the respective SAMs implemented during their custody implicate substantial privacy interests and would likely cause reputational and other harm to the individuals in question.

Having established the privacy interest at stake, the Court must weigh protection of that interest through nondisclosure "against the public interest in the release of the records." *Multi Ag Media*, 515 F.3d at 1230 (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)). The relevant public interest in FOIA cases is to "shed[] light on an agency's performance of its statutory duties" and thereby enable citizens to be informed about

"what their government is up to." *Id.* at 1231 (quoting *Reporters Comm.*, 489 U.S. at 773). Thus, information that does not directly reveal the behavior of federal government employees or agencies "falls outside the ambit of the public interest that the FOIA was enacted to serve." *See Reporters Comm.*, 489 U.S. at 774–75; *see also Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 88 (2d Cir. 1991) (explaining that disclosure of personal information having an "attenuated" relationship to government activity is insufficient to overcome FOIA privacy exemptions). There must be some "nexus between the requested information and the asserted public interest that would be advanced by disclosure." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172–73 (2004). The burden of establishing that disclosure would serve the public interest is on the requester, *see Associated Press*, 549 F.3d at 66, and "[m]ere speculation about hypothetical public benefits cannot outweigh a demonstrably significant invasion of privacy," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 178–79 (1991).

The Court concludes that Exemption 6 protects, at the very least, the names and other personal identifying information concerning the inmates discussed in the SAMs memoranda. Other personal identifying information might include "the inmate's crimes" to the extent they are sufficiently distinctive to be identifiable, "the effective dates of the SAMs," the inmate's "prison location," or the particularized "risks of declining to apply SAM restrictions to that inmate." *Human Rights Watch v. U.S. Dep't of Justice*, No. 13-cv-7360, 2015 WL 5459713, at *9–10 (S.D.N.Y. Sept. 16, 2015) (concluding that the government properly invoked Exemptions 6 and 7(C) to withhold this type of information from SAMs memoranda). In the Court's view, the public does have an interest in disclosure of the circumstances surrounding the imposition of the SAMs and in learning the terms of those measures. This information would shed light on BOP's performance of its statutory duties—to protect inmates and the public—and thus inform citizens

about what their government is up to. Despite that interest, however, Mr. Pinson has failed to demonstrate how the disclosure of the identities of the particular inmates' subject to the SAMs would serve that public interest or provide further meaningful insight into BOP's activities. Thus, these individuals' substantial privacy interest outweighs the negligible public interest in the disclosure of the identities of particular individuals subject to the SAMs. As discussed below, if redaction of the personal identifying information can adequately protect the privacy of the individuals referenced, any segregable, non-exempt information should be disclosed.

### b. Exemption 7

DOJ also invokes several subsections of Exemption 7 as a basis for withholding the SAMs memoranda. Exemption 7 requires a threshold determination that the information withheld constitutes "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). The D.C. Circuit has indicated that "a court may apply a more deferential attitude toward the claims of 'law enforcement purpose' made by a criminal law enforcement agency" based on "the generally accurate assumption that federal agencies act within their legislated purposes." *Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982). Consequently, "a court can accept less exacting proof from such an agency that the purpose underlying disputed documents is law enforcement." *Id.* BOP is a law enforcement agency and thus deserves this deference. *See Duffin v. Carlson*, 636 F.2d 709, 713 (D.C. Cir. 1980).

The D.C. Circuit has articulated "two critical conditions that must be met" before a law enforcement agency's activity leading to the creation of relevant documents may be deemed to have had a "law enforcement purpose." *Pratt*, 673 F.2d at 420.[1] First, the agency's activity "must

---

[1] Taken broadly, DOJ appears to argue that because BOP is a law enforcement agency, *all* documents compiled by that agency *inherently* meet the threshold requirement. *See* Defs.' Mot. Summ. J. at 5 ("Documents compiled by law enforcement agencies are inherently records

be related to the enforcement of federal laws or to the maintenance of national security." *Id.* In order to satisfy this requirement, the agency should "be able to identify a particular individual or a particular incident as the object of its [activity] and the connection between that individual or incident and a possible security risk or violation of federal law," thus connecting the activity with "law enforcement agencies' legislated functions of preventing risks to the national security and violations of the criminal laws and of apprehending those who do violate the laws." *Id.* at 420–21.[2] In making this determination, "the focus is on how and under what circumstances the requested files were compiled, and 'whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'" *Jefferson v. U.S. Dep't of Justice, Office of Prof'l Responsibility*, 284 F.3d 172, 176–77 (D.C. Cir. 2002) (quoting *Aspin v. Dep't of Def.*, 491 F.2d 24, 27 (D.C. Cir. 1973)) (internal citation omitted). The threshold inquiry does not require that particular materials be "compiled in the course of a specific investigation," but is sufficiently expansive to include "internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions." *See Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002).

---

compiled for 'law enforcement purposes.'"); Rodgers Decl. ¶ 6. This broad argument is erroneous. Instead, the *Pratt* test was articulated specifically for law enforcement agencies, and details two conditions that even law enforcement agencies must meet to pass the threshold with respect to particular documents.

[2] The statutory threshold determination previously required that the information withheld constitute "*investigatory* records compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7) (1982 ed.) (emphasis added), but the statute was revised in 1986 to apply more broadly to any "records or information compiled for law enforcement purposes." *See* 5 U.S.C. § 552(b)(7) (2016); *see also* Pub. L. No. 99-570, § 1802(a) (Oct. 27, 1986). Although the *Pratt* test was crafted prior to this revision, the D.C. Circuit subsequently explained that the *Pratt* test remains valid, generally. *See Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 340 (D.C. Cir. 1987). As a result, the quoted language from *Pratt* has been revised (where noted) to be consistent with the current, broader language of the statute.

Second, "the nexus between the [activity] and one of the agency's law enforcement duties must be based on information sufficient to support at least 'a colorable claim' of its rationality." *Pratt*, 673 F.2d at 421. Courts should be "deferential to the particular problems of a criminal law enforcement agency," when assessing this factor. *Id.*

Here, both prongs of the *Pratt* test are met. BOP's activity at issue relates to the enforcement of federal laws and possible security risks in prisons. Specifically, the SAMs memoranda "memorialize decisions of the Attorney General to employ the carefully designed administrative measures attendant to incarceration to protect the public [and] the correctional officers and staff of the institutions to which they are assigned." Defs.' Mot. Summ. J. at 12. The SAMs memoranda relate to the management of particular security risks, and thus fall within Exemption 7. As for the second prong, BOP is a law enforcement agency that functions to protect inmates, staff, and the community. *See Swope v. U.S. Dep't of Justice*, 439 F. Supp. 2d 1, 6 (D.D.C. 2006). Thus, memoranda reflecting BOP's efforts to deal with potential security risks to the public, inmates, and staff are rationally related to BOP's law enforcement duties, and the threshold requirement is satisfied in this case as to the SAMs memoranda.

### i. Exemption 7(C)

Under subsection (C), the government may withhold information if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption 7(C) requires a balancing test similar to the one used for Exemption 6, weighing the privacy interests implicated in the requested records against the public interest in release. *See SafeCard*, 926 F.2d at 1205.[3] For the reasons discussed above, the privacy interest in

---

[3] Because Exemption 7(C) covers information that "could reasonably be expected" to cause an unwarranted invasion of privacy, 5 U.S.C. § 552(b)(7)(C), the balancing test in Exemption 7(C) is more deferential to the government agency than the test in Exemption 6. *See*

releasing the individuals' names and identifying information is outweighed by any public interest

in knowing what the government is up to, because release of the individuals' identities would not

substantially further transparency in BOP. Moreover, the D.C. Circuit has held that names of

"private individuals appearing in files within the ambit of Exemption 7(C)" are categorically

exempt from disclosure unless disclosing such information "is necessary in order to confirm or

refute compelling evidence that the agency is engaged in illegal activity." *See id.* at 1206. Thus,

because Mr. Pinson has presented no compelling evidence of illegal activity by BOP, the

individuals' identities in the SAMs memoranda are properly withheld under Exemption 7(C).[4]

### ii. Exemption 7(E)

DOJ also argues that the 14-page SAMs memorandum was properly withheld under

Exemption 7(E), which allows redaction of information that "would disclose techniques and

procedures for law enforcement investigations or prosecutions, or would disclose guidelines for

---

*Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984) (Exemption 7(C) covers a "somewhat broader range of privacy interests than Exemption 6.").

[4] DOJ also invokes Exemption 7(D) as a basis for withholding the 14-page SAMs memorandum. Exemption 7(D) permits the government to withhold law enforcement records or information that "could reasonably be expected to disclose the identity of a confidential source" or "information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). DOJ claims that because the SAMs memorandum discloses the fact that a named criminal organization "routinely employs conduct designed to undermine investigations of their criminal behavior," the SAMs memorandum, if made public, might "cause those who might otherwise have cooperated in investigations and prosecutions" of this criminal organization to refuse to cooperate "out of concern for their safety and that of their family members." Defs.' Mot. Summ. J. at 13. Yet, the text of Exemption 7(D) permits withholding only of a confidential source's identity or the information furnished by a confidential source. *See* 5 U.S.C. § 552(b)(7)(D); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993) (explaining that, when applying Exemption 7(D), a court must ask whether a "particular source spoke with an understanding that" his or her communication "would remain confidential" or "'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred'" (quoting S. Rep. No. 93-1200, at 13 (1974)) (emphasis omitted)). Exemption 7(D) does not permit the government to withhold information that it believes might potentially persuade unnamed or anticipated future sources to disclose information. Therefore, this exemption is not applicable to the SAMs memorandum at issue here.

law enforcement investigations or prosecutions if such disclosure could reasonably be expected

to risk circumvention of the law. . . ." 5 U.S.C. § 552(b)(7)(E). Exemption 7(E) affords

"categorical protection," *Judicial Watch, Inc. v. FBI*, 2001 WL 35612541, at *8 (D.D.C. Apr. 20,

2001) (internal quotation marks omitted), to material that "would compromise law enforcement

by revealing information about investigatory techniques that are not widely known to the general

public," *Smith v. Bureau of Alcohol, Tobacco & Firearms*, 977 F. Supp. 496, 501 (D.D.C. 1997).

DOJ first vaguely argues that Exemption 7(E) justifies withholding the 14-page SAMs

memorandum because disclosure "would reveal law enforcement techniques and would thereby

increase the chance that those techniques could be circumvented." Defs.' Mot. Summ. J. at 14. If

this concern relates to circumvention of the SAMs, however, that concern is difficult to square

with the BOP's own regulations. As explained in more detail below, those regulations require

that staff disclose the terms of SAMs to the inmate subject to the measures. *See* 28 C.F.R. §

501.3(b) (providing that "[d]esignated staff shall provide to the affected inmate, as soon as

practicable, written notification of the restrictions imposed"). That requirement suggests that the

BOP is *not* concerned that disclosure of the measures to the inmate will pose a risk of

circumvention and, therefore, it is unclear why disclosure to other, third-party individuals would

nonetheless pose such a risk. If, on the other hand, DOJ's concern is that *other* investigatory

techniques beyond the SAMs will be disclosed, it has wholly failed to describe those techniques,

or that concern, in any detail.

In addition, DOJ asserts that the inmate subject to the SAMs discussed in the 14-page

memorandum belongs to an organization that "has represented a severe threat to good order and

discipline within Bureau of Prisons facilities for many years by routinely employing coercion

backed by violence to punish and prevent cooperation with law enforcement and correctional

authorities." Defs.' Mot. Summ. J. at 14. That may be so, but as Mr. Pinson responds, DOJ has

not identified what in the memorandum, in particular, would "disclose techniques for law

enforcement investigations and prosecutions or be reasonably expected to risk circumvention of

the law." Pl.'s Resp. at 4. DOJ has not explained the nexus between any information contained in

the memorandum and the possible disclosure of investigatory or prosecutorial techniques. It may

be that there is reason to fear that the inmate, or his or her associates, will seek to circumvent the

law. But beyond its boilerplate assertion, DOJ has not yet explained what material in the SAMs

memoranda would pose that risk. Because DOJ has not shown how the memorandum relates to

law enforcement investigations or prosecutions, and has not made clear how disclosing a

memorandum discussing special security protocols would disclose techniques for investigation

or prosecution that are not known to the public, the Court will deny DOJ's motion for summary

judgment, without prejudice, on Exemption 7(E) grounds.[5]

### iii.  Exemption 7(F)

DOJ seeks to justify the withholding of the other, 18-page SAMs memorandum under

Exemption 7(F), which allows for the non-disclosure of records or information that "could

reasonably be expected to endanger the life or physical safety of any individual." § 552(b)(7)(F).

The D.C. Circuit has described the text of Exemption 7(F) as "expansive." *See Elec. Privacy*

*Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 526 (D.C. Cir. 2015), *cert. denied sub*

*nom. Elec. Privacy Info Ctr. v. Dep't of Homeland Sec.*, 136 S. Ct. 876 (2016). "The exemption

---

[5] In particular, if the memorandum relates to the convicted inmate, who has already been prosecuted and whose conduct is already a matter of public record, it is conceivable that certain investigation or prosecutorial techniques have already been publicly disclosed (unless the proceedings were sealed). This possibility is difficult to assess, however, because DOJ has not clarified which individual is the subject of the 14-page memorandum for which it claims Exemption 7(E) applies. *See* Defs.' Mot. Summ. J. at 11.

does not require that a particular kind of individual be at risk of harm; 'any individual' will do."

*Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 205 (D.C. Cir. 2014). Nor need the government show that disclosure would "*definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices." *Id.* Furthermore, unlike Exemptions 6 or 7(C), which involve balancing tests, Exemption 7(F) "is an absolute ban against [disclosure of] certain information and, arguably, an even broader protection than 7(C)." *Raulerson v. Ashcroft*, 271 F. Supp. 2d 17, 29 (D.D.C. 2002).

DOJ identifies two potential threats implicated by release of this memorandum. First, DOJ claims that because the memorandum includes a "detailed description of criminal conduct" the individual was expected to engage in, including information about weapons and targeted locations, the SAMs memorandum essentially "establish[es] a blueprint that others might follow to inflict mass casualties." *See* Defs.' Mot. Summ. J. at 14. Second, DOJ argues that release of the SAMs memorandum would constitute a threat to BOP employees because "release of the records would permit a close examination of their terms—and the permissible exceptions to them—that would allow those subject to their terms, and their criminal associates, to plot how such measures could be compromised and defeated." *See id.*

While DOJ's first argument is plausible, the agency has not yet provided a sufficiently detailed explanation for the Court to adequately assess it. Mr. Pinson claims that DOJ's rationale is too generic, and that DOJ fails to explain why disclosure of this particular criminal activity would likely serve as a ready blueprint for others to replicate. *See* Pl.'s Resp. at 4–5. This argument has some force. DOJ has the burden to justify its "nondisclosure with reasonably specific detail" demonstrating "that the information withheld logically falls within the claimed exemption." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v.*

*Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984). Yet, DOJ merely states that the memorandum discloses "the types of weapons, explosives, and/or munitions [the individual and his/her criminal associates] were likely to employ, and the locations where their intended crimes would occur." Rodgers Decl. ¶ 12(d); *see also* Defs.' Mot. Summ. J. at 14. DOJ's claim that it can withhold any information that could serve as a "blueprint" for future crimes, out of concern for a generalized risk of future danger, is overbroad. That argument would seem to suggest that any information about criminal conduct, even if already in the public domain or disclosed during an individual's prosecution, could be withheld out of fear that it could provide an avenue for others to replicate the conduct. Here, DOJ has not explained what it is about this criminal conduct that makes it more likely than other conduct to serve as a "blueprint" that others could replicate, or that poses unique risks to individuals. If there are special concerns motivating the withholding of information related to these particular criminal acts, DOJ has failed to describe them.

Moreover, DOJ has not responded to Mr. Pinson's contention that at least some of the information may already be in the public record. *See* Pl.'s Resp. at 4–5. DOJ has not clarified whether this memorandum relates to the convicted prisoner or the pretrial detainee, and to the extent some of the information about the inmate's criminal activity is already public record, any safety interest in non-disclosure may be diminished, even if not eliminated altogether.[6]

---

[6] Of course, the fact that information is already a matter of public record does not necessarily preclude a FOIA exemption from applying. *See Reporters Comm.*, 489 U.S. at 763 n.15; *ACLU*, 655 F.3d at 9. However, the rationale behind a continuing *privacy* interest on the part of individuals in the context of Exemptions 6 and 7(C) for publicly available information, as discussed above and as referenced in these cases, does not necessarily apply with the same force to an argument about public safety under Exemption 7(F). Whereas releasing information that is publicly available but relatively obscure could bring unwanted notoriety to the individual, it is not clear that releasing information about an individual's criminal conduct, which is already a matter of public record, increases the likelihood that it would be used as a blueprint for future crimes, as criminals likely to employ such blueprints and motivated to find them could already access the information through other avenues.

DOJ's second argument, that the release of the SAMs memorandum would pose a safety risk because it would allow a close examination of the SAMs and the possible exceptions to them, is unpersuasive. BOP's own regulations direct that the terms of SAMs should be routinely disclosed to the inmate subject to them. *See* 28 C.F.R. § 501.3(b). Indeed, it is hard to imagine how such measures could be imposed on an inmate without revealing the terms of those measures to him or her.[7] The regulations instruct that "[d]esignated staff shall provide to the affected inmate, as soon as practicable, written notification of the restrictions imposed and the basis for these restrictions." *Id.* Furthermore, although the regulations explicitly allow for the *basis* for the restrictions to be "limited in the interest of prison security or safety or to protect against acts of violence or terrorism," *id.*, there is no corresponding statement that the *terms* of the restrictions may also be limited or withheld. Any argument that disclosure of the terms of the SAMs memorandum would provide the inmate with an opportunity to circumvent those measures makes little sense in light of the fact that the regulations already mandate such disclosure.

To the extent that DOJ is arguing that release of the SAMs' terms to *third-party* individuals would allow circumvention of their terms—and thus pose a threat to the life or physical safety of individuals—the Court is not aware of any general prohibition on an inmate disclosing the terms of SAMs to third parties. DOJ has not pointed the Court to any such proscription. Of course, some SAMs place restrictions on an inmate's ability to communicate with particular individuals as a general matter. *See, e.g.*, 28 C.F.R. § 501.3(a) (providing that

---

[7] These measures can include terms such as "housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone." 28 C.F.R. § 501.3(a); *see also* Defs.' Mot. Summ. J. at 11–12 (citing Rodgers Decl. ¶ 12(a)).

SAMs may include "limiting certain privileges, including . . . correspondence, visiting, . . . and use of the telephone"); *United States v. Mohamed*, 103 F. Supp. 3d 281, 288 (E.D.N.Y. 2015) (discussing SAMs imposed against an inmate who had previously broken out of prisons in Niger and Mali which included, among other things, restrictions on communications intended to prevent the inmate "from sending coded communications to co-conspirators outside the prison"). Yet, any risk that disclosure of the SAMs memorandum's contents will endanger individuals' lives or physical safety might be accommodated through a more limited redaction. For example, redacting the name and other identifying information of the individual subject to the terms of the SAMs memorandum could eliminate the possibility that the information could be used by the criminal associates of the incarcerated individual. If a redaction would be insufficient to eliminate the risk, DOJ has not yet explained why.

For all of these reasons, DOJ has not yet provided the Court with sufficient information to make a determination as to whether disclosure of information about the criminal activity discussed in the 18-page SAMs memorandum has properly been withheld under Exemption 7(F). Thus, the Court will deny DOJ's motion, without prejudice, on this ground.

### c. Segregability

Although the Court has denied, without prejudice, DOJ's invocation of certain exemptions, the Court nevertheless has concerns that DOJ has not adequately shown that all reasonably segregable material has been disclosed. To aid the ultimate resolution of this case, the Court will briefly highlight its segregability concerns.

FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). FOIA focuses on "information, not documents, and an agency cannot justify withholding

an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). The D.C. Circuit has long held that "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Id.* Indeed, in light of this rule, "categorical treatment . . . raises doubt as to whether [a] document was properly reviewed for segregability." *Geronimo v. Exec. Office for U.S. Att'ys*, No. 05-1057 (JDB), 2006 WL 1992625, at *7 (D.D.C. July 14, 2006). At the same time, an agency need not produce material if "the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value." *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1327 (D.C. Cir. 2000) (quoting *Neufeld v. IRS*, 646 F.2d 661, 666 (D.C. Cir. 1981)).

DOJ "has the burden of demonstrating that no reasonably segregable information exists within the documents withheld." *Army Times Publ'g Co. v. Dep't. of the Air Force*, 998 F.2d 1067, 1068 (D.C. Cir. 1993); *see also* 5 U.S.C. § 552(a)(4)(B). Although "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007), a government agency's "conclusion on a matter of law is not sufficient support for a court to conclude that the self-serving conclusion is the correct one," *Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008). Thus, an agency official's "conclusory affidavit" declaring that each page has been reviewed line-by-line to ensure compliance with the segregability requirement does not suffice. *See id.*

In this case, all the DOJ has provided is the type of conclusory affidavit that the D.C. Circuit has held to be insufficient. *See* Defs.' Mot. Summ. J. at 19 (stating that declarant "carefully reviewed for reasonably segregable information, and determined that there is no

additional reasonably segregable information that can be released to plaintiff"). DOJ's affidavit does not provide the Court with enough information to make specific findings as to segregability, which it is obligated to do. *See Stolt-Nielsen*, 534 F.3d at 734. The Court has held that Exemptions 6 and 7(C) shield the names and identifying information about the subjects of the SAMs memoranda, and that Exemptions 7(E) and 7(F) might apply to additional material, although DOJ has not yet adequately supported invoking those exemptions. Even still, DOJ has not demonstrated that any properly withheld material could not be redacted, and segregated from, the remainder of the SAMs memoranda. Mr. Pinson argues that "[t]he agency could reasonably segregate identities of the inmate and organization while disclosing the criminal conduct itself." Pl.'s Resp. at 3.[8] The Court agrees that releasing the portions of the memoranda that do not contain personal identifying information could protect the privacy of the individuals involved while shedding light on BOP's activities and thereby serving the public interest. *Cf. Dep't of the Air Force v. Rose*, 425 U.S. 352, 372–82 (1976) (holding that personal identifying information in records of Air Force Academy disciplinary proceedings was exempt under FOIA, but that in camera examination of the documents was appropriate to determine whether any non-identifying information was segregable, because information about the disciplinary proceedings themselves would preserve the public's right to governmental information); *id.* at 375 (quoting approvingly Senator Kennedy's remark that "deletion of names and identifying characteristics of individuals would in some cases serve the underlying purpose of exemption 6" (120 Cong. Rec. 17,018 (1974))).

---

[8] Although Mr. Pinson makes this objection under the heading of Exemption 7(D), it is relevant across all of the invoked exemptions. Moreover, even when a party does not raise segregability, the Court has a duty to *sua sponte* consider the issue, and "must make specific findings of segregability regarding the documents to be withheld." *Stolt-Nielsen*, 534 F.3d at 734 (quoting *Sussman*, 494 F.3d at 1116).

DOJ suggests, instead, that the documents are "amenable to categorical treatment." *See* Rodgers Decl. ¶ 12 n.1. Yet, the Court observes that in one recent case in the Southern District of New York, DOJ did release portions of several SAMs memoranda in response to a FOIA request, while redacting personal identifying information regarding the inmates at issue. *See Human Rights Watch*, 2015 WL 5459713, at *10. In that case, DOJ released the descriptions of the specific SAMs imposed, as well as the basis for why those SAMs were imposed where the basis was described "at a level of generality that makes it difficult for the inmate to be identified." *Id.* When the plaintiff, Human Rights Watch, challenged additional withholdings, the court held that DOJ had appropriately withheld personal information "of little value to the public"—such as descriptions of inmates' family members and visitors, or information that "would make identification of the inmate . . . substantially more likely by revealing information specific to the inmate"—because that information provided only "incremental value" to the public. *Id.*

In light of DOJ's disclosures in *Human Rights Watch*, and the Court's own consideration of DOJ's arguments made in this case, the Court is skeptical of DOJ's claim that the SAMs memoranda contain no non-exempt material that can reasonably be segregated from properly withheld material. In the context of its renewed motion for summary judgment addressing Exemptions 7(E) and 7(F), DOJ must consider whether non-exempt material can be segregated, or further justify its claim that categorical treatment is appropriate in this instance. If providing additional explanation would disclose the very information DOJ seeks to withhold, DOJ may provide this additional explanation to the Court in an in camera declaration, and may submit the SAMs memoranda for an in camera review. *See* 5 U.S.C. § 552(a)(4)(B); *Smith*, 977 F. Supp. at 501.

**B.  B. FOIA/PA Request No. AG/12-0668, DAG/12-0669, and ASG/12-0670**

DOJ also seeks summary judgment with respect to Request No. AG/12-0668, in which Mr. Pinson sought information concerning Charles Samuels's selection as BOP Director and any reports of deaths of inmates in federal custody from 2008 to 2011. *See* Brinkmann Decl. ¶¶ 27, 28 & Exs. N, O. Among the 139 pages of responsive records located in response to that request, BOP requested that OIP redact: (1) identifying information of third-parties referenced in the memoranda from the BOP Director to the Deputy Attorney General regarding inmate deaths; (2) the identity of, information concerning, and the curriculum vitae of, an individual Mr. Lappin recommended for the position of Director of BOP who was not ultimately selected; and (3) the home address of Director Samuels. *See* Brinkmann Decl. ¶¶ 30–34 & Exs. O, P, Q. The Court will grant DOJ's Motion for Summary Judgment with respect to these withholdings.[9]

**1.  Memoranda Related to Inmate Deaths**

DOJ released much of the content of the memoranda discussing inmate deaths, including the names of the individuals in BOP custody who either "took their own life, or were the victim of a homicide." *See* Rodgers Decl. ¶ 13. BOP concluded that "concerns regarding [those individuals'] personal privacy ended at the time of their death." *Id.* But where the inmate was a homicide victim, "the name or names of the suspected assailant or assailants and the offenses for which they were previously convicted and sentenced" were redacted. *Id.* Similarly, BOP redacted a description of the likely motive for the homicide of an individual in BOP custody at a

---

[9] Although Mr. Pinson claims that OIP's search for this request was inadequate, *see* Pl.'s Resp. at 6, this Court already granted summary judgment to DOJ on this issue, concluding that the search was adequate, *see* Pinson, 2016 WL 614364, at *9. Moreover, contrary to Mr. Pinson's contention that OIP failed to detail its search efforts as to the Regional Director Paul Laird's selection, OIP *did* indicate that its search of DES records included the term "Paul Laird." *See* Brinkmann Decl. ¶ 29.

Residential Reentry Center in Puerto Rico. *Id.* BOP also requested that the names and identifying information of third-parties and family members be redacted from memoranda: discussing an inmate who escaped from a facility and then "took the lives of two family members and injured another before taking his own life"; detailing the death of an inmate who died while serving a home confinement sentence, where a family member of the individual identified him or her to law enforcement; and discussing an inmate who took his own life shortly after he had assaulted several visiting family members. *Id.* In each instance the name of the individual in BOP custody who died was disclosed, but the names of their family members or third parties were redacted. *Id.* DOJ argues that this information was properly withheld under Exemptions 6 and 7(C). Defs.' Mot. Summ. J. at 15–17.

### a.  Exemption 6

As discussed above, Exemption 6 allows agencies to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 6 requires the Court to follow a two-step inquiry: First, the Court must ask whether the information is contained in a personnel, medical, or "similar" file. Second, the Court considers whether disclosure would constitute a clearly unwarranted invasion of personal privacy. *See Multi Ag Media*, 515 F.3d at 1228.

The first step includes essentially all information "which applies to a particular individual [which] is sought from Government records." *Wash. Post Co.*, 456 U.S. at 602. The second step requires a balancing test. *See Multi Ag Media*, 515 F.3d at 1228. First, the Court examines whether disclosure implicates a substantial privacy interest, *i.e.* more than a *de minimis* privacy interest. *See id.* at 1229–30. The exemption protects, among other things, "intimate personal details the disclosure of which would be likely to cause embarrassment," *Ripskis*, 746 F.2d at 3,

including an individual's name and criminal history, *see Associated Press*, 549 F.3d at 65. Even

a convicted criminal has a privacy interest in the facts of his or her conviction. *See ACLU*, 655

F.3d at 7–8. Next, the court must weigh the privacy interest in non-disclosure against the public

interest in information about the agency's performance of its statutory duties, to determine

whether disclosure would result in a "clearly unwarranted invasion of personal privacy." *See*

*Multi Ag Media*, 515 F.3d at 1230–31 (internal quotation marks and citation omitted).

Information that does not directly reveal the behavior of federal employees and agencies "falls

outside the ambit of the public interest that the FOIA was enacted to serve." *Reporters Comm.*,

489 U.S. at 775; *see also Hopkins*, 929 F.2d at 88.

     Here, because the redacted information, including the names of third-parties or homicide

assailants, or the offenses for which the homicide assailants were convicted, applies to particular

individuals, the memoranda constitute "similar" files for the purposes of Exemption 6. *See Wash.*

*Post Co.*, 456 U.S at 602 (explaining that Exemption 6 covers essentially all information "which

applies to a particular individual [which] is sought from Government records"). In addition, DOJ

properly identified substantial privacy interests in the names and the potentially embarrassing

personal details of living individuals and third-party family members. *See Ripskis*, 746 F.2d at 3

(explaining that the exemption covers "intimate personal details the disclosure of which would

be likely to cause embarrassment"). Indeed, the Court notes that DOJ did exercise discretion, and

*did* release information related to deceased prisoners, where the agency concluded that no

substantial privacy interests were implicated.[10] Finally, the Court agrees with DOJ that the

---

[10] While DOJ posits that "concerns regarding their personal privacy ended at the time of their death," Defs.' Mot. Summ. J. at 15, this is an oversimplification. Although "the deceased by definition cannot personally suffer the privacy-related injuries that may plague the living," it is *not* the case that "under FOIA deceased persons have no privacy interest in nondisclosure of their identities." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 33–34 (D.C. Cir. 1998), *as*

release of the redacted information would not shed significant light on the government's

activities, because it involves personal identifying information of individuals who were neither

government employees nor individuals in BOP custody. *See* Defs.' Mot. Summ. J. at 16. Mr.

Pinson's conclusory statement that "[t]he public interest . . . outweighs the private interests of

those who seek to . . . violate our nation's laws," *see* Pl.'s Resp. at 5, constitutes "[m]ere

speculation about hypothetical public benefits[, which] cannot outweigh a demonstrably

significant invasion of privacy," *Ray*, 502 U.S. at 179. DOJ has demonstrated that it conducted

the careful balancing of the relevant private and public interests that FOIA mandates, and the

Court agrees that the redactions were proper under Exemption 6.[11]

---

*amended* (Mar. 3, 1999) (internal quotation marks and citation omitted). Proper analysis of the privacy interests at stake in a FOIA disclosure must "account for the fact that certain reputational interests and family-related privacy expectations survive death." *Id.* at 33. Because DOJ has released this information without objection, however, the Court will not determine whether such release was required by FOIA. In fact, unlike with the deceased inmates, DOJ did withhold the names of certain family members whom an inmate killed in at least one instance, despite the fact that those family members are now deceased. *See* Rodgers Decl. ¶ 13 (noting that one memorandum discussed an inmate who escaped "and took the lives of two family members and injured another," and that "various references to the family members have been redacted"). And the Court agrees that in the case of deceased family members, the substantial privacy interests outweigh public interest in the information.

[11] The fact that DOJ released the bulk of the information in the memoranda while redacting personal information demonstrates that DOJ made the required efforts to segregate and release as much non-exempt information as possible under FOIA.

DOJ also properly invokes Exemption 7(C) to justify the redactions in the memoranda related to inmate deaths. The redacted information meets the threshold requirement for Exemption 7 because it was "compiled for law enforcement purposes." *See* 5 U.S.C. § 552(b)(7). Specifically, BOP's activity is "related to the enforcement of federal laws," *Pratt*, 673 F.2d at 420–21, because it relates to BOP's response to violations of federal laws and the related investigations. Additionally, there is a "nexus" between the activity and BOP's law enforcement duties, because BOP punishes crime and functions to protect inmates, staff, and the community. *See id.* at 421; *Swope*, 439 F. Supp. 2d at 6. The balancing test under Exemption 7(C) supports the redactions for the reasons discussed with regard to Exemption 6.

## 2.  Unsuccessful Nominee for BOP Director

DOJ also withheld from disclosure portions of the "Lappin Memo" and an attachment, in which Harley Lappin, the former BOP Director, advanced for consideration the names of two BOP officials to serve as the next Director upon his retirement. *See* Defs.' Mot. Summ. J. at 17; Rodgers Decl. ¶ 14 & Ex. C. The memorandum contained a description of the professional qualifications of two individuals and their official biographies. The candidates' respective curricula vitae were attached. *See* Defs.' Mot. Summ. J. at 17; Rodgers Decl. ¶ 14 & Ex. C. DOJ disclosed the information related to the successful nominee, Director Samuels (redacting only his home address), but withheld the unsuccessful nominee's name, Mr. Lappin's recommendation of that individual, and his or her curriculum vitae. *See* Defs.' Mot. Summ. J. at 17–18. The Court concludes that the redacted information was properly withheld under Exemptions 5 and 6.

### a.  Exemption 5

The redacted portion of the memorandum—which details Mr. Lappin's description of the second candidate he recommended as director—was properly withheld under FOIA Exemption 5. Exemption 5 covers "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).[12] Exemption 5 must be understood in light of FOIA's goal to "make available to the public a wide range of information in the Government's control," and therefore should "be

---

[12] Congress recently amended FOIA, and Exemption 5 now provides that agencies may withhold: "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested." FOIA Improvement Act of 2016, Pub. L. No. 114-185, § 552(b)(5), 130 Stat. 538, 540 (enacted June 30, 2016) (to be codified at 5 U.S.C. § 552(b)(5)). The records Mr. Pinson seeks were created less than twenty-five years before he submitted his requests. *See* Brinkman Decl. Exs. A, N (indicating that information requested in Mr. Pinson's FOIA claims was explicitly limited to 2008 and afterward).

interpreted narrowly." *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 66 (D.C. Cir. 1974).[13]

To qualify for Exemption 5, (1) the document's "source must be a Government agency," and (2) "it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). One such privilege is the deliberative process privilege, which covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotation marks omitted). Under this exemption, a document must be predecisional and deliberative. *See Horowitz v. Peace Corps*, 428 F.3d 271, 276 (D.C. Cir. 2005). Predecisional documents are those "'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)); *see also Sears, Roebuck & Co.*, 421 U.S. at 151.

A "deliberative" document must be "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*

---

[13] In the context of civil litigation, the deliberative process exemption is a "qualified" privilege that may "be overcome by a sufficient showing of need." *See In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). However, under FOIA, "[t]his characteristic of the deliberative process privilege is not an issue . . . because the courts have held that the particular purpose for which a FOIA plaintiff seeks information is not relevant in determining whether the FOIA requires disclosure." *Id.* at 737 n.5. Thus, it is "not sensible" to consider whether there would be sufficient need to overcome the exemption by imagining "hypothetical litigation"; FOIA instead indicates only that what the government would "*routinely* . . . disclose[] in private litigation" does not fall within Exemption 5's ambit. *Sears, Roebuck & Co.*, 421 U.S. at 149 n.16 (emphasis added) (internal quotations omitted).

(*Vaughn II*), 523 F.2d 1136, 1144 (D.C. Cir. 1975). The exemption is not limited to a narrow

class of "policies," but includes "documents reflecting advisory opinions, recommendations and

deliberations comprising part of a process by which governmental *decisions* and policies are

formulated." *Sears, Roebuck & Co.*, 421 U.S at 150 (emphasis added) (internal quotation marks

omitted); *see also McPeek v. Ashcroft*, 202 F.R.D. 332, 334 (D.D.C. 2001) (noting that

Exemption 5 covers not merely "policy" decisions but also decisions regarding other "action[s]"

by the agency). "Material is deliberative if it 'reflects the give-and-take of the consultative

process.'" *Petroleum Info Corp.*, 976 F.2d at 1434 (quoting *Coastal States Gas Corp. v. Dep't of

Energy,* 617 F.2d 854, 866 (D.C. Cir. 1980)). Thus, Exemption 5 covers "subjective documents

which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal

States*, 617 F.2d at 866.

   Material is not generally considered to be deliberative it is "purely factual" and is

"severable from the policy advice" in a document. *Ryan v. Dep't of Justice*, 617 F.2d 781, 790

(D.C. Cir. 1980). However, if "the manner of selecting or presenting those facts would reveal the

deliberative process," or "the facts are inextricably intertwined with the policy-making process,"

the exemption may cover even factual material. *Id.* (internal quotations omitted); *see also Wolfe

v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc); *Mead Data,*

566 F.2d at 256 (indicating that even "purely factual material may so expose the deliberative

process within an agency" that the material is privileged under the exemption). Thus, a FOIA

requester may not "use the FOIA to discover what factual information [staff members] cited,

discarded, compared, evaluated, and analyzed to assist the [decisionmaker] in formulating his

decision," which would constitute an "improper probing of the mental processes behind [the]

decision." *Montrose*, 491 F.2d at 68; *see also Playboy Enters., Inc. v. Dep't of Justice*, 677 F.2d

931, 936 (D.C. Cir. 1982) (holding that "summaries [that] would have permitted inquiry into the mental processes of the Administrator by revealing what materials he considered significant in reaching a proper decision, and how he evaluated those materials" were exempt); *Morley v. U.S. CIA*, 699 F. Supp. 2d 244, 255 (D.D.C. 2010), *aff'd in relevant part sub nom. Morley v. CIA*, 466 F. App'x 1 (D.C. Cir. 2012) (concluding that the CIA's description of information regarding an individual's familial background and suitability for a security clearance constituted predecisional deliberation because "CIA employees must be free to engage in candid and personal deliberations regarding the ultimate grant or denial of a potential agent's security clearance").

The Court concludes that the redacted portion of the Lappin memo, which contained Mr. Lappin's recommendation of the individual who was not selected as BOP Director, was properly withheld under Exemption 5.[14] First, the Lappin Memo is an "inter-agency . . . memorandum[]" because its source is a Government agency, namely, BOP. *See* § 552(b)(5); *Duffin*, 636 F.2d at 713. Second, the redacted portion of the Lappin Memo falls within the ambit of the deliberative process privilege. Because the Lappin Memo was drafted in advance of the decision regarding whom to select as the next BOP Director, and prepared in order to provide input on this decision, it satisfies the "predecisional" prong of the test. *See* Defs.' Mot. Summ. J. at 18.

The redacted portion of the Lappin Memo was also deliberative. It contained Mr. Lappin's opinion about the suitability of a certain individuals to serve as his successor. Although

---

[14] The Court does not determine whether Exemption 5 also covers the curriculum vitae of the unsuccessful nominee attached to the Lappin Memo, because the Court holds, below, that the curriculum vitae was properly withheld under Exemption 6. In addition, although the Court concludes below that Mr. Samuel's identity was properly disclosed under Exemption 6, the Court notes that Exemption 5 may have applied to shield additional portions of the memorandum that discuss Mr. Lappin's *assessment* of Mr. Samuels (although the memo appears to include little, if any, deliberative information specific to Mr. Samuels). Because DOJ has voluntarily disclosed the balance of the memorandum, however, the Court does not discuss what else might have been properly withheld under Exemption 5.

the memorandum set forth and represented a series of facts, the thrust of the memorandum was to provide a recommendation on the basis of those facts. The very inclusion of particular factual statements rather than others reveals the deliberations and mental processes sought to be protected. Thus, requiring the agency to disclose the redacted portion of the Lappin Memo would improperly subject the mental processes of the decisionmaker to public scrutiny.[15] Furthermore, permitting the information to be withheld promotes Exemption 5's policy goal: to allow agency officials to candidly share their assessments. Compelling disclosure of this type of information would likely cause agency officials to be more guarded in their recommendations.[16]

### b.  Exemption 6

Withholding the portion of the Lappin Memo discussing the unsuccessful nominee is also justified under Exemption 6, as is withholding the candidate's attached curriculum vitae. First,

---

[15] The Court also finds that DOJ has met its obligation regarding segregability. The Court recognizes that, in general, "biographical information of a routine, nonprivate nature, such as would commonly appear in Who's Who or similar reference works, is not inextricably intertwined with the protected deliberative process of making recommendations," and is thus not protected by Exemption 5. *Ryan*, 617 F.2d at 791. Thus, it is possible that some purely factual information (e.g. the name of the individual recommended) could be segregated and released without running afoul of Exemption 5. However, to the extent that any information is purely factual and does not reflect the thought processes of agency officials, it is *for that reason* an unwarranted invasion of privacy because it discloses only personal information about the individual and does not provide any meaningful insight into what the government is up to. Thus, any portion of the redacted information that would be segregable is covered by Exemption 6.

[16] Mr. Pinson objects primarily to the form of DOJ's invocation of Exemption 5, arguing that DOJ improperly failed to produce a *Vaughn* index. *See* Pl.'s Resp. at 5; *see generally Vaughn v. Rosen (Vaughn I)*, 484 F.2d 820, 827 (D.C. Cir. 1973). Putting aside the propriety of creating a *Vaughn* index in these circumstances, to deny summary judgment on this technicality here would "exalt[] form over substance." *See Goland v. CIA*, 607 F.2d 339, 351 (D.C. Cir. 1978). DOJ has "[made] clear which exemptions are claimed for the deletions . . . and explain[ed] why the deleted material fits within the exemptions claimed," so the purpose of requiring a *Vaughn* index has been served, even if DOJ "did not tender its analysis in the form of an 'index.'" *Id.* at 351–52. The Court further notes that the redacted portion of the Lappin Memo constitutes only a single paragraph, and DOJ has provided the Court with a sufficient description of the redacted information to allow the Court to make a decision regarding the exemption's applicability.

the information withheld is contained in a "similar" file covered by Exemption 6 because it "applies to a particular individual" and is found in Government records. *See Wash. Post Co.*, 456 U.S. at 602. Second, disclosure would constitute a clearly unwarranted invasion of personal privacy. A substantial privacy interest is implicated in this case, because the Lappin Memo contains information about the individual's name and employment history. *See Associated Press*, 549 F.3d at 65; *Core*, 730 F.2d at 948. The Court agrees with DOJ's assessment that the individual "has a considerable privacy interest" in avoiding having his or her non-selection disclosed to the public, a disclosure which would likely cause embarrassment. Defs.' Mot. Summ. J. at 17; *see Ripskis*, 746 F.2d at 3. Mr. Pinson implies that the individual's privacy interests are decreased because he or she was "seek[ing] to lead our nation's governmental bodies." Pl.'s Resp. at 5. However, as DOJ correctly notes, the fact that Mr. Lappin identified this individual as an appropriate candidate does not imply that he or she affirmatively sought public office or bid to run BOP. *See* DOJ's Reply at 4. Moreover, the fact that an individual holds a governmental position or a public office does not necessarily render FOIA's privacy protections inapplicable to him or her. *See U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 494–95 (1994) (applying Exemption 6 to protect privacy interests of federal agency employees). Thus, the Court finds that a substantial privacy interest would be implicated by the disclosure of the information.

Next, the Court must weigh the individual's privacy interest in nondisclosure against the public interest in disclosure of information that "sheds light on an agency's performance of its statutory duties." *See Multi Ag Media*, 515 F.3d at 1231 (quoting *Reporters Comm.*, 489 U.S. at 773). Mr. Pinson alleges that "the public has an interest in knowing the identity of those who seek public office, to lead a $7 [b]illion annual budget overseeing operation of [a] hundred plus

facilities." Pl.'s Resp. at 3 (discussing Exemption 7(C), which requires a balancing test similar to that used here). DOJ concedes that the public interest in understanding the "competence and qualifications of a high-level law enforcement official" would generally outweigh a successful nominee's privacy interest in the information, but contends that "the public interest in a failed candidate is less significant because that candidate's qualifications do not assist the public in evaluat[ing] the selectee's qualifications." *See* Defs.' Mot. Summ. J. at 17.

The Court agrees. Although the public has an interest in evaluating the competence of individuals who are appointed as government employees, in the case of individuals who are not ultimately selected, the privacy interest outweighs public interest in disclosure. *See Core*, 730 F.2d at 949 (concluding that "[d]isclosure of the qualifications of people who were not appointed [to a position as Systems Architect for the United States Postal Service] is unnecessary for the public to evaluate the competence of people who were appointed," and thus that "the public interest in learning the qualifications of people who were not selected to conduct the public's business is slight"); *see also Commodity News Serv., Inc. v. Farm Credit Admin.*, No. 88-3146 HHG, 1989 WL 910244, at *3 (D.D.C. July 31, 1989) (stating that "public interest in knowing whether the . . . most qualified applicant [was selected is] satisfied by release of the successful applicant's employment information").[17]

In terms of segregability, the Court finds that no non-exempt information from the redacted portion of the Lappin Memo or the curriculum vitae can be segregated and released. As DOJ notes, "the character of official biographies and curriculum [sic] vitae frustrates efforts to

---

[17] The public also has an interest in nondisclosure of the information. Although disclosing information regarding evaluation of public officials could further the public good by promoting "efficient and evenhanded personnel policies," it could also cause harm to the public, by hindering the performance of BOP, causing "unhealthy comparisons" and "discord in the work place," as well as "chill[ed] candor" in evaluating employees. *Ripskis*, 746 F.2d at 3.

segregate releasable information." Defs.' Mot. Summ. J. at 18. Thus, "it would be impossible to release any substantial amount of information without enabling a viewer to identify the individual." *Id.* Indeed, when a FOIA requester asks for release of documents containing information that is "unique and specific" to the individuals referenced, their "identities may become apparent from the specific details set forth in these documents." *Rashid v. U.S. Dep't of Justice*, No. 99-2461 (GK), 2001 U.S. Dist. LEXIS 26353, at *19 (D.D.C. June 11, 2001). The Court agrees with DOJ's conclusion that no segregable information could be released without identifying the individual. Moreover, to the extent that purely evaluative material that could not be linked to the individual is contained in the document, it would be exempt under Exemption 5.[18]

### 3.  Director Samuels's Home Address

DOJ also redacted the home address listed on BOP Director Charles Samuels's curriculum vitae, attached to the Lappin Memo. *See* Defs.' Mot. Summ. J. at 19; Rodgers Decl. ¶ 15 & Ex. C. DOJ justifies this redaction on the basis of Exemptions 6, 7(C), and 7(F). Mr. Pinson does not contest this redaction, *see generally* Pl.'s Resp., and in any event Mr. Samuels's home address was properly withheld under Exemption 6, *see, e.g.*, *FLRA*, 510 U.S. at 488 (holding that

---

[18] DOJ also relies on Exemption 7(C) for withholding the portions of the Lappin Memo related to the unsuccessful nominee. While Exemption 7(C) employs a balancing test similar to that used when evaluating Exemption 6, Exemption 7 also requires a threshold determination that the information was "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). DOJ has not shown that the threshold requirement has been met, and thus Exemption 7 may not be used to justify the withholding. Specifically, DOJ has not shown that the information in the Lappin Memo was compiled for law enforcement purposes because it has introduced no evidence that it was "based on a legitimate concern that federal laws have been or may be violated" or in any way related to an enforcement proceeding rather than to routine discussions of the agency's employment and internal management decisions. *See King*, 830 F.2d at 229.

home addresses "would not appreciably further the citizens' right to be informed about what their Government is up to" and are thus covered by Exemption 6).

## V.  CONCLUSION

For the foregoing reasons, DOJ's justification for BOP's withholding from the OIP documents (ECF No. 239), construed as a separate motion for partial summary judgment, is **GRANTED IN PART** and **DENIED IN PART**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: July 29, 2016                                     RUDOLPH CONTRERAS
                                                         United States District Judge