**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| JEREMY PINSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-1872 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 287, 310, 317 |
| | : | | |
| UNITED STATES DEPARTMENT OF | : | | |
| JUSTICE, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**DENYING DEFENDANTS' MOTION TO DISMISS;
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
IN THE ALTERNATIVE FOR SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION TO AMEND THE COMPLAINT;
DENYING AS PREMATURE PLAINTIFF'S SUPPLEMENTAL MOTION FOR DISCOVERY;
APPOINTING *PRO BONO* COUNSEL**

## I. INTRODUCTION

Plaintiff Jeremy Pinson claims that her[1] constitutional rights were violated when Bureau of Prisons (BOP) officials retaliated against her for exercising her First Amendment rights. The DOJ—on behalf of the defendant-officials—moves to dismiss, or, in the alternative, for summary judgment. Because the Court concludes that Pinson has adequately stated a claim, it denies the motion to dismiss. The Court also denies the DOJ's motion for summary judgment as to Pinson's claims that prison officials refuse to investigate her administrative complaints and

---

[1] Pinson identifies using feminine pronouns, and the government and this Court follow suit. *See* Defs.' Mot. Dismiss or, Alt., Renewed Mot. Summ. J. at 2 n.1, ECF No. 287. The Court's use of feminine pronouns does not reflect any substantive or legal characterization.

transferred her to a more restrictive setting, but grants the DOJ's motion for summary judgment as to Pinson's other claims of miscellaneous retaliation.

## II.  BACKGROUND[2]

This is not the first time this Court has addressed Pinson's claims for First Amendment retaliation. In her Corrected Second Amended Complaint of October 2013, Pinson raised a variety of constitutional claims against, *inter alia*, defendants Charles Samuels and John Dignam. Corr. 2d Am. Compl. at 2, ECF No. 32. Each was sued in both his official and individual capacity. Corr. 2d Am. Compl. at 2. Samuels was the Director of the BOP, and Dignam was Chief of the BOP's Office of Internal Affairs. Corr. 2d Am. Compl. at 2. As relief, Pinson seeks an injunction against Samuels and Dignam barring them "from further acts of retaliation," as well as "[c]ompensatory and punitive damages." Corr. 2d Am. Compl. at 16. This Court dismissed several of Pinson's constitutional claims for failure to exhaust administrative remedies, and required Pinson to submit a more definite statement of the facts underlying each surviving claim, *see generally* Mem. Op. at 52–63, *Pinson v. U.S. Dep't of Justice*, No. 12-1872, 2016 WL 29245, at *23–27 (D.D.C. Jan. 4, 2016), ECF No. 259, which Pinson has now filed, *see generally* Pl.'s More Def. Statement *Bivens* Claims (Pl.'s Statement), ECF No. 279.

The Court now considers Pinson's current claims—first, a claim alleging that Dignam and Samuels refused to investigate Pinson's administrative complaints in retaliation for her First

---

[2] The DOJ advances both a motion to dismiss for failure to state a claim and a motion for summary judgment. "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006). In deciding a motion for summary judgment, however, the Court may also consider additional materials. The Court thus segregates these additional materials into Part II.D.

Amendment activities; second, a claim that Samuels transferred Pinson to ADX Florence[3] in retaliation for her First Amendment activities; and third, Pinson's claims of other miscellaneous retaliation for her First Amendment activities directed by Samuels.

All of these claims involve alleged retaliation against Pinson for her First Amendment activities. These activities include contributing to news articles, posting to a blog, tweeting, filing lawsuits on her own behalf, and assisting other inmates in filing lawsuits. Corr. 2d Am. Compl. at 14. Despite the retaliation she describes, Pinson asserts that she "explicitly vowed to never cease writing lawsuits, blog posts (www.betweenthebars.org) and letters to the media," and identifies an example of her continued engagement with the media. Pl.'s Statement ¶ 8; *see also* Pl.'s Statement, Ex. 1, Alan Prendergast, *Fires, Hangings, Madness: Is Florence SHU the Worst Cellblock in America?*, Westword (Mar. 15, 2016), http://www.westword.com/news/fires-hangings-madness-is-florence-shu-the-worst-cellblock-in-america-7700845 (news article discussing Florence ADX with contribution from Pinson).

### A.  Claim One—Refusal to Investigate

According to Pinson, she has filed "dozens" of complaints alleging misconduct by BOP employees that were eventually routed to Dignam. Pl.'s Statement ¶¶ 1–3, ECF No. 279. Plaintiff asserts that she has confirmed that the complaints were referred to Dignam through FOIA requests. Pl.'s Statement ¶ 4. Pinson claims that Dignam "refused to investigate the complaints unless Plaintiff agreed to cease news media contacts and litigation against BOP." Corr. 2d Am. Compl. at 14.

---

[3] "[T]he United States Penitentiary Administrative Maximum Facility in Florence, Colo., known more colloquially as the ADX. . . . is the highest-security prison in the country." Mark Binelli, *Inside America's Toughest Federal Prison*, N.Y. Times (March 26, 2015), https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html.

As evidence of this claim, Pinson states that she met with a special agent and unit manager in 2011 who told her that Dignam would not investigate her complaints because she was "a gadfly constantly inundating Dignam's office with complaints" and adverse attention from the media. Pl.'s Statement ¶ 5. According to Pinson, the special agent and unit manager told her that Dignam would investigate her complaints if she ceased these activities. Pl.'s Statement ¶ 5. Pinson claims that the special agent and unit manager told her that they met with her on Samuels's instruction. Pl.'s Statement ¶ 7. Pinson also claims that she met in-person with Samuels in August of 2015, and that he "admitted in his own words" to her that he had caused the 2011 meeting. Pl.'s Statement ¶ 7.

Pinson further claims that in the "summer of 2015" she met with two agents from BOP's Office of Internal Affairs who told her that she was "hated all the way to the top"—which they clarified referred to Dignam and Samuels—and therefore "no one is gonna help you and end up in the New York Times over something you filed." Pl.'s Statement ¶ 6. Pinson claims that "Samuels and Dignam also gave authorization to place plaintiff on mail restrictions limiting plaintiffs [sic] communications with attorneys and the news media." Corr. 2d Am. Compl. at 16.

### B.  Claim Two—Transfer to ADX Florence

Pinson also alleges that she was transferred to ADX Florence in retaliation for her activities. Pinson claims that when Samuels was Assistant Director of the BOP, he emailed an employee and had that employee interrogate Pinson and order her to cease contacts with the news media. Corr. 2d Am. Compl. at 15. When she refused, Pinson alleges that Samuels "ordered plaintiff moved to ADX Florence using information he knew to be false." Corr. 2d Am. Compl. at 15.

As evidence, Pinson asserts that she was told by staff at ADX Florence that Samuels had told them to stop her from engaging in lawsuits or contacts with the news media. Corr. 2d Am. Compl. at 15. Pinson also asserts that, during her ADX referral hearing in December of 2015, the hearing administrator told her that Samuels would "halt her transfer to ADX [Florence] if she agreed to cease all lawsuits and press contacts, or the reverse if she didnt [sic]." Pl.'s Statement ¶ 8. When Pinson was transferred to ADX Florence, she asserts that it was "personally authorized" by Samuels, Pl.'s Statement ¶ 9, as evidenced by his signature on the paperwork, ADX General Population Placement Decision, ECF No. 279, Ex. 2; ECF No. 288-1, Ex. A (same document).

### C.  Claim Three—Other Allegedly Retaliatory Acts

Pinson also alleges several other miscellaneous acts of retaliation.[4] She claims that Samuels ordered various employees to "convince" her to stop filing lawsuits and contacting the news media in March of 2013, and that the employees' persuasive strategies included separating Pinson from another individual and "cell searches, strip searches, deprivation of meals, and making threats." Corr. 2d Am. Compl. at 15.

---

[4] In her more definite statement, Pinson adds an allegation that, during her in-person meeting with Samuels in 2015, he "threatened" to place her in solitary confinement. Pl.'s Statement ¶ 9. "Inmates at the ADX spend approximately 23 hours of each day in solitary confinement." Mark Binelli, *Inside America's Toughest Federal Prison*, N.Y. Times (March 26, 2015), https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html. If being placed at ADX Florence is similar to being placed in solitary confinement, the Court is uncertain if this claim is distinct from Pinson's claim that Samuels transferred her to ADX Florence. To the extent that this claim is incorporated in Pinson's claim of retaliatory transfer, the Court need not address it separately. To the extent that it attempts to state a new claim not laid out in her initial complaint, the Court disregards it for several reasons.

First, Pinson does not specifically allege that this threat was in response to her First Amendment activity. Moreover, the Court does not identify any claim in Pinson's corrected second amended complaint related to this claim (such a connection is highly improbable, given that the alleged threat occurred in 2015 and the corrected second amended complaint was filed in 2013). As Pinson has not moved to amend the complaint, the Court thus disregards this allegation.

### D.  Materials Considered in Relation to the Motion for Summary Judgment

The DOJ submitted a declaration from Samuels which provides additional factual material. In 2011—prior to his role as the Director of the Bureau of Prisons[5]—Samuels served as the Assistant Director for the Correctional Programs Division. 2d Samuels Decl. ¶ 10, ECF No. 288-1. In that capacity Samuels admits that he approved Pinson's transfer to ADX Florence, as he was responsible for approving or rejecting all recommended transfers to ADX Florence. 2d Samuels Decl. ¶¶ 10, 12. Samuels claims that his participation in the transfer came only after a hearing administrator had reviewed and approved the referral. 2d Samuels Decl. ¶ 12. Samuels denies telling the hearing administrator that he would stop the transfer if Pinson stopped litigation and press contacts. 2d Samuels Decl. ¶ 12. The DOJ also provided the report of the hearing administrator who recommended Pinson's transfer to ADX Florence. That report shows that, prior to the transfer, Pinson had accumulated a disciplinary record that included sixteen reported incidents, including seven for possession of a weapon, four for serious assault, four for setting fires, and one for taking a hostage. ECF No. 288-1, Ex. A.

Samuels also denies all of Pinson's other allegations. Samuels denies having any conversation with the special agent and unit manager about Pinson. 2d Samuels Decl. ¶ 5. Samuels denies that he interacted with Pinson at all in August of 2015, including denying threatening to keep Pinson in "restrictive housing." 2d Samuels Decl. ¶¶ 6, 13. Samuels also denies having any conversation with the named OIA agents regarding Pinson. 2d Samuels Decl. ¶ 8.

*      *      *

---

[5] Samuels served as the Director of the BOP from 2011 to 2016. 2d Samuels Decl. ¶ 1, ECF No. 288-1.

The DOJ has now moved to dismiss, or, in the alternative, to renew its motion for summary judgment.[6] *See generally* Def.'s Mot. Dismiss or Renewed Mot. Summ. J. (MTD), ECF No. 287.

## III.  LEGAL STANDARD

The DOJ raises both a motion to dismiss and a motion for summary judgment. The Court considers the applicable legal standard for each in turn. In general, it notes that a *pro se* complaint is held to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)), although it still must comply with the Federal Rules of Civil Procedure, *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987). As a result, the Court considers Pinson's complaint "in light of" all filings, including her more definite statement and second corrected amended complaint. *Cf. Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 151 (D.C. Cir. 2015) ("[A] district court errs in failing to consider a *pro se* litigant's complaint 'in light of' all filings, including filings responsive to a motion to dismiss.").

---

[6] The DOJ's briefing focuses entirely on Pinson's *Bivens* claims. The Court notes that Pinson appears to also assert official capacity claims. *See* Corr. 2d Am. Compl. at 2 ("Defendants Samuels and Dignam are sued in their individual and official capacities."). Although it appears that Samuels, at least, is no longer in his official position, under Rule 25(d) of the Federal Rules of Civil Procedure "[t]he officer's successor is automatically substituted as a party" when "a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending." These official-capacity claims, of course, are not cognizable under *Bivens*, *Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011), and may only extend to prospective relief, *see Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 929 (D.C. Cir. 2012). As the DOJ has not briefed any objections to these official-capacity claims, the Court takes no action at this time.

### A.  Motion to Dismiss

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain factual allegations that, if accepted as true, would state a plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.*, instead, plaintiffs must "nudge[] their claims across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court considering a motion to dismiss a *pro se* plaintiff's complaint for failure to state a claim presumes that the factual allegations of the complaint are true and construes those allegations liberally in the plaintiff's favor. *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 976 (D.C. Cir. 2016).

### B.  Motion for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it may affect the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could, based on the evidence, return a verdict for the nonmovant. *Scott v. Harris*, 550 U.S. 372, 380 (2007). After the movant has identified the basis for its motion, the burden is on the nonmovant to identify specific facts in the record that reveal a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

A court considering a motion for summary judgment analyzes all underlying facts and inferences in the light most favorable to the nonmovant, *Anderson*, 477 U.S. at 255, and "eschew[s] making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). Nonetheless, "conclusory allegations" and "unsubstantiated

speculation," by the nonmovant "do not create genuine issues of material fact." *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195, 200 n.12 (D.D.C. 2008) (citations omitted). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

While Pinson's filings are somewhat eccentric, the Court construes her corrected second amended complaint and more definite statement as sworn affidavits given her *pro se* status. *Cf. Gore v. Lockheed Martin IS & GS Def.*, No. 1:13-1513, 2016 WL 5312844, at *1 (D.D.C. Sept. 22, 2016) ("Plaintiff did not, however, provide any evidence to support her Opposition. Nevertheless, in recognition of Plaintiff's *pro se* status, the court will treat her Opposition as a sworn affidavit and thus evaluate the merits of Defendant's Motion [for summary judgment] as if Plaintiff has attempted to come forward with evidence to show a genuine dispute of material fact.").

## IV.  ANALYSIS

As a threshold matter, the DOJ argues that *Bivens* actions are unavailable for violations of the First Amendment because the Supreme Court[7] has not recognized such a cause of action. MTD at 10–12, ECF No. 287. Because the D.C. Circuit has recognized *Bivens* claims for First Amendment retaliation, this Court disagrees.

In *Bivens*, the Supreme Court "established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Carlson v. Green*, 446 U.S. 14, 18 (1980); *see also Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971) (recognizing an implied right of action under the Constitution for violation of Fourth

---

[7] As the DOJ notes, lower courts have reached various conclusions about the availability of a *Bivens* claim for First Amendment violations. MTD at 12 & n.3.

Amendment rights). In the time following *Bivens*, "the Supreme Court has proceeded cautiously" in expanding *Bivens* actions to cover additional constitutional violations. *Meshal v. Higgenbotham*, 804 F.3d 417, 421 (D.C. Cir. 2015). The Supreme Court has explicitly recognized *Bivens* claims for "employment discrimination in violation of the Due Process Clause" and "cruel and unusual punishment by prison officials in violation of the Eighth Amendment," but has rejected any "'automatic entitlement'" to the remedy. *Id.* (first citing *Davis v. Passman*, 442 U.S. 228, 243–45 (1979), then citing *Carlson v. Green*, 446 U.S. 14, 19–23 (1980)).

Although the Supreme Court has not embraced the application of *Bivens* to First Amendment claims, nor has it definitively eliminated the possibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("Petitioners do not press this argument, however, so we assume, without deciding, that respondent's First Amendment claim is actionable under *Bivens*."); *cf. Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."). Indeed, in *Hartman v. Moore*, the Supreme Court described a *Bivens* claim for First Amendment retaliation:

> Official reprisal for protected speech "offends the Constitution [because] it threatens to inhibit exercise of the protected right," and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out. . . . [W]hen nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution. When the vengeful officer is federal, he is subject to an action for damages on the authority of *Bivens*.

*Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588, n.10 (1998), other citations omitted) (ultimately concluding that the plaintiff could not recover because the plaintiff did not plead the absence of probable cause supporting his allegedly retaliatory prosecution).

The D.C. Circuit has gone further than the Supreme Court in identifying a *Bivens* remedy for First Amendment retaliation:

> We agree that the retaliatory prosecution constitutes an actionable First Amendment wrong redressable under *Bivens* . . . . We share the conviction of forerunning determinations that retaliatory prosecution unconstitutionally impinges on the right of access to the courts guaranteed by the First Amendment. [Plaintiff's claim] partakes from the circumstances enough substance to entitle him to proceed directly under the First Amendment for damages. This conclusion parallels our holding in *Dellums v. Powell*, that a *Bivens* action can be utilized by complainants asserting an infringement of their First Amendment right to petition Congress for redress of grievances. That [the plaintiff] avers interference with his right to entreat the courts rather than the legislature does not weaken the *Dellums* rationale.

*Haynesworth v. Miller*, 820 F.2d 1245, 1255–57 (D.C. Cir. 1987), *abrogated in other part by Hartman v. Moore*, 547 U.S. 250 (2006) (requiring a plaintiff asserting a retaliatory prosecution claim to show the absence of probable cause).

Most recently,[8] the D.C. Circuit has assumed the existence of a *Bivens* action for First Amendment retaliation in the context of a lawsuit by a prisoner alleging he was kept in more restrictive conditions in retaliation for his protected speech. In *Aref v. Lynch* the D.C. Circuit concluded that damages were not precluded by the PLRA but the defendant was protected by qualified immunity. *See generally Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016). In *Aref* the prisoner-plaintiff alleged that he was kept in a more restrictive unit in retaliation for First Amendment activity. *Id.* at 258. Although the government defendants argued to the D.C. Circuit that it "should be especially hesitant to extend [a *Bivens* remedy]" because "[t]he Supreme Court

---

[8] The D.C. Circuit had previously confronted a plaintiff's *Bivens* claims for First Amendment retaliation in *Kimberlin v. Quinlan*, where the prisoner-plaintiff claimed that he was placed in administrative segregation in retaliation for his contacts with journalists. *Kimberlin v. Quinlan*, 199 F.3d 496, 498 (D.C. Cir. 1999). *Kimberlin*'s tortuous path brought it before the D.C. Circuit on multiple occasions, and on no occasion did the D.C. Circuit object to the premise of a *Bivens* action for First Amendment retaliation. *See, e.g., id.*; *Kimberlin v. Quinlan*, 6 F.3d 789 (D.C. Cir. 1993) (subsequent history omitted).

has emphasized that *Bivens* is a 'limited' remedy, and it has elsewhere 'declined to extend *Bivens* to a claim sounding in the First Amendment,'" Brief for Official-Capacity Appellees and on Behalf of the United States as *Amicus Curiae* at 55, 2016 WL 278962, *Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) (quoting *Iqbal*, 556 U.S. 662, 675 (2009)), the D.C. Circuit did not accept this invitation to limit the availability of *Bivens* in First Amendment cases.

It its reply, the DOJ appears to argue that, although there may be a *Bivens* cause of action for some types of First Amendment retaliation, "there is no *Bivens* cause of action for a 'refusal to investigate' or 'retaliatory transfer.'" Defs.' Reply Supp. Mot. Dismiss (Defs.' Reply) at 1, ECF No. 315 at 1. The DOJ does not cite any authority in support of its view that *Bivens* claims are defined at such a high level of particularity. Moreover, the D.C. Circuit recently confronted a nearly identical claim in *Aref*—where the plaintiff alleged that he had been *kept* in an overly restrictive setting instead of, as Pinson alleges, transferred there—and declined to hold that no remedy was available under *Bivens*.

This Court is not free to shut a door to the courthouse which the D.C. Circuit has left open. *See Hartley v. Wilfert*, 918 F. Supp. 2d 45, 52 (D.D.C. 2013) (permitting a plaintiffs *Bivens* claim for First Amendment retaliation to proceed because "[e]ven if Defendants are correct in predicting the Supreme Court's response to questions not yet before it, this Court cannot accept its invitation to depart from this Circuit's binding precedent" (citing the holding of *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (en banc) that decisions of D.C. Circuit are binding "unless and until overturned by the court en banc or by Higher Authority")). The Court therefore will not dispose of Pinson's claims for the reason that *Bivens* does not offer a cause of action for First Amendment retaliation.

The Court thus turns to the DOJ's arguments. The DOJ objects to Pinson's claims because (1) she fails to allege personal action by defendants, (2) she fails to allege any adverse consequences, (3) her speech was not chilled, (4) Dignam and Samuels are entitled to qualified immunity, and (5) the BOP had alternative reasons for her transfer to ADX Florence. As the DOJ does not divide its arguments between the motion to dismiss stage and the summary judgment stage, the Court assumes that all arguments relying upon the DOJ's evidence beyond the pleadings are aimed at the summary judgment stage, and that all other arguments are aimed at the motion to dismiss stage.

## A.  Motion to Dismiss

The DOJ argues that Pinson has failed to state a claim because she (1) insufficiently alleges personal involvement by Dignam and Samuels, (2) she does not allege any adverse consequences, (3) her speech was not chilled, and (4) Dignam and Samuels should receive qualified immunity.

As an initial matter, the Court identifies the elements of a claim for First Amendment retaliation. To state such a claim, a plaintiff must show that "(1) he [or she] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him [or her]."[9] *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp.

---

[9] This formulation differs from that offered by the DOJ, which was drawn from a district court's interpretation of the Ninth Circuit's § 1983 standard. *See* MTD at 13 (quoting *Anderson-Bey v. District of Columbia*, 466 F. Supp. 2d 51, 65 (D.D.C. 2006) (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005))). To the extent these differences are material, the Court believes the DOJ's position is unsound, see discussion *infra*.

2d 89, 111 (D.D.C. 2007)). The DOJ does not challenge Pinson's claim as to the first element.

The Court thus proceeds to the DOJ's objections.

### 1. Personal Involvement by Dignam and Samuels

The DOJ argues that Pinson has failed to allege "personal involvement" by Dignam and

Samuels in the retaliatory acts. MTD at 14, 17, 18, ECF No. 287. However, the Court finds that

Pinson has alleged such personal involvement.

As to her first claim—refusal to investigate—Pinson alleges direct action by both

Dignam and Samuels. *See* Corr. 2d Amend. Compl. at 14 ("Dignam refused to investigate the

complaints unless Plaintiff agreed to cease news media contacts and litigation against BOP.");

Pl.'s Statement ¶ 7 ("Director Samuels was said to have caused the [2011 meeting in which

Pinson was told that Dignam would not investigate complaints], a fact Samuels admitted in his

own words to plaintiff . . . [in] 2015.").

As to her second claim—transfer to ADX Florence—Pinson alleges direct action by

Samuels, the only defendant in that claim. *See* Corr. 2d Amend. Compl. at 15 ("When plaintiff

refused [to stop lawsuits and contact with the media] Samuels ordered plaintiff moved to ADX

Florence using information he knew to be false."); Pl.'s Statement ¶ 9 (Samuels personally

authorized plaintiff's transfer to ADX . . .").

As to her third claim—other retaliatory behavior—Pinson also alleges direct action by

Samuels. *See* Corr. 2d Amend. Compl. at 15 ("Samuels . . . instructed staff to 'convince' plaintiff

to quit filing lawsuits and contacting the news media. As a result staff began to harrass [sic]

Plaintiff . . .").

The DOJ appears to conflate Pinson's allegations with potential evidentiary issues,

arguing, for example, that "[h]er only evidence of Samuels'[s] retaliatory intent is a statement by

a non-defendant." MTD at 18. The DOJ's arguments about the strength of Pinson's evidence are more appropriately addressed at the summary judgment stage, and the Court does so. In a 12(b)(6) motion to dismiss, the Court accepts the nonmovant's factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 976 (D.C. Cir. 2016). Because Pinson asserts that each defendant "through the official's own individual actions, has violated the Constitution," *Iqbal*, 556 U.S. at 676;, the Court will not dismiss her claims for failure to allege the personal involvement of Samuels or Dignam. *See also Meyer v. Reno*, 911 F. Supp. 11, 15 (D.D.C. 1996) (holding that defendant-supervisors could be liable under *Bivens* if they "personally participated in the events which gave rise to the plaintiff's claims.").

The DOJ also argues that Pinson improperly attempts to "impose vicarious liability [on Dignam and Samuels] for their staff member's actions (or inactions)," an attempt that fails because *Bivens* does not create liability on a *respondeat superior* theory. MTD at 9–10. Certainly it is true that *Bivens* does not hold supervisors vicariously liable absent their personal involvement. *See Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (citations omitted)). However, Pinson seeks to hold Dignam and Samuels liable only to the extent that they personally retaliated against her for exercising her First Amendment rights. Pinson's references to statements made by subordinate employees are used as *evidence* to demonstrate the actions and beliefs of Dignam and Samuels. *See, e.g.*, Pl.'s Statement ¶ 7 ("[D]uring the 2011 . . . meeting [with the special investigative agent and unit manager] Director Samuels was said to have caused the private discussion . . . ."). Although "high-level officials . . .

typically are not subject to *Bivens* liability since they do not routinely participate personally in decisions about a particular individual at a particular location," *Morris v. United States Sentencing Comm'n*, 62 F. Supp. 3d 67, 75 (D.D.C. 2014), *appeal filed* No. 14-5204 (D.C. Cir. Aug. 21, 2014), that personal intervention into her case is precisely what Pinson alleges here.

### 2.  Lack of Adverse Action and Lack of Chilling Effect

The DOJ argues on two fronts that the alleged actions of Samuels and Dignam did not rise to the level of First Amendment retaliation. First, the DOJ claims there is an "adverse action" requirement which Pinson cannot meet because she does not allege that any of her neglected complaints later gave rise to violations of her constitutional rights. Second, the DOJ argues that Pinson's subsequent conduct demonstrated that she was not chilled.

The Court first addresses the DOJ's claim that Pinson "has failed to allege any adverse action as a result of" Dignam and Samuels's refusal to investigate her complaints, because she pleads no "harm . . . such as one of the staff members she allegedly complained about later violating her constitutional rights." MTD at 14–15. The Court notes that the correct standard, as articulated in 2016 by the D.C. Circuit, includes no reference to "adverse action," but only requires that "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)). Moreover, the DOJ offers no definition of "adverse action" to assist this Court, and nor does the case which they cite. *See generally Anderson-Bey v. District of Columbia*, 466 F. Supp. 2d 51, 65 (D.D.C. 2006). As a question of intuition, the Court notes that being denied access to the designated results for resolving any complaints—from minor to serious—about the conditions of incarceration would appear to be an adverse action.

The better view is thus that any adverse action requirement is defined by the type of retaliatory action which would deter ordinary people from First Amendment activity. This view is bolstered by the conclusions of other courts in this jurisdiction that actions such as telling a protester that "if she intended to remain on the sidewalk discussing her concerns, she would have to give background data including name, date of birth and Social Security number, fill out a card, and submit to questions" can constitute adverse action. *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013).

The Court thus turns to the question of whether the alleged actions against Pinson would have chilled a person of ordinary firmness.[10] In *Toolasprashad*, the D.C. Circuit found that the BOP's reclassification of a prisoner as a "special offender"—which prevented him from working as a tutor—and transfer to a new facility far from his family would have chilled a person of reasonable firmness and thus met the standard for First Amendment retaliation. *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 584–85 (D.C. Cir. 2002); *see also Crawford-El v. Britton* (*Crawford-El I*), 93 F.3d 813, 826 (D.C. Cir. 1996) (finding that "the pecuniary losses [the plaintiff] sustained in the form of the costs of shipping his boxes and replacing clothing, though small, might well deter a person of ordinary firmness in [the plaintiff's] position from speaking again"), *vacated on other grounds*, *Crawford-El II*, 523 U.S. 574 (1998); *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (holding that a statement by law enforcement officers that the

---

[10] The DOJ initially argued that "Pinson materially undermines her claim when she boasts that her exercise of her First Amendment rights was not chilled following the alleged acts," MTD at 15, and cites to language purporting to define the standard for First Amendment retaliation as including a requirement that the "action . . . chilled the inmate's exercise of his First Amendment rights," *Anderson-Bey v. District of Columbia*, 466 F. Supp. 2d 51, 65 (D.D.C. 2006). However, the DOJ acknowledges in its reply that the correct test is "whether the alleged violations would have been 'likely to deter a person of ordinary firmness' from speaking out" rather than whether Pinson specifically was chilled. Def.'s Reply at 2, ECF No. 315 (quoting *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002)).

plaintiff-protester must either leave or submit to detailed inquiry and registration was sufficient to chill the speech of a personal of ordinary firmness).

In this case, as the DOJ notes, the BOP's actions do not appear to have had any discernable chilling effect on Pinson's speech. *See* MTD at 15–16 & n.4, ECF No. 287 (listing First Amendment activities by Pinson since January 1, 2011, including commencing fifty-one lawsuits); Pl.'s Statement ¶ 8 (asserting that Pinson "explicitly vowed to never cease writing lawsuits, blog posts . . . and letters to the media"). However, "a plaintiff's actual response to a defendant's conduct is not dispositive," even if it may "'provide[] some evidence of the tendency of that conduct to chill First Amendment activity.'" *Hartley*, 918 F. Supp. 2d at 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). The possibility that Pinson might be an unusually staunch individual, therefore, does not doom her claim.

The Court thus considers the alleged retaliatory actions. First, Pinson claims that BOP employees refused to investigate her complaints and threatened to continue ignoring future complaints. The BOP's administrative complaint process is the primary avenue for inmates to raise concerns about the conditions of their confinement.[11] The Court easily concludes that removing access to that avenue would be at least as chilling as the alleged retaliation in *Crawford-El*, where the plaintiff's personal items and legal materials were delayed in transit and he had to pay for shipping. *See Crawford-El I*, 93 F.3d 813 at 826 (finding those actions "might

---

[11] In addition, when an inmate is threatened with exclusion from the complaint process, she does not know how she will be treated in the future or if the topics of her past complaints will recur or increase in severity. She might quite reasonably fear that exclusion from the complaint system would significantly worsen the conditions of her confinement in a variety of ways. The Court thus rejects the DOJ's suggestion that Pinson must show that an employee she complained about did, in fact, violate her rights again because of the alleged failure to investigate her complaints. *See* MTD at 14–15.

well deter a person of ordinary firmness in [the plaintiff's] position from speaking again").

Second, Pinson claims that she was initially threatened with transfer—and later actually

transferred—to the BOP's highest security facility, ADX Florence. Such a transfer to the BOP's

most restrictive placement is clearly more chilling than the transfer to a similar facility, which

was found sufficient in *Toolasprashad*. *See Toolasprashad*, 286 F.3d at 584–85 (finding that

being transferred to a distant facility and reclassified as a less-favored class of prisoner would

deter a person of ordinary firmness). The Court finds that the retaliation Pinson alleges would

deter a person of ordinary firmness from First Amendment activity, and thus that Pinson's claim

does not fail for lack of sufficiently severe retaliation.

### 3.  Qualified Immunity

The DOJ asserts, cursorily, that Dignam and Samuels are shielded from liability by

qualified immunity.[12] MTD at 8–9. "Qualified immunity shields federal and state officials from

money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or

constitutional right, and (2) that the right was 'clearly established' at the time of the challenged

conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982)).

---

[12] The defense of qualified immunity may be raised either at the motion to dismiss stage or the summary judgment stage. *See Behrens v. Pelletier*, 516 U.S. 299, 306 (1996). Although the DOJ does not specify which it intends here, the Court first considers qualified immunity at the motion to dismiss stage, in order to give effect to the intent of qualified immunity to shield officials from burdensome pretrial procedure. *Id.* at 306–07. As discussed *infra*, the Court concludes at the motion to dismiss phase that qualified immunity is not warranted.

The Court's conclusion remains the same at the summary judgment phase. As discussed below, the Count concludes that Pinson had a clearly established right. The qualified immunity defense thus turns on whether there was a violation of that right. As the Court finds below in its discussion of summary judgment, the question of whether such a violation occurred turns on material facts which are genuinely in dispute, and thus the defendants cannot be granted qualified immunity on summary judgment.

The DOJ recites the standard for qualified immunity without specifying whether it asserts that Pinson has failed to show a violation of a constitutional right or failed to show that that right was clearly established at the time, or offering any argument in support of either view. Nevertheless, the Court briefly considers if either Dignam or Samuels is protected here by qualified immunity.

First,[13] the Court concludes that Pinson had a clearly established right at the time of the conduct not to be subject to the alleged retaliation for her First Amendment conduct. A right is clearly established if it would have been "clear to a reasonable officer that his [or her] conduct was unlawful in the situation he [or she] confronted." *Aref v. Lynch*, 833 F.3d 242, 267 (D.C. Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Furthermore, "[t]he Supreme Court has cautioned us not to define the right at too high a level of generality; instead, we must examine the right in its 'particularized' context." *Id.* at 267 (citing *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012))."

Multiple decisions[14] of the Supreme Court and D.C. Circuit have held that a prisoner's right not to be retaliated against for First Amendment activity such as contacting the media or

---

[13] Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis" to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[14] *See also Kimberlin v. Quinlan*, 199 F.3d 496, 502 (D.C. Cir. 1999) (holding, with regard to an inmate alleging retaliation because he had described selling marijuana to Dan Quayle to reporters that the right "to be free from governmental interference with [a prisoner's] contacts with the press if that interference is based on the content of [the] speech or proposed speech . . . without doubt was clearly established in 1988." (internal quotation marks and citations omitted)); *Banks v. York*, 515 F. Supp. 2d 89, 113 (D.D.C. 2007) (reviewing cases and concluding that the general right not to be retaliated against for First Amendment conduct was clearly established, but such a right for *informal oral complaints* about matters not of public concern was not clearly established).

filing lawsuits was clearly established at the time of the actions here.[15] *Crawford-El* presents an

especially analogous example. In *Crawford-El*, the plaintiff was a "litigious and outspoken"

prisoner who had "filed several lawsuits and had assisted other prisoners with their cases," and

"provided interviews to reporters who have written news stories about prison conditions."

*Crawford-El II*, 523 U.S. 574, 578 (1998). The D.C. Circuit considered Crawford-El's claim of

First Amendment retaliation, and the defendant's claim of qualified immunity. *See generally*

*Crawford-El I*, 93 F.3d 813 (D.C. Cir. 1996), *vacated on other grounds*, 523 U.S. 574 (1998). In

1996, the D.C. Circuit concluded that "withholding Crawford-El's property in retaliation for

exercise of his First Amendment speech rights would indeed be a violation of clearly established

law." *Id.* at 825. Although the Supreme Court disagreed with other portions of the D.C. Circuit's

opinion in, it did not dispute the conclusion on qualified immunity. *See generally Crawford-El*

*II*, 523 U.S. 574. Indeed, the Supreme Court later cited to its *Crawford-El* decision in rejecting a

qualified immunity claim by prison officials who allegedly retaliated against an inmate for

reporting a sexual assault, because the "pre-existing law was not in controversy." *Ortiz v.*

*Jordan*, 562 U.S. 180, 189–91 (2011) ("[T]he pre-existing law was not in controversy . . . '[the]

First Amendment shields prisoners from "retaliation for protected speech."'" (citing *Crawford-El*

*II*, 523 U.S. at 592)).

The right asserted by the prisoner in *Crawford-El* is congruent with the right asserted by

Pinson here. Both were outspoken and litigious prisoners who had repeatedly filed lawsuits

against the prison system and spoken to reporters. Both alleged retaliation by prison officials in

---

[15] Based on the corrected second amended complaint, the Court understands the actions
to have taken place beginning sometime after 2007. Corr. 2d Am. Compl. at 14–15.

response. Therefore, the Court finds that, after at least 1996, it was clearly established that an inmate had the right not to be retaliated against for such conduct.

Next, the Court considers if Pinson has shown a violation of this right. As discussed above, Pinson has stated a claim for First Amendment retaliation that is robust enough to survive the DOJ's motion to dismiss. Thus, she has also established that her rights were violated, sufficient to pass the low bar at the motion to dismiss stage, and the Court will not grant the motion to dismiss on qualified immunity grounds.

### B.  Renewed Motion for Summary Judgment

In addition to its motion to dismiss for failure to state a claim, the DOJ moves in the alternative for summary judgment. As a preliminary matter, the Court briefly addresses the relationship between discovery and summary judgment.

A court may grant summary judgment prior to the completion of discovery by both parties, subject to the right of the nonmovant to file a motion for discovery under Rule 56(d) of the Federal Rules of Civil Procedure. *See generally U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 27 (D.C. Cir. 2014). Rule 56(d) requires a nonmovant seeking either delay or additional discovery prior to summary judgment to "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *See also Vasser v. McDonald*, No. 14-0185, 2016 WL 7480263, at *6 n.9 (D.D.C. Dec. 29, 2016) ("It is appropriate for the Court to rule on the merits of a converted motion for summary judgment when '(1) the evidence submitted is sufficiently comprehensive to conclude that further discovery would be unnecessary; and (2) the non-moving party has not been unfairly disadvantaged by being unable to access the sources of proof necessary to create a genuine issue of material fact.'" (quoting *Ryan-White v. Blank*, 922 F. Supp. 2d 19, 24 (D.D.C. 2013)).

Here, Pinson has not yet conducted discovery on her *Bivens* claims. Most recently, this Court denied Pinson's motion to conduct discovery pending its resolution of the DOJ's initial summary judgment motion on Pinson's *Bivens* claims and instructed Pinson to "raise . . . arguments pursuant to Fed. R. Civ. P. 56(d) in response to the Defendants' motion [for summary judgment]" "to the extent that [she] claims that discovery is necessary to respond." Mem. & Order at 2 (June 5, 2015), ECF No. 209.

In regard to this renewed motion for summary judgment, Pinson has made only one request for discovery. That request seeks "the file maintained on Plaintiff in [the] Office of Internal Affairs." Supp. Mot. Disc., ECF No. 317. Pinson does not directly explain why she believes that access to this file will assist her in opposing the motion for summary judgment, although she suggests that it will "prove or rule out Dignam's involvement." Supp. Mot. Disc. Because the Court concludes that summary judgment for the DOJ is not appropriate as to any claims involving Dignam or Pinson's history of administrative complaints, it does not resolve this motion prior to considering the DOJ's motion for summary judgment. *See Acosta v. Nelson*, 561 F. App'x 4, 6 (D.C. Cir. 2014) ("[T]he district court afforded [the plaintiff] all of the notice required to be given to *pro se* plaintiffs, specifically alerting [the plaintiff] to the effect of a motion for summary judgment and the consequences of his failure to respond. Because [the plaintiff] nevertheless did not make any showing that could even be liberally construed as a request for additional discovery, he cannot now complain that more discovery was needed." (citations omitted)).

### 1. Claim One—Refusal to Investigate

The DOJ argues that it is entitled to summary judgment on Pinson's first claim because Pinson lacks evidence on which a jury could conclude that Dignam and Samuels were personally involved in any failure to investigate her complaints. MTD at 14, ECF No. 287.

As to Dignam, the DOJ does not present any evidence disputing Pinson's assertions that Dignam retaliated against her. Instead, the DOJ claims to have identified an absence of necessary evidence. MTD at 7; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion . . . . But . . . we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. . . . [T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.").

The Court reviews Pinson's evidence to determine if it is sufficient for a reasonable jury to find in her favor. The scant evidence Pinson identifies is as follows.[16] Pinson claims that "[i]n 2011 plaintiff met with [a] Special Agent . . . and [a] Unit Manager . . . who each stated that

---

[16] The DOJ does not explicitly challenge the admissibility of any of these statements. *Cf. Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (holding that, at summary judgment, "a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, [but] the evidence still must be capable of being converted into admissible evidence." (citing Fed. R. Civ. P 56(e)).

The Court notes that, were it to consider their admissibility, the statements may be admissible, and not hearsay, because of the definitions provided in Rule 801(d)(2)(A) (statements of a party-opponent) and Rule 801(d)(2)(D) (statements of an employee or agent of a party-opponent) of the Federal Rules of Evidence. *See also Geleta v. Gray*, 645 F.3d 408, 414–15 (D.C. Cir. 2011) (considering statements at summary judgment because the plaintiff "filed suit against the mayor of D.C. in his official capacity, [thus] the District is a party to the suit and statements by District employees concerning matters within the scope of their employment are admissible against the District. . . . The statements therefore fall within Rule 801(d)(2)(D).").

Dignam was not going to investigate staff for plaintiff because plaintiff was 'a gadfly constantly inundating Dignam's office with complaints,' adverse press attention, lawsuits and if these activities were stopped Dignam would assist plaintiff." Pl.'s Statement ¶ 5. As to both Dignam and Samuels, Pinson claims that she had a separate meeting with two OIA employees in 2015 who told her "dude youre [sic] hated all the way to the top, no one is gonna help you . . ." and said that they meant Samuels and Dignam would not help her. Pl.'s Statement ¶ 6.

This evidence, if converted to a form admissible at trial, suffices to permit a reasonable jury to find for Pinson. Pinson presents evidence tending to show that Dignam retaliated against her for her First Amendment conduct. The Court notes that—at summary judgment—it must not draw credibility determinations. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[The summary judgment standard] by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970))). The Court thus concludes that summary judgment on Pinson's claim for refusal to investigate must be denied.[17]

As to Samuels's involvement in the alleged refusal to investigate her complaints, Pinson advances similar evidence. Pinson claims that the special agent and unit manager told her that Samuels had sent them to talk to her. Pl.'s Statement ¶ 7. Pinson also claims that she met with

---

[17] Pinson appears to argue that Dignam has "conceded his role in this case" by not offering an affidavit denying her accusations with the government's summary judgment briefing. Pl.'s Opp'n at 1. In its current posture—considering *the DOJ's* motion to dismiss or for summary judgment—this argument cannot succeed because it is not the DOJ's burden to establish the evidentiary sufficiency of its contentions.

Samuels in 2015 and he admitted that he had sent the special agent and unit manager. Pl.'s Statement ¶ 7. In response, the DOJ offers rebuttal evidence in the form of a declaration by Samuels. Samuels directly disputes each of Pinson's three pieces of evidence. *See* 2d Samuels Decl. ¶ 5 ("I deny that I advised [the named employees from the 2011 meeting] to tell Plaintiff to stop [her] complaints, adverse press attention, or lawsuits. In fact, I deny that I had any conversation with [the named employees] regarding Plaintiff."); 2d Samuels Decl. ¶ 6 ("I deny that I had a personal conversation or interacted with Plaintiff at any time during an official visit to the Federal Correctional Complex in Florence, Colorado ('FCC Florence') in August 2015."); 2d Samuels Decl. ¶ 8. ("I deny having any conversation with [one of the named OIA officers from the 2015 meeting] regarding Plaintiff.").

However, presenting contrary evidence does not suffice to show that summary judgment for the DOJ is warranted. Pinson and Samuels directly contradict each other, and deciding between the two statements would require credibility determinations that this Court may not make at summary judgment. *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). Nor may the Court weigh the persuasive power of Pinson's evidence against that of the DOJ. *See id.* Pinson's evidence here, although not strong, rises past the level of a conclusory allegation or unsubstantiated speculation and creates a genuine issue of material fact that, at least at this stage of the litigation, entitles her to take discovery. The Court thus denies the DOJ summary judgment on claim one.

### 2.   Claim Two—Transfer to ADX Florence

The DOJ argues, first, that Pinson has likewise failed to present sufficient evidence to show Samuels's personal involvement in her transfer. Pinson's evidence consists of her statement that the hearing officer told her "that Samuels was offering to halt her transfer to ADX

[Florence] if she agreed to cease all lawsuits and press contacts, or the reverse if she didnt [sic]."
Pl.'s Statement ¶ 8. The DOJ opposes this evidence with a declaration from Samuels. *See
generally* 2d Samuels Decl., ECF No. 288-1. Samuels denies that Pinson's transfer to ADX
Florence hinged or whether she continued her lawsuits and press contacts. *See* 2d Samuels Decl.
¶ 12 ("I did ultimately approve Plaintiff's transfer to ADX Florence on January 14, 2011. . . .
However, my involvement came only after the [BOP department] received the [hearing officer's]
recommendation. I deny telling the [hearing officer] that I would halt Plaintiff's transfer to ADX
Florence if [she] agreed to cease [her] litigation and press contacts."). However, as with claim
one, the Court may not weigh the evidence or make a credibility determination. Based on the
limited record before the Court prior to discovery, Pinson has sufficiently disputed a genuine
issue of material fact such that a reasonable jury could find for her if it found her more credible
than Samuels.

Second, the DOJ argues that its showing of a non-retaliatory reason for Pinson's
placement in ADX Florence rules out the possibility of retaliation. MTD at 18–20. The DOJ
submits the report of the hearing administrator who recommended that Pinson be placed in ADX
Florence. *See generally* ADX General Population Hearing Administrator's Report (ADX
Hearing Report), ECF No. 288-1, Ex. A. According to the report, the BOP concluded that Pinson
presented problems in a less restrictive placement, as evidenced by her accumulation of sixteen
disciplinary offenses classified in the "Greatest" category and twenty-eight "High" offenses.
MTD at 18; *see generally* ADX Hearing Report. This laundry list of wrongdoing includes
assaults, setting fires, possessing weapons, threats, and taking a hostage. ADX Hearing Report.
In light of these factors, the hearing administrator concluded that "a more restrictive environment

should be explored" and recommended placement in ADX Florence because Pinson presented "a

risk to institution security, staff, [and] inmates." MTD at 19.

However, it is not sufficient for the DOJ to merely point to a non-retaliatory reason for

the transfer—"even if [defendants] provide an objectively valid reason for their actions in this

case, the District Court must still inquire into whether there is a disputed issue of fact as to

whether appellants were *actually* motivated by an illegitimate purpose. The opinion for the

[Supreme] Court in *Crawford-El* specifically rejected the dissent's proposal to 'immunize all

officials whose conduct is "objectively valid," regardless of improper intent.'" *Kimberlin v.*

*Quinlan*, 199 F.3d 496, 502–03 (D.C. Cir. 1999) (emphasis added) (quoting *Crawford-El II*, 523

U.S. at 593–94).

Therefore, the fact that the DOJ has here provided an objectively valid reason does not

end the inquiry. The Court must still consider the possibility that the objectively valid reason was

a sham and that the true motivation was retaliation. Pinson's account of Samuels's explanation to

the hearing officer—if credited by the jury—would be highly probative as evidence that Samuels

actually intended to retaliate against Pinson.[18] Pinson has thus shown a disputed issue of material

fact as to the reason that Samuels transferred Pinson to ADX Florence. The issue is not proper

for summary judgment, at this stage of the litigation with a limited record prior to discovery,

because it would require a credibility determination by this Court, and therefore the Court denies

summary judgment.[19]

_____

[18] Furthermore, Pinson disputes the DOJ's alleged non-retaliatory reasons for the transfer by asserting that Samuels "ordered plaintiff moved to ADX Florence using information [Samuels] knew to be false." Corr. 2d Am. Compl. at 15.

[19] This jurisdiction's treatment of First Amendment retaliation claims in the *employment* context suggests another possibility for the DOJ. In a so-called "mixed-motive" case, where both retaliatory and non-retaliatory reasons for the adverse action are present, the employer may prevail at summary judgment by showing that the adverse action would have occurred even

3.  Claim Three—Other Allegedly Retaliatory Acts

The Court notes that, as discussed above, Pinson has advanced several miscellaneous claims of retaliation based on the alleged "cell searches, strip searches, deprivation of meals, and making threats" that unnamed staff inflicted on Pinson at Samuels's behest. Corr. 2d Am. Compl. at 15. Pinson has failed to describe any evidence linking Samuels to the adverse actions. Unlike her other claims, Pinson does not assert that she was told by anyone that the reason for the acts was retaliation, or point to any other evidence that could establish a retaliatory motive. Because no reasonable jury could conclude from Pinson's evidence that Samuels was personally responsible for the acts Pinson describes, the Court grants the DOJ summary judgment to the extent that Pinson alleges miscellaneous acts of retaliation other than a refusal to investigate her complaints and her transfer to ADX Florence.[20] The Court notes that it has not yet provided

---

absent the protected behavior. *See Berry v. Coastal Int'l Sec., Inc.*, No. 12-1420, 2016 WL 1060196, at *13 (D.D.C. Mar. 15, 2016), *aff'd*, No. 16-7043, 2016 WL 4434664 (D.C. Cir. Aug. 22, 2016) (holding that a plaintiff in an employment retaliation case "must establish that retaliation was the 'but-for cause' of the adverse action in order to survive summary judgment. 'This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) ("[T]he District Court should have gone on to determine whether the [defendant] had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct."); *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 53 (D.D.C. 2011) ("Even . . . direct evidence of retaliation . . . [can] be negated at the summary judgment stage if defendant [is] able to demonstrate that it would have reached the same decision absent the prohibited discrimination."), *aff'd*, 685 F.3d 1096 (D.C. Cir. 2012). At summary judgment, subsequent to discovery, the parties may explore whether the DOJ could prevail here by showing, at a preponderance of the evidence standard, that it would, for example, have transferred Pinson to ADX Florence even absent any prohibited retaliation.

[20] The Court understands a challenge to these claims to be included in the DOJ's motion for summary judgment. Even if it were not, "district courts possess the authority to enter summary judgment against a party *sua sponte*, . . . 'so long as the losing party was on notice that she had to come forward with all her evidence.'" *Athridge v. Rivas*, 141 F.3d 357, 361 (D.C. Cir. 1998) (quoting *McBride v. Merrell Dow & Pharms., Inc.*, 800 F.2d 1208, 1212 (D.C. Cir. 1986)).

Pinson the discovery she sought of "the file maintained on Plaintiff in [the] Office of Internal Affairs." Supp. Mot. Disc., ECF No. 317. However, Pinson's explanation of the need for access to this file is that it will "prove or rule out Dignam's involvement," Supp. Mot. Disc., which is irrelevant to these claims, which are asserted only against Samuels. As the D.C. Circuit has noted, a nonmovant seeking to delay summary judgment under Rule 56(d) must "among other things, 'outline the particular facts he [or she] intends to discover and describe why those facts are necessary to the litigation,'" *Smith v. United States*, 843 F.3d 509, 513 (D.C. Cir. 2016) (quoting *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99–100 (D.C. Cir. 2012)). Furthermore, the delay permitted by Rule 56(d) is not mandatory. Fed. R. Civ. P. 56(d).

### C.  Pinson's Motion to Amend the Complaint and Sever *Bivens* Claims

The Court notes that Pinson's filing "Plaintiffs [sic] Response to ECF No. 307," itself docketed at ECF No. 310, "seeks to add defendants to the BIVENS claim in this case pursuant to Fed.R.Civ.P. 15(d)." The Court construes this statement as a motion to amend the complaint, and denies it because the proposed amendment bears no more than a tangential relation to Pinson's existing claims.

Rule 15 of the Federal Rules of Civil Procedure requires either "the opposing party's written consent or the court's leave" to amend a complaint in these conditions. Here, the DOJ has not consented, and the decision of whether to grant leave is therefore at the discretion of the district court. *Atchinson v. District of Columbia*, 73 F.3d 418, 426 (D.C. Cir. 1996). Courts are directed to "freely give leave when justice so requires." Fed. R. Civ. Pro. 15(a)(2). Considerations militating against granting leave include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously

---

The DOJ's motion, or this Court's *Fox/Neal* order of June 1, 2016, ECF No. 289, sufficiently put Pinson on notice.

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

of amendment, etc.," *Atchinson*, 73 F.3d at 425–26 (quoting *Foman v. Davis*, 371 U.S. 178, 182

(1962)), and the necessity of additional discovery, *id.* at 426 (collecting cases). Moreover,

"[w]here . . . the complaint, as amended, would radically alter the scope and nature of the case

and bears no more than a tangential relationship to the original action, leave to amend should be

denied." *De Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 113 (D.D.C. 2012) (quoting *Miss. Ass'n*

*of Coops. v. Farmers Home Admin.*, 139 F.R.D. 542, 544 (D.D.C. 1991) and citing *Nat'l*

*Treasury Emps. Union v. Helfer*, 53 F.3d 1289, 1295 (D.C. Cir. 1995)).

Even reading Pinson's filing generously, the exact contours of Pinson's proposed

amendment are unclear, but Pinson apparently seeks to add claims against one or more named

employees at USP Terre Haute, who Pinson alleges have recently limited her access to postage

stamps. *See generally* Plaintiffs [sic] Resp. to ECF No. 307, ECF No. 310.

These proposed amendments bear—at most—a tangential relationship to Pinson's

original claims. The proposed and existing claims are unconnected in time, the identity of the

alleged perpetrator, the BOP facility involved, and the type of alleged retaliation. The interests of

justice would not be served by allowing Pinson to assert her proposed claims here, because the

new claims do not involve the same evidence or substantially the same legal issues as the

existing claims, and the new claims would likely require expanding the scope of discovery.[21]

---

[21] Moreover, Pinson faces an additional challenge because her proposed amendment
would require joining one or more new defendants to this action. Rule 20(a)(2) of the Federal
Rules of Civil Procedure permits the joinder of claims against multiple parties in one action only
if there is a claim "asserted against them jointly, severally, or in the alternative . . . that aris[es]
out of the same transaction, occurrence, or series of transactions or occurrences" and presents
common questions of law and fact. If Pinson could not meet that standard here—as appears
likely because the alleged postal issues do not relate to either the alleged refusal to investigate
complaints or Pinson's transfer to ADX Florence—then any amended complaint would be
susceptible to a motion to dismiss for misjoinder under Rule 21. "Noncompliance with

Pinson has not stated any reason that she could not pursue these claims in a separate action, and thus it does not appear that she will be prejudiced by denial of the motion to amend. Given the advanced nature of this case, and that Pinson has accumulated three strikes under the PLRA, the Court declines to extend the complaint beyond the original claims. If Pinson wishes to pursue these new claims, she must bring a new case.

Pinson also seeks for her *Bivens* claims to "be severed into a seperate [sic] civil action within this Court from the FOIA claims since FOIA matters are resolved on summary judgment and the BIVENS [sic] claims will be tried to a jury." Plaintiffs [sic] Resp. to ECF No. 307 at 3, ECF No. 310. Pinson accurately states the typical resolution of FOIA claims, however, severing the *Bivens* claims into a separate civil action is not necessary. This Court has already proceeded separately and appropriately as to all claims, and retains the discretion to, if necessary, "order a separate trial" of the *Bivens* claims while retaining all of Pinson's claims in the same action. *See* Fed. R. Civ. P. 42(b).

### D.  Pinson's Supplemental Motion for Discovery

Pinson requests that the Court order the DOJ to "produce the file maintained on Plaintiff in [the] Office of Internal Affairs." Supp. Mot. Disc., ECF No. 317. According to Pinson, this document will "prove or rule out Dignam's involvement." Supp. Mot. Disc. Pinson's briefing and the email chain she attaches suggest that the OIA file likely contains some information about administrative complaints filed by Pinson. *See* Supp. Mot. Disc. & Ex. 1. The DOJ primarily objects to this request on the grounds that it is premature. Because the Court has denied the DOJ's instant motion to dismiss or for summary judgment, these objections have now evaporated.

---

party-joinder rules renders the proposed amendment futile and provides adequate justification for denying the Rule 15(a) motion." *Wilson v. ABN Amro Mortg. Grp.*, No. 05-0108, 2005 WL 3508658, at *3 (D.D.C. Dec. 21, 2005).

However, sensitive to the concerns of permitting unfettered discovery in this context, *see generally Crawford-El II*, 523 U.S. 574, 597–98 (1998), this Court will review together all of Pinson's discovery requests and consider responsive briefing from the DOJ. As discussed in the accompanying order, the Court expands its prior appointment of *pro bono* counsel,[22] *see generally* Order of Appointment of Pro Bono Counsel (May 15, 2015), ECF No. 204, by appointing Pinson counsel for the limited purpose of pursuing her claims against Dignam and Samuels in their official and individual capacities. The Court thus denies Pinson's current motion as premature and will consider the appropriateness of this request for discovery along with all other discovery issues to be raised in the context of a scheduling order created with the input of DOJ and appointed counsel.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 287) is **DENIED**, Defendants' Motion for Summary Judgment (ECF No. 287) is **GRANTED IN PART** and **DENIED IN PART**, Plaintiff's request to amend the complaint (ECF No. 310) is **DENIED**, and Plaintiff's Supplemental Motion for Discovery (ECF No. 317) is **DENIED AS PREMATURE**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 30, 2017                                          RUDOLPH CONTRERAS
                                                                      United States District Judge

---

[22] The Court's appointment will be subject to the objection of assigned counsel. Given that Pinson's motion seeking to expand the appointment is currently pending before the Court, the Court does not anticipate an objection from Pinson. *See generally* Mot. to Modify Appointment of Counsel (Oct. 6, 2016), ECF No. 335.