# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JEREMY PINSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-1872 (RC) |
| | : | | |
| v. | : | Re Document No.: | 477 |
| | : | | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANTS' MOTION TO DISMISS, MOTION FOR RECONSIDERATION, AND RENEWED MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Jeremy ("Grace") Pinson[1] initiated this lawsuit against the Bureau of Prisons ("BOP"), BOP officials, and other government defendants ("Defendants") over eight years ago. The case involves disputes along two fronts: a series of FOIA requests Pinson filed from prison and Pinson's claims that BOP officials retaliated against her for exercising her First Amendment rights. Today, the Court addresses Pinson's remaining constitutional claims. It first holds that there is no implied cause of action enabling a prisoner to sue federal prison officials in their individual capacities for First Amendment retaliation. The Court then dismisses as moot Pinson's official-capacity claim alleging that BOP officials retaliatorily transferred her to a supermax prison. Finally, the Court grants summary judgment to Defendants on Pinson's official-capacity claim alleging that BOP officials retaliatorily refused to investigate her administrative complaints.

---

[1] Pinson self-identifies using feminine pronouns, so the Court follows suit.

## II. BACKGROUND

### A. Procedural History

In an earlier decision, the Court dismissed some of Pinson's constitutional claims for failure to exhaust administrative remedies and required her to submit a more definite statement for the remaining claims. *See Pinson v. U.S. Dep't of Justice (Pinson I)*, No. 12-cv-1872, 2016 WL 29245, at \*23–27 (D.D.C. Jan. 4, 2016). After receiving Pinson's statement, Pl.'s More Definite Statement *Bivens* Claims ("Pl.'s Statement"), ECF No. 279, the Court considered those claims in another opinion, *see Pinson v. U.S. Dep't of Justice (Pinson II)*, 246 F. Supp. 3d 211 (D.D.C. 2017).

In the latter opinion, the Court recognized that Pinson had sued two BOP officials—Charles Samuels and John Dignam—in both their individual and official capacities. *Id.* at 214; *see also* Corrected Second Am. Compl. ("SAC") at 2, ECF No. 32. It also noted that Pinson sought money damages as well as an injunction prohibiting Samuels and Dignam from taking "further acts of retaliation." *Pinson II*, 246 F. Supp. 3d at 214 (quoting SAC at 16). Because Defendants had not addressed Pinson's official-capacity claims for injunctive relief, the Court limited its analysis to the individual-capacity claims requesting money damages. *Id.* at 217 n.6.

The Court framed Pinson's suit as consisting of three First Amendment retaliation claims alleging: (1) "that Dignam and Samuels refused to investigate Pinson's administrative complaints in retaliation for her First Amendment activities;" (2) "that Samuels transferred Pinson to ADX Florence in retaliation for her First Amendment activities;" and (3) "miscellaneous retaliation for her First Amendment activities directed by Samuels." *Id.* at 215 (footnote omitted). Reasoning from then-controlling D.C. Circuit precedent, the Court held that Pinson could bring her retaliation claims as a *Bivens* action—in other words, under a cause

of action implied in the First Amendment. *Id.* at 218–21. It went on to deny Defendants

summary judgment on the first two claims and grant Defendants summary judgment on the third

claim. *Id.* at 227–31. The parties have since completed discovery.

Based in part on recent Supreme Court precedent, Defendants have submitted a motion to

dismiss, motion for reconsideration, and renewed motion for summary judgment on Pinson's two

remaining First Amendment retaliation claims. *See* Defs.' Mem. Supp. Mot. Dismiss, Mot.

Recons., and Renewed Mot. Summ. J. ("Defs.' Mot."), ECF No. 477-1. That motion is ready for

resolution. *See* Pl.'s Mem. Supp. Opp'n Defs.' Mot. Dismiss, Mot. Recons., & Renewed Mot.

Summ. J. ("Pl.'s Opp'n"), ECF No. 485; Defs.' Reply Supp. Mot. Dismiss, Mot. Recons., &

Renewed Mot. Summ. J. ("Defs.' Reply"), ECF No. 487.

### B. Factual Background

The Court now briefly summarizes the facts behind Pinson's two surviving constitutional

claims under the assumption that the reader is familiar with its previous opinions on the subject.

*See Pinson I*, 2016 WL 29245, at *8–9; *Pinson II*, 246 F. Supp. 3d at 215–16.

Pinson has been incarcerated for over a decade. *See* Pl.'s Resp. to Defs.' Statement of

Material Facts as to Which There Is No Genuine Dispute ¶¶ 1–3. ("Pl.'s Resp. SOMF"), ECF

No. 485-1. In that time, she has filed over one thousand administrative grievances, *id.* ¶ 122, she

has regularly contacted and written for various news outlets, *see, e.g.*, Pl.'s Statement ¶ 8, and

she has filed or helped other inmates file numerous lawsuits, *e.g.*, SAC at 14. She says that these

First Amendment–protected activities earned her the ire of Samuels, formerly the BOP's

Director, and Dignam, who used to be Chief of the BOP's Office of Internal Affairs ("OIA").

Neither official still works with the BOP. *See* Pl.'s Resp. SOMF ¶¶ 6, 10; Pl.'s Opp'n at 27.

In one claim, Pinson alleges that Samuels transferred her to ADX Florence (the BOP's most secure facility) in retaliation for her complaints, press contacts, and lawsuits against the BOP. She testified that, before Samuels was BOP Director, he instructed an employee to warn her to stop her First Amendment activities. Pl.'s Opp'n, Ex. 6 ("Pl.'s Dep."), at 79:20–81:3, ECF No. 485-8. A BOP staff member told her about Samuels's order and explained that Pinson's efforts to draw attention to prison conditions had generated "a lot of agitation" and "were making [her] situation worse." *Id.* Pinson said several other BOP staff members indicated that Samuels was the only one who could remove her from ADX Florence and that he would only do so if Pinson stopped her First Amendment activities. *See id.* at 111:2–112:10. The BOP transferred Pinson from ADX Florence in October 2014, and she has not been housed there since. Pl.'s Resp. SOMF ¶¶ 113, 115. Pinson testified that, after her transfer, she spoke with Samuels when he visited a facility she was housed in. Pl.'s Dep. at 103:10–108:7. Samuels did not offer her anything to stop contacting the media or filing lawsuits, Pinson explained, but he was clearly displeased with the negative publicity that her activities generated. *Id.* at 110:6–22.

Pinson's other claim asserts that Samuels and Dignam "refused to investigate" numerous complaints she filed alleging misconduct by BOP employees unless she ceased her First Amendment activities. *See* SAC at 14; *see also* Pl.'s Statement ¶¶ 1–4, 7. She says that an OIA special agent told her that Dignam would not investigate her complaints because she "was a gadfly constantly inundating Dignam's office with complaints, adverse press attention, [and] lawsuits." Pl.'s Dep. at 87:10–12 (quoting Pl.'s Statement ¶ 5). According to Pinson, the agent and a BOP unit manager made clear that Dignam would investigate her complaints if she stopped those activities. *See, e.g.*, *id.* 87:12–13, 88:15–19, 90:25–91:22. Pinson testified that two other OIA special agents conveyed the message to her again a few years later. She said one agent told

her: "[D]ude, you're hated all the way to the top.  No one is going to help you and end up in the New York Times over something that you filed." *Id.* at 97:1–5 (quoting Pl.'s Statement ¶ 6). When Pinson asked the agents who they meant by "the top," they indicated "they meant Dignam and Samuels." *Id.* at 97:5-7 (quoting Pl.'s Statement ¶ 6); *see also id.* at 100:11–16.

## III.  LEGAL STANDARDS

Defendants' motion is styled as motion to dismiss, motion for reconsideration, and renewed motion for summary judgment.  Defs.' Mot. at 1.  First, they want the Court to reconsider its decision holding that Pinson had an implied cause of action to sue Samuels and Dignam in their individual capacities.  *Id.* at 2; *see also Pinson II*, 246 F. Supp. 3d at 218–21. When a court order "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" and "does not end the action as to any of the claims or parties," it may revise the order "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).  The court has discretion to reconsider an interlocutory order "as justice requires."  *Lemmons v. Georgetown Univ. Hosp.*, 241 F.R.D. 15, 21 (D.D.C. 2007) (citation omitted).  It may be appropriate to reconsider such an order when the court "has 'patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court.'"  *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (alteration in original) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)).

Defendants argue that the Court should dispose of Pinson's individual-capacity claims pursuant to Federal Rule of Civil Procedure 12(c).  Defs.' Mot. at 2, 4–5.  A motion under that rule requests "judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Although a party can raise the

failure-to-state-a-claim defense under Rule 12(c), *id.* 12(h)(2)(B), the standard governing such a

motion differs from the Rule 12(b)(6) standard, *see generally Murphy v. Dep't of Air Force*, 326

F.R.D. 47 (D.D.C. 2018). "As with a motion under Rule 12(b), '[t]he court construes the

complaint in the light most favorable to the non-moving party and accepts as true all factual

inferences drawn from well-pleaded factual allegations.'" *Young v. Perdue*, No. 19-cv-2144,

2020 WL 3448011, at *2 (D.D.C. June 24, 2020) (quoting *Kambala v. Checchi & Co.*

*Consulting, Inc.*, 280 F. Supp. 3d 131, 136 (D.D.C. 2017)). "Unlike a motion under Rule 12(b),"

however, the party moving for a Rule 12(c) judgment on the pleadings "'must demonstrate that

the law entitles him to win given the undisputed facts that have been alleged in both parties'

pleadings' and that 'no material fact is in dispute.'" *Id.* (quoting *Murphy*, 326 F.R.D. at 49); *see*

*also Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar.*

*Corp.*, 933 F.3d 751, 760–61 (D.C. Cir. 2019).

Defendants next assert that Pinson's retaliatory transfer claim against Samuels in his

official capacity is moot and should be dismissed for want of jurisdiction. Defs.' Mot. at 33.

Federal Rule of Civil Procedure 12(h)(3) requires a court to dismiss a suit if it determines that it

lacks subject-matter jurisdiction.

Mootness aside, Defendants argue that they are entitled to summary judgment on both

official-capacity claims. Defs.' Mot. at 2–3. A court will grant a motion for summary judgment

"if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Materiality depends on whether

a disputed fact would affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). The genuineness of a factual dispute turns on whether a reasonable jury

could rule in the nonmovant's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Once the movant

has identified the basis for its motion, the nonmovant must point to specific facts in the record

that demonstrate a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The reviewing court should view all evidence, credibility determinations, and inferences in the

light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255. "[T]here is no issue for trial

unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party." *Id.* at 249.

## IV.  ANALYSIS

As discussed, two of Pinson's First Amendment retaliation claims remain before the

Court: (1) her claim that Samuels transferred Pinson to ADX Florence in retaliation for her

complaints, communications with news media, and litigation against the BOP; and (2) her claim

that Samuels and Dignam refused to investigate her administrative complaints for the same

reason.  Pinson requests two forms of relief for each claim.  First, she seeks money damages

from Samuels and Dignam in their individual capacities.  *See* SAC at 2, 16.  Second, she wants

an injunction against Samuels and Dignam in their official capacities that prohibits them from

taking "further acts of retaliation."  *See id.*  The Court will proceed by form of requested relief.

### A.  Pinson's Requests for Money Damages

In its previous opinion, the Court held that Pinson could sue Samuels and Dignam in their

individual capacities for money damages under the *Bivens* doctrine.  *See Pinson II*, 246 F. Supp.

3d at 218–21.  The *Bivens* doctrine permits a plaintiff to recover damages against individual

federal officers for violations of certain constitutional rights even when there is no statute

authorizing her claim.  *See Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020); *see also Bivens v.

Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  Relying on D.C.

Circuit precedent, the Court held that there was an implied cause of action under *Bivens* for

Pinson's First Amendment retaliation claims.  *See Pinson II*, 246 F. Supp. 3d at 220 ("This Court

is not free to shut a door to the courthouse which the D.C. Circuit has left open.").

Since that ruling, the Supreme Court decided *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).

The *Abbasi* Court reviewed the history of the *Bivens* remedy, observing that the Supreme Court

had found an implied cause of action for damages under the Constitution itself only three times.

*Id.* at 1855.  The Supreme Court first recognized an implied cause of action in *Bivens* when it

held that a plaintiff could recover damages for federal agents' violation of his Fourth

Amendment right against unreasonable searches and seizures.  403 U.S. at 397.  It later extended

that holding to two other contexts.  In *Davis v. Passman*, 442 U.S. 228 (1979), the Court held

that a congressional staffer could bring a gender discrimination suit under the Fifth

Amendment's Due Process Clause.  *Id.* at 248–49.  And in *Carlson v. Green*, 446 U.S. 14

(1980), the Court held that a prisoner could sue federal jailers for failing to provide him adequate

medical treatment under the Eighth Amendment's Cruel and Unusual Punishments Clause.  *Id.* at

19.  *Abbasi* explained that these three decisions were products of an "*ancien regime*," in which

the Supreme Court assumed that a remedy should exist whenever someone suffers a violation of

her federal constitutional or statutory rights.  *See* 137 S. Ct. at 1855 (quoting *Alexander v.

Sandoval*, 532 U.S. 275, 287 (2001)).

The *Abbasi* Court made clear that the "*ancien regime*" was no more.  Citing separation-

of-powers concerns that arise when the Judiciary creates a cause of action against federal

officials, *id.* at 1856, the Court declared that "expanding the *Bivens* remedy is now a 'disfavored'

judicial activity," *id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).  It reasoned

that Congress is better positioned than the courts to weigh the "host of considerations" involved

in "imposing a 'new substantive legal liability.'"  *Id.* (first quoting *Bush v. Lucas*, 462 U.S. 367,

380 (1983); and then quoting *Schweiker v. Chilicky*, 487 U.S. 412, 426–27 (1988)).  Courts

should therefore exercise "'caution' before 'extending *Bivens* remedies into any new context.'"

*Id.* (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001).  Indeed, "for almost 40

years" the Supreme Court has "consistently rebuffed requests to add to the claims allowed under

*Bivens*."  *Hernandez*, 140 S. Ct. at 743 (collecting cases).

      After rehearsing that background, *Abbasi* laid out a two-part test for recognizing an

implied cause of action under *Bivens*.  *See* 137 S. Ct. at 1857–60; *see also Hernandez*, 140 S. Ct.

at 743.  First, a court must determine whether the plaintiff's claim "arises in a 'new context' or

involves a 'new category of defendants.'"  *Hernandez*, 140 S. Ct. at 743 (quoting *Malesko*, 534

U.S. at 68).  "[A] case presents a new *Bivens* context" if it "is different in a meaningful way from

previous *Bivens* cases decided by" the Supreme Court.  *Abbasi*, 137 S. Ct. at 1859.  Meaningful

differences include differences in:

> the rank of the officers involved; the constitutional right at issue; the generality or
> specificity of the official action; the extent of judicial guidance as to how an
> officer should respond to the problem or emergency to be confronted; the
> statutory or other legal mandate under which the officer was operating; the risk of
> disruptive intrusion by the Judiciary into the functioning of other branches; or the
> presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.  "[E]ven a modest extension" along these lines "is still an extension."  *Id.* at 1864.

      If the plaintiff's claim represents a new context for *Bivens* relief, a court "proceed[s] to

the second step and ask[s] whether there are any 'special factors that counsel hesitation' about

granting the extension."  *Hernandez*, 140 S. Ct. at 743 (brackets in original omitted) (quoting

*Abbasi*, 137 S. Ct. at 1857).  That "inquiry must concentrate on whether the Judiciary is well

suited, absent congressional action or instruction, to consider and weigh the costs and benefits of

allowing a damages action to proceed."  *Abbasi*, 137 at 1857–58.  A court may hesitate to create

a new remedy due to the impact of recognizing *Bivens* liability "on governmental operations

systemwide" or because "Congress has designed its regulatory authority in a guarded way" that "mak[es] it less likely that Congress would want the Judiciary to interfere." *Id.* at 1858. In addition, the existence of an "alternative remedial structure . . . alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* The bottom line is this: whenever there are "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," a court should "refrain from creating the remedy in order to respect the role of Congress." *Id.*

In light of *Abbasi*, this Court will reconsider its earlier ruling permitting Pinson to bring First Amendment retaliation claims against Samuels and Dignam under *Bivens*. The case represents "a controlling or significant change in the law" that makes reconsideration appropriate. *See Singh*, 383 F. Supp. 2d at 101 (D.D.C. 2005) (citation omitted). The D.C. Circuit has recognized as much. In a recent case rejecting an implied cause of action for financial regulators' alleged retaliatory enforcement in violation of the First Amendment, that court observed that *Abbasi* had "displaced" or "overtaken" several of its prior *Bivens* precedents. *See Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020).

With the benefit of additional guidance from the Supreme Court, this Court holds that Pinson does not have an implied cause of action that allows her to sue Samuels and Dignam for damages. First, Pinson's case presents a new *Bivens* context. Pinson alleges First Amendment retaliation, and the Supreme Court has "never held that *Bivens* extends to First Amendment claims." *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012). The Court even rejected an implied First Amendment retaliation claim for federal employees in *Bush v. Lucas*, 462 U.S. 367, 368 (1983). The constitutional right at issue here thus differs from those in the only three Supreme Court cases that have approved *Bivens* actions. That difference is meaningful, *see Abbasi*, 137 S. Ct. at 1859–60, so Pinson hopes to extend *Bivens* into a new context. *See Loumiet*, 948 F.3d at

382 (holding that financial regulators' alleged violation of the First Amendment's Free Speech

Clause was a new *Bivens* context); *see also Mack v. Yost*, 968 F.3d 311, 320 (3d Cir. 2020)

(holding that "First Amendment retaliation claims brought in the prison context" represented a

new *Bivens* context); *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 523–24 (6th Cir. 2020)

(same); *Vega v. United States*, 881 F.3d 1146, 1153 (9th Cir. 2018) (same).

      Second, at least two related special factors counsel hesitation.  Separation-of-powers

principles suggest that recognizing a *Bivens* remedy here would "risk . . . interfering with the

authority of the other branches" of government.  *See Hernandez*, 140 S. Ct. at 743.  "Running a

prison is an inordinately difficult undertaking that requires expertise, planning, and the

commitment of resources, all of which are peculiarly within the province of the legislative and

executive branches of government."  *Turner v. Safley*, 482 U.S. 78, 84–85 (1987).  Accordingly,

the "task . . . has been committed to the responsibility of those branches, and separation of

powers concerns counsel a policy of judicial restraint" when dealing with disputes arising in a

correctional setting.  *Id.* at 85; *see also Pitts v. Thornburgh*, 866 F.2d 1450, 1453 (D.C. Cir.

1989) ("[I]ssues of prison management are, both by reason of separation of powers and highly

practical considerations of judicial competence, peculiarly ill-suited to judicial resolution,

and . . . courts should be loath to substitute their judgment for that of prison officials and

administrators.").

      Pinson's retaliatory transfer claim illustrates the point.  BOP officials' decision to transfer

an inmate to a more secure facility lies within their expertise as to what is required to keep a

correctional facility orderly and safe.  *See Bistrian v. Levi*, 912 F.3d 79, 96 (3d Cir. 2018)

(holding that a special factor counseling restraint was that the plaintiff's First Amendment

retaliation claims were "grounded in administrative detention decisions").  Precisely because

courts lack such expertise, Congress has gone so far as to limit courts' ability to review BOP security and facility designations. *See* 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *Brown v. Holder*, 770 F. Supp. 2d 363, 365 (D.D.C. 2011) (explaining that 18 U.S.C. § 3625 excludes from APA review "cases in which federal inmates are challenging their security classifications and facility designations"). Similarly, the Supreme Court has warned that a court considering whether a prisoner has a liberty interest in his placement in a particular prison unit "ought to afford appropriate deference and flexibility to . . . officials trying to manage a volatile environment." *Sandin v. Conner*, 515 U.S. 472, 482 (1995) (collecting cases). Given the leeway owed to the political branches when it comes to prison administration, the Court is reluctant to insert into that sphere a new form of liability.[2]

In addition, recognizing either of Pinson's retaliation claims under *Bivens* could "create substantial costs" that interfere with prison management indirectly. *See Abbasi*, 137 S. Ct. at

---

[2] Pinson's refusal-to-investigate claim touches on another domain that belongs to the Executive: the discretion it enjoys in initiating and conducting investigations. "The power to decide when to investigate . . . lies at the core of the Executive's duty to see to the faithful execution of the laws," so "when reviewing the exercise of that power, the judicial authority is . . . at its most limited." *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986). Indeed, because deciding when and how to investigate an alleged violation of law involves "a complicated balancing of a number of factors which are peculiarly within [an agency's] expertise" courts typically cannot review those kinds of decisions at all. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *see also US Airline Pilots Ass'n v. Pension Benefit Guar. Corp.*, No. 09-cv-1675, 2011 WL 13273132, at *4 (D.D.C. Mar. 14, 2011); *Giacobbi v. Biermann*, 780 F. Supp. 33, 37 (D.D.C. 1992), *aff'd*, No. 92-5095, 1992 WL 309042 (D.C. Cir. Oct. 6, 1992).

Similar separation-of-powers concerns are present in the correctional setting. While BOP officials must "[c]onduct an investigation into each" administrative complaint they receive, they still decide how to investigate those complaints. *See* 28 C.F.R. § 542.11(a). Authorizing a refusal-to-investigate claim under *Bivens* would require a court to second-guess BOP officials' chosen response and determine whether it amounted to an investigation. That sort of judicial intrusion into a characteristically executive function is an additional factor counseling hesitation.

1856. "[T]he decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide," including "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself." *Id.* at 1858. Retaliation claims like Pinson's may have a far-reaching impact. They are "easy to allege and difficult to prove," which means they are "'easily fabricated' and cannot be readily dismissed on the pleadings." *Mack*, 968 F.3d at 324–25 (quoting *Bistrian*, 912 F.3d at 96). Permitting retaliation claims under *Bivens* could therefore "clog the courts and burden individual prison officials with the costs and resources needed to defend such suits." *Id.* at 325. Beyond the financial consequences of recognizing this new category of liability, "the fear of such suits and the efforts needed to defend against them may detract from an officer's ability to properly fulfill his duties to the federal government." *Id.*; *see also Abbasi*, 137 S. Ct. at 1863 ("If *Bivens* liability were to be imposed, high officers who face personal liability for damages might refrain from taking urgent and lawful action in a time of crisis."). In a sensitive area such as prison administration, the legislative and executive branches are better positioned than this Court to "weigh the costs and benefits of allowing a damages action to proceed." *See Abbasi*, 137 S. Ct. 1857–58; *see also Mack*, 968 F.3d at 325; *Bistrian*, 912 F.3d at 96.[3]

---

[3] While *Carlson* also took place in a correctional setting, it did not categorically permit judicial intrusion into prison administration. For one thing, Pinson's retaliation claims are more invasive than the "medical care issues . . . at issue in *Carlson*" because they "require analysis of the reasoning, motivations, or actions of prison officials." *See Bistrian*, 912 F.3d at 95 n.23; *see also Mack*, 968 F.3d at 322–23. For another thing, now that "expanding the *Bivens* remedy is . . . 'disfavored,'" the Court is more skeptical of attempts to create new *Bivens* claims than of suits invoking already-existing *Bivens* claims. *See Abbasi*, 137 S. Ct. at 1857 (citation omitted); *see also id.* at 1856 ("[I]t is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today."); *cf. Callahan*, 965 F.3d at 525 (distinguishing between "a *Bivens* claim already in existence" and "the creation of a new *Bivens* claim" when discussing the relevance of special factors).

Ordinarily, another special factor would probably counsel hesitation too: there is an alternate remedial scheme for prisoners.  The BOP's Administrative Remedy Program ("ARP") "allow[s] an inmate to seek formal review of an issue relating to any aspect of his/her own confinement."  28 C.F.R. § 542.10; *see also Malesko*, 534 U.S. at 74.  The ARP is "substantial; it contains its own statutes of limitations, filing procedures, and appeals process.  And prisoners may retain attorneys for assistance with the process."  *Callahan*, 965 F.3d at 524 (citing 28 C.F.R. 542.13–.16).  BOP officials must "[c]onduct an investigation" and "[r]espond to" prisoners' ARP grievances.  28 C.F.R. § 542.11.  Because the ARP provides prisoners with "an avenue for some redress," *Malesko*, 534 U.S. at 69; *see also id.* at 74, it likely "amoun[ts] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages," *see Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).  Several circuit courts have held as much.  *See, e.g.*, *Mack*, 968 F.3d at 320–21; *Callahan*, 965 F.3d at 523–24; *Vega*, 881 F.3d at 1153.

Nevertheless, Pinson argues that the ARP was effectively unavailable to her because BOP officials refused to investigate her complaints.  Pl.'s Opp'n at 18.  There are some cases indicating that, when officials obstruct a plaintiff's access to an alternative remedial scheme, that scheme should not foreclose a *Bivens* remedy.  *See, e.g.*, *Himmelreich v. Fed. Bureau of Prisons*, No. 10-cv-2404, 2019 WL 4694217, at *11 (N.D. Ohio Sept. 25, 2019); *Jerra v. United States*, No. 12-cv-1907, 2018 WL 1605563, at *5 (C.D. Cal. Mar. 29, 2018).  Yet those cases appear to be in tension with the rationale behind the alternative-remedial-scheme analysis.  Courts do not look to the existence of such a scheme to ensure the fair treatment of an individual plaintiff.  *Cf. Wilson v. Libby*, 535 F.3d 697, 709 (D.C. Cir. 2008) ("The special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or

she wishes to pursue.").  Instead, the existence of an alternative scheme implies that

"congressional inaction" in declining to provide a damages remedy "has not been inadvertent,"

so the Judiciary should not interfere.  *See Chilicky*, 487 U.S. at 423; *see also Liff v. Off. of*

*Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 921 (D.C. Cir. 2018) ("Even if gaps

remain in the overlapping and extensive . . . remedies, Congress's activity in this area counsels

against a judicially created *Bivens* remedy.").[4]  It is thus "the comprehensiveness of the . . .

scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels

judicial abstention."  *Spagnola v. Mathis*, 859 F.2d 223, 227 (D.C. Cir. 1988) (en banc) (per

curiam) (citing *Chilicky*, 487 U.S. at 423).[5]  The ARP—with its broad coverage and "substantial"

procedures, *Callahan*, 965 F.3d at 524—seems comprehensive enough to suggest that

---

[4] The alternative scheme does not need to be Congress's creation to counsel hesitation before recognizing a *Bivens* remedy.  *Callahan*, 965 F.3d at 524 (citing *Minneci v. Pollard*, 565 U.S. 118, 126–31 (2012)); *see also Malesko*, 534 U.S. at 74 (discussing the ARP as an alternative scheme).  "'Alternative remedial structures' can take many forms, including administrative, statutory, equitable, and state law remedies."  *Vega*, 881 F.3d at 1154.

[5] Pinson's access to injunctive and habeas corpus relief likely weighs against the creation of a *Bivens* action too.  The Supreme Court suggested as much in *Abbasi*.  While remanding a claim to the court of appeals to conduct a special factors analysis, it noted that "the existence of alternative remedies usually precludes a court from authorizing a *Bivens* action" and observed that an injunction and a writ of habeas corpus "might have been . . . available" to the prisoner plaintiffs.  *See* 137 S. Ct. at 1865.  Pinson cannot dispute the availability of injunctive relief here—that is the object of her official-capacity claims.  And though the Supreme Court has "left open the question" of whether prisoners "might be able to challenge their confinement conditions via a petition for a writ of habeas corpus," *id.* at 1862–63, the D.C. Circuit has said they can, *see Aamer v. Obama*, 742 F.3d 1023, 1036 (D.C. Cir. 2014).  *Abbasi* indicates that the availability of these two avenues of relief weakens—if not precludes—Pinson's case for an implied cause of action under *Bivens*.  *Cf. Jangjoo v. Sieg*, 319 F. Supp. 3d 207, 218 (D.D.C. 2018) (holding that injunctive relief available under the APA was an alternative remedy that counseled hesitation, even though the plaintiff also sought money damages); *Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1208–09 (11th Cir. 2016) (holding that a detained alien's access to habeas relief was an alternative remedy that indicated a *Bivens* remedy was inappropriate).

"Congress . . . has 'not inadvertently' omitted damages remedies" for prisoners.  *See Spagnola*, 859 F.2d at 228.[6]

In any case, the Court does not need to decide whether Pinson's impeded access to the ARP warrants disregarding the scheme in its special-factors analysis.  It is sufficient that prison management is traditionally the province of the political branches and that they are best suited to weigh the costs and benefits of recognizing a new cause of action in that context.  *See Arar v. Ashcroft*, 585 F.3d 559, 573 (2d Cir. 2009) (en banc) (declining to decide availability issue because, regardless, other special factors counseled hesitation).  The Court therefore agrees with nearly every other court to have addressed the issue and holds that prisoners cannot bring First Amendment retaliation claims under *Bivens*.[7]  Pinson's individual-capacity claims are dismissed.

### B.  Pinson's Requests for Injunctive Relief

The Court now turns to Pinson's official-capacity claims for injunctive relief.  It first dismisses her retaliatory transfer claim as moot.  Then, it grants summary judgment to Defendants on her refusal-to-investigate claim.

---

[6] By contrast, the Court does not infer from silence on the topic of *Bivens* suits in the Prison Litigation Reform Act ("PLRA") that Congress intended to preclude such suits.  That Act "has been interpreted to govern the process by which federal prisoners bring *Bivens* claims," so it "cannot rightly be seen as dictating that a *Bivens* cause of action should not exist at all." *Bistrian*, 912 F.3d at 93; *see also Porter v. Nussle*, 534 U.S. 516, 524 (2002) (explaining that the PLRA requires federal prisoners suing under *Bivens* to "exhaust inmate grievance procedures"). Indeed, Congress enacted the PLRA "to reduce the quantity and improve the quality of prisoner suits," *Nussle*, 534 U.S. at 524, not "eliminate whole categories of claims through silence and implication," *Bistrian*, 912 F.3d at 93 n.22.  Moreover, the "argument is untenable" because "it would arguably foreclose all *Bivens* claims brought in the prison context, which would run counter to the Supreme Court's ruling in *Carlson*."  *Mack*, 968 F.3d at 324.

[7] *See Mack*, 968 F.3d at 325; *Callahan*, 965 F.3d at 525; *Bistrian*, 912 F.3d at 96; *Vega*, 881 F.3d at 1155; *see also Akande v. Philips*, No. 17-cv-01243, 2018 WL 3425009, at *8 (W.D.N.Y. July 11, 2018) ("[N]ationwide, district courts seem to be in agreement that, post-*Abbasi*, prisoners have no right to bring a *Bivens* action for violation of the First Amendment." (citation omitted)).

1.  Pinson's Retaliatory Transfer Claim

Pinson's retaliatory transfer claim is moot.  Mootness is an Article III jurisdictional doctrine that "limits federal courts to deciding actual, ongoing controversies."  *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011) (quoting *Clarke v. United States*, 915 F.2d 699, 700–01 (D.C. Cir. 1990) (en banc)).  Courts must "evaluat[e] mootness 'through all stages' of the litigation in order to ensure there remains a live controversy."  *21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 198 (D.C. Cir. 2003) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).  If facts develop such that a "decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future," a case is moot and the court should not decide it.  *Am. Bar Ass'n*, 636 F.3d at 645 (quoting *Clarke*, 915 F.2d at 701).

Because the BOP transferred Pinson away from ADX Florence, Pl.'s Resp. SOMF ¶ 113, Pinson is left requesting "injunctive relief prohibiting BOP officials from transferring [her] to ADX in the future."  Pl.'s Opp'n at 27.  That would change nothing for her now.  So for a live controversy to remain, there must be a "more-than-speculative chance" that BOP officials will transfer her back to ADX Florence in the future because she exercised her First Amendment rights.  *See Am. Bar Ass'n*, 636 F.3d at 645 (citation omitted).  That question overlaps with the mootness exception that Pinson invokes to keep her claim alive: the voluntary cessation doctrine.  Under that doctrine, a defendant's voluntary cessation of challenged conduct cannot moot a case unless "(i) 'there is no reasonable expectation . . . that the alleged violation will recur,' and (ii) 'interim relief or events have completely and irrevocably eradicated the effects of the alleged

violation.'" *Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016) (omission in original) (quoting *Am. Bar Ass'n*, 636 F.3d at 648).[8]

There is no reasonable, more-than-speculative chance that BOP officials will again transfer Pinson to ADX Florence in retaliation for her exercising First Amendment rights. As an initial matter, "where the defendant is a government actor—and not a private litigant—there is less concern about the recurrence of objectionable behavior." *Citizens for Responsibility & Ethics in Wash. v. SEC*, 858 F. Supp. 2d 51, 61–62 (D.D.C. 2012) (collecting cases from other circuits); *see also Comm. in Solidarity With People of El Salvador (CISPES) v. Sessions*, 929 F.2d 742, 745 (D.C. Cir. 1991) (explaining that, in deciding "whether a case presents a live controversy," it is "settled practice" to accept government defendants' representations regarding cessation). More significantly, the sources of the retaliatory motive that Pinson asserts are gone. She says it herself: "Dignam and Samuels are no longer employed by the BOP." Pl.'s Opp'n at 27. "[W]here the conduct challenged is personal to the original named defendant, even though he was sued in his official capacity, a request for prospective injunctive relief is mooted when the defendant resigns." *Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 788 (D.C. Cir. 1981). Pinson's suit targets Samuels and Dignam personally as the ones who harbored a retaliatory motive against her. *See* SAC at 16 (requesting relief "enjoining defendants Samuels and Dignam from further acts of retaliation"). She mentions that her First Amendment activities

---

[8] Attempting to show that leaving ADX Florence did not eliminate all the effects of the retaliatory transfer, Pinson argues that her time there inflicted "irreparable" harm by "exacerbat[ing] her mental health conditions." Pl.'s Opp'n at 27. But granting her request for an injunction prohibiting future retaliatory transfers to ADX Florence would not redress her "irreparable" injury. That kind of injury lends itself to money damages, which are barred by sovereign immunity. *See Clark v. Library of Cong.*, 750 F.2d 89, 103 (D.C. Cir. 1984) ("Sovereign immunity . . . bar[s] suits for money damages against officials in their official capacity absent a specific waiver by the government." (emphasis omitted)).

annoyed BOP staff generally, Pl.'s Opp'n at 33–34, but her discussion of the retaliatory transfer focuses on the actions and motivations of Samuels (who ultimately signed off on the transfer), *id.* at 39–42. With him gone, there is no "reasonable expectation" that his successors will again transfer Pinson to ADX Florence in retaliation for her First Amendment activities. *Cf. Spomer v. Littleton*, 414 U.S. 514, 521–22 (1974) (remanding for mootness analysis an official-capacity suit for injunctive relief against a State's Attorney because the suit was "based upon an alleged practice of willful and malicious racial discrimination" that was "personal to" the named defendant, who had left office). Pinson does not point to any evidence suggesting otherwise. *Cf. Network Project v. Corp. For Pub. Broad.*, 561 F.2d 963, 967 (D.C. Cir. 1977) (dismissing as moot claim when "the wrongful conduct charged is personal to the named defendant," the named defendant had left office, and the plaintiffs "ha[d] not averred that it is departmental policy to follow the practices charged"). Indeed, in the six years since Pinson was transferred from ADX Florence and the five years since Samuels left the BOP, there has been no effort to transfer Pinson back to the supermax prison.

Updated BOP guidance on the handling of prisoners who suffer from mental illness makes a second retaliatory transfer even more speculative. While Pinson was housed at ADX Florence, the BOP issued policies that require input by mental health professionals in the designation process for mentally ill inmates. Defs.' Mot. at 34–35; *see also* Pl.'s Resp. SOMF ¶¶ 33–41; Defs.' Mot. Exs. 14–15. One policy provides that "seriously mentally ill inmates" will "ordinarily" not be placed at ADX Florence except when "extraordinary security needs are identified that cannot be managed elsewhere." Defs.' Mot., Ex. 15, at 19; *see also* Pl.'s Resp. SOMF ¶ 40. In fact, Defendants say that these new policies led to Pinson's transfer out of ADX Florence. *See* Defs.' Mot. at 35; Defs.' Reply at 11. Pinson retorts that, despite new

requirements for ADX referrals depending on an inmate's "care level," "transfer is not prohibited" for any inmate.  Pl.'s Opp'n at 30; *see also* Defs.' Mot., Ex. 15, at 19.  But while the policies do not prohibit the BOP from transferring Pinson back to ADX Florence, they certainly make it harder for officials to do so without a legitimate basis.

Cases holding that prisoners' suits were not mooted by a prison transfer do not help Pinson.  Instead, they underscore the lack of evidence showing a likelihood of recurrence in her case.  In *Aref v. Lynch*, for instance, the D.C. Circuit held that the voluntary cessation exception permitted prisoners to challenge their designation to Communication Management Units ("CMUs") even though the BOP had transferred them back into the general population since the lawsuit began.  *Id.* at 250–51.  The court noted that "normally a prisoner's transfer or release from a prison moots any claim he might have for equitable relief arising out of the conditions of his confinement in that prison."  *Id.* at 251 (cleaned up) (quoting *Scott v. District of Columbia*, 139 F.3d 940, 941 (D.C. Cir. 1998)).  But it observed that the plaintiffs had "point[ed] to the likelihood of redesignation from general population to a CMU."  *Id.*  Specifically, one of them had been previously "designated to a CMU, transferred back into the general population[,] and then redesignated to a CMU."  *Id.* (quoting *Aref v. Holder*, 774 F. Supp. 2d 147, 158 (D.D.C. 2011)).  The court went on to hold that the government had not shown that the allegedly wrongful conduct "could not reasonably be expected to recur."  *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).  A more recent case permitted a prisoner to challenge conditions in Special Housing Units because, although he was not then housed in one, he had been housed in them eight times previously and had suffered "a uniform set of deprivations" each time.  *Reid v. Hurwitz*, 920 F.3d 828, 834 (D.C. Cir. 2019) (applying the mootness exception for claims capable of repetition, yet evading review, which

requires a reasonable expectation that the plaintiff will be subject to the challenged conduct again).  Unlike those cases, there is no evidence that BOP officials will again retaliate against Pinson by assigning her to ADX Florence.  Her removal from that facility thus moots her official-capacity claim for retaliatory transfer. [9]

### 2.  Pinson's Retaliatory Refusal-to-Investigate Claim

Finally, the Court awards summary judgment to Defendants on Pinson's retaliatory refusal-to-investigate claim.  To prove a claim for First Amendment retaliation, a plaintiff must show: "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him."  *Aref*, 833 F.3d at 258 (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)).  Defendants do not dispute that Pinson engaged in First Amendment–protected activities.  Instead, they argue that Pinson has failed to demonstrate that Samuels and Dignam took any retaliatory action against her at all.  *See* Defs.' Mot. at 37–38; Defs.' Reply at 18–21.  If one characterizes Pinson's claim as attacking the BOP's failure to investigate (as the parties do in their briefs), then Defendants are right.  If Pinson instead challenges Samuels and

---

[9] Pinson informed the Court that the BOP recently transferred her to a new facility and that she continues to suffer mistreatment at the hands of BOP officials.  *See* ECF No. 488. Although she asserts troubling conduct by BOP personnel, the new information does not help her claims here.  First, her status update suggests that she was transferred because her health was in danger—not out of retaliation.  *See id.*; *see also Pinson v. Othon*, No. 20-cv-169, 2020 WL 7404587, at *2 (D. Ariz. Dec. 17, 2020).  Second, Pinson alleges conduct exhibiting a retaliatory motive by BOP staff but not by anyone senior enough to effectuate her transfer back to ADX Florence.  *See* Pl.'s Opp'n, Ex. 1 at 115:23–116:2 (Samuels testifying that he, as an assistant director, made the "final decision" to transfer Pinson to ADX Florence in 2011).  Finally, Pinson's suit seeks to avoid a transfer to ADX Florence specifically.  *See* Pl.'s Opp'n at 5, 27. Transfers to facilities other than that most secure supermax prison do not tend to show that the BOP is likely to return her to ADX Florence, especially given the BOP's guidelines generally prohibiting prisoners with serious mental health issues from being placed there.

Dignam's *threats* not to investigate her complaints, then she runs into another problem: mootness.  Either way, Defendants are entitled to summary judgment.

First, Pinson points to no evidence indicating that Samuels and Dignam actually refused to investigate a complaint of hers when they should not have.  She alludes to the possibility that BOP officials can abuse the discretion they enjoy in deciding whether a prisoner complaint deserves an investigation.  *See* Pl.'s Opp'n at 43.[10]  But even after Defendants produced summaries of hundreds of her complaints and their dispositions, *see* Defs.' Mot., Ex. 50, ECF No. 478-4 (OIA complaints); *id.* Exs. 39–48, ECF Nos. 477-40 to -49 (administrative complaints), Pinson does not attempt to prove up a single instance when a complaint improperly went uninvestigated.[11]  The Court is thus left with only Pinson's conclusory allegation that the BOP failed to investigate some unspecified, unidentified complaints.  *See* Pl.'s Opp'n at 43.  Because Pinson has not pointed to specific facts in the record to support her charge that Samuels or Dignam took the retaliatory action of stifling investigations into her complaints, a charge based on the BOP's refusal to investigate cannot survive summary judgment.  *See Celotex Corp.*, 477 U.S. at 324; *cf. Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (granting summary judgment against employee who put forth no evidence to support retaliatory animus other than a cursory allegation in an affidavit).

---

[10] Pinson does not challenge the BOP's procedure for classifying complaints and determining which ones require an investigation.  *See* Pl.'s Opp'n at 43.

[11] Pinson mentions one possible example in her response to Defendants' statement of material facts.  Pl.'s Resp. SOMF ¶ 171.  She alleged in a complaint that BOP correctional officers called her homophobic slurs, kept legal papers from her, and withheld kosher meals from her.  *See* Defs.' Mot., Ex. 50, at 135–36.  Although BOP OIA classified the complaint as requiring investigation, the narrative field in OIA's system merely states: "There is insufficient evidence to support . . . [the] allegations."  *Id.* at 136.  On its own, however, that description does not establish whether or not BOP officials investigated the complaint.  And Pinson identifies no other evidence that could shed light on that complaint.

Second, to the extent Pinson's claim is premised on Samuels and Dignam's alleged threats to ignore her complaints, the claim is moot.[12]  *See Moreau v. FERC*, 982 F.2d 556, 566 n.4 (D.C. Cir. 1993) (explaining that courts are obligated to assess mootness *sua sponte* because it is a jurisdictional issue), *overruled on other grounds by Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020).  Once again, she attacks conduct personal to named defendants who have left the BOP.  *See Nat'l Treasury Emp. Union*, 654 F.2d at 788.  Samuels and Dignam were the ones alleged to have retaliatory animus against her, *see* SAC at 16, and Pinson does not assert that their successors have continued to threaten her access to the BOP administrative grievance system, *see Network Project*, 561 F.2d at 967.  As a result, an injunction forbidding BOP officials from threatening Pinson again would not affect her present rights and would guard against only a speculative risk of future threats.  *See Am. Bar Ass'n*, 636 F.3d at 348.[13]  Any claim based on Samuels and Dignam's threats is therefore moot.

---

[12] As the Court already held, an official's threat not to investigate future complaints could constitute a retaliatory act because it would deter an ordinary plaintiff from engaging in protected speech again.  *See Pinson II*, 246 F. Supp. 3d at 224 & n.11; *see also Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) ("[T]he mere *threat* of harm can be an adverse action . . . ." (alteration and omission in original) (citation omitted)).  Nevertheless, Pinson does not press this theory in her briefing, *see* Pl.'s Opp'n at 42–45, so—notwithstanding mootness—she has forfeited it.  *See Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[U]ndeveloped arguments . . . are deemed waived.").

[13] Notably, Pinson does not articulate what injunctive relief for her official-capacity claim should consist of now that Samuels and Dignam have left the BOP.  In a refusal-to-investigate claim where (unlike here) the plaintiff had identified a complaint that went uninvestigated, the remedy would be clear: require current officials to investigate the complaint.  When the claim is based on seemingly unexecuted threats from officials who are no longer with the BOP, however, an order requiring those officials' successors not to threaten the plaintiff again is the best the Court could do.

## V.  CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss, motion for reconsideration, and renewed motion for summary judgment.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: January 8, 2021                                            RUDOLPH CONTRERAS
                                                                  United States District Judge